# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-80483-DMM

UNITED STATES OF AMERICA *ex rel*.
BRIAN BUTLER and MARK PHILIPP,

      Plaintiffs/Relators,

v.

MAZIN SHIKARA; MEDICAL CONSULTANTS OF
FLORIDA, LLC; WELL-LIFE GROUP, LLC;
MEDICAL CONSULTANTS MANAGEMENT,
LLC; HUMANA MEDICAL PLAN, INC.;
COVENTRY HEALTH PLAN OF FLORIDA, INC.;
AETNA HEALTH, INC.; UNITEDHEALTHCARE
OF FLORIDA, INC.; MMM OF FLORIDA, INC.;
AND FREEDOM HEALTH, INC

      Defendants.

_____/

## AMENDED FALSE CLAIMS ACT COMPLAINT

CONTENTS

**INTRODUCTION** ..................................................................................................................4

**JURISDICTION AND VENUE** ..........................................................................................6

**PROCEDURAL HISTORY** ................................................................................................7

**PARTIES** ...............................................................................................................................7

    The Relators ......................................................................................................................7

    Defendant Mazin Shikara ................................................................................................8

    Defendant Medical Consultants of Florida, LLC ........................................................10

    Defendant Well-Life Group, LLC .................................................................................11

    Defendant Medical Consultants Management, LLC .....................................................13

    Defendant Humana Medical Plan, Inc. .........................................................................14

    Defendants Coventry Health Plan of Florida, Inc. & Aetna Health, Inc. .....................14

    Defendant UnitedHealthcare of Florida, Inc. ...............................................................15

    Defendant MMM of Florida, Inc. .................................................................................15

    Defendant Freedom Health, Inc. ...................................................................................15

**THE FALSE CLAIMS ACT** ..............................................................................................15

**THE FEDERAL ANTI-KICKBACK STATUTE** ...........................................................18

**THE MEDICARE ADVANTAGE PROGRAM** ...............................................................21

    Medicare Part C .............................................................................................................21

    How Medicare Advantage Plans Pay Primary Care Physicians ...................................23

    How Medicare Advantage Plans Pay Insurance Agents ...............................................25

    "Street Level" Agent Commission ...............................................................................26

    FMO Fees, Administrative Fees or "Overrides" ..........................................................27

    How Shikara Moves Patients From One Plan to Another .............................................27

**LEGAL RESTRICTIONS ON MARKETING MEDICARE ADVANTAGE PLANS** .......................28

**Defendant MA Organizations Promised to Comply with the AKS and Medicare Rules and Regulations** ......29

**Medical Consultants and Shikara Promised to Comply with the AKS and Medicare Rules and Regulations** 30

**The Well-Life Agency Promised to Comply with the AKS and Medicare Rules and Regulations** ....................31

**Medicare Advantage Organizations Remain Liable for Violations by Vendors** ...............................32

    MA Organization and First Tier or Downstream Entities Cannot Pay or Receive Kickbacks ...................33

    Participants Cannot Discriminate Based on Health Status ...........................................34

    Participants Cannot Use Providers to Influence Insurance Decisions ..........................35

    Participants Cannot Engage in Direct Solicitation, Cold-Calling, or Use HIPAA-Protected Materials for Solicitation ........37

**THE FRAUDULENT SCHEMES** .....................................................................................39

    Overview ........................................................................................................................39

    Shikara and His Entities Steered Patients to Humana in Exchange for Kickbacks from Humana .............43

**Shikara and His Entities Steered Patients to Coventry/Aetna in Exchange for Kickbacks from Coventry/Aetna** ..............................................................................................................47

**Shikara and His Entities Steered Patients to United/Preferred Care Partners in Exchange for Kickbacks from United/Preferred Care Partners** ................................................................51

**Shikara and His Entities Steered Patients Away From Molina and to Humana and United/PCP in Exchange for Kickbacks from Those Defendants** ...............................................................57

**Shikara and His Entities Steered Patients to MMM in Exchange for Kickbacks from MMM** ....................61

**Shikara and His Entities Steered Patients to Freedom in Exchange for Kickbacks from Freedom.**............68

**Defendants Discriminated Based on Health Status.** ............................................................72

**Shikara Paid Kickbacks for Referrals of Patients From Agents.** ..............................................75

**RELATORS OBJECT TO THE FRAUD** ............................................................................78

**CONDITIONS PRECEDENT** ....................................................................................79

**COUNT I** ..................................................................................................79

**COUNT II** .................................................................................................79

**COUNT III** ................................................................................................80

**COUNT IV** ................................................................................................81

**COUNT V** .................................................................................................81

**COUNT VI** ................................................................................................82

**COUNT VII** ...............................................................................................83

**COUNT VIII** ..............................................................................................83

**COUNT IX** ................................................................................................84

**COUNT X** .................................................................................................85

**COUNT XI** ................................................................................................85

**COUNT XII** ...............................................................................................86

**COUNT XIII** ..............................................................................................87

**COUNT XIV** ..............................................................................................88

**COUNT XV** ...............................................................................................88

**COUNT XVI** ..............................................................................................89

**COUNT XVII** .............................................................................................90

**COUNT XVIII** ............................................................................................90

**COUNT XIX** ..............................................................................................91

**COUNT XX** ...............................................................................................92

**COUNT XXI** ..............................................................................................92

**COUNT XXII** .............................................................................................93

**COUNT XXIII** ............................................................................................94

**COUNT XXIV** ............................................................................................94

**COUNT XXV** .............................................................................................95

**COUNT XXVI** ............................................................................................95

**COUNT XXVII** ...........................................................................................96

**PRAYERS FOR RELIEF** ....................................................................................97

The Relators, Brian Butler and Mark Philipp, bring this *qui tam* action in the name of the United States against Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; Medical Consultants Management, LLC; Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. (hereafter "Defendants") and states as follows:

## INTRODUCTION

1.      The Relators submit this Amended Complaint pursuant to the False Claims Act ("False Claims Act" or "FCA"), 31 U.S.C. §§ 3729 *et seq*.  This Amended Complaint alleges violations of the False Claims Act by a South Florida doctor, Mazin Shikara, along with a number of companies under his control, and six Medicare Advantage Organizations ("MA Organizations"): Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. (collectively, "Defendant MA Organizations").  Relators bring this action for false and/or fraudulent statements, records, and claims made and caused to be made, by Defendants and their respective affiliates, subsidiaries, owners, and parent companies, in connection with defrauding Government Health Care Programs, in violation of the False Claims Act.

2.      As set forth below, Shikara operates a large primary care practice in South Florida, Medical Consultants of Florida, Inc. ("Medical Consultants").  This practice has ten (10) offices and specializes in serving Medicare Advantage patients.  Shikara also operates a Management Services Organization, Medical Consultants Management, LLC (the "MSO"), through which he handles all, or nearly all, interactions between the Defendant MA Organizations and approximately twenty additional physicians.  All told, between his own substantial practice and the MSO, Shikara has a base of approximately 4,000 Medicare beneficiaries.

3.     Notably, Shikara also owns and controls an insurance agency (the "Well-Life Agency") that specializes in selling plans offered by Medicare Advantage Organizations to Medicare beneficiaries.  On official paperwork filed with the Florida Division of Corporations, Shikara has placed this company under the names of relatives, including his sister and his wife.  In reality, however, Shikara has always controlled all day-to-day operations of the Well-Life Agency.

4.     In blatant violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and numerous material laws and regulations governing the Medicare Advantage program, Shikara routinely uses his dual role as both a medical provider and insurance agency to steer his large patient base from one MA Organization to another, based solely on which MA Organization is currently paying him the most – whether via provider rates, insurance commissions, or blatant kickbacks, including all-expense paid vacations and money to expand his medical practice.  The Defendant MA Organizations are each active participants and co-conspirators in this kickback scheme; they are fully aware of Shikara's dual role and are eagerly offering him financial and other incentives to convince him to steer his large patient base to their insurance plans.

5.     The conduct detailed in this Amended Complaint began in or around December 2013 and continued thereafter.  As discussed below, this behavior not only violates the AKS (and thus renders all resulting claims false or fraudulent under the False Claims Act), but also turns the Medicare Advantage program completely on its head, making a farce of a carefully constructed regulatory scheme.  The illegal schemes, include but are not limited to, the following:

- Each Defendant MA Organization pays illegal kickbacks to Shikara in the form of: (1) business development and marketing funds, extravagant trips, and other items of value; (2) insurance commissions; and (3) inflated provider rates.  The purpose – and effect – of this is to induce Shikara, and the physicians, MSO, and insurance

agents under his control, to steer Medicare beneficiaries to the Defendant MA Organizations. As a result, patients are steered from one MA Organization to another, not based on what is best for the patient, but what is best for Shikara and his related entities.

- Shikara implemented a *quid pro quo* kickback scheme by which Shikara and Medical Consultants provide insurance leads to independent insurance agents, but only if those agents refer a threshold number of new patients to Defendant Medical Consultants for primary care services.

- As part these schemes, Defendants engaged in widespread HIPAA violations when using and transferring private health information to unauthorized individuals to solicit Medicare beneficiaries. The private health information itself was even part of the remuneration within the scheme.

- Shikara engaged in other fraudulent behavior leading to liability under the FCA, including providing illegal inducements such as gift cards and free hair and nail salon services (including free rides to these non-medical services) to Medicare Advantage beneficiaries to induce them to use Defendant Medical Consultants and/or Shikara as their primary care physician.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought under the False Claims Act pursuant to 31 U.S.C. §§ 3729 and 3720.

7.      This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because on or more Defendants can be found in, resides in, and transacts substantial business in this district, including business related to Defendants' misconduct.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a), because at least one Defendant can be found in and/or transacts business in this District.

## PROCEDURAL HISTORY

9.      On March 24, 2020, the Relators filed their initial *qui tam* False Claims Act lawsuit under seal.  On August 22, 2023, the Court entered an order unsealing the Complaint, which was subsequently served on each of the Defendants.

10. On December 18, 2023, each Defendant filed a motion to dismiss, and on January 2, 2024, the Court entered an order extending the Relators' time to respond to those motions to dismiss until January 16, 2024.  In accordance with Fed. R. Civ. P. 15(a)(1), Relators now file this Amended Complaint.

## PARTIES

11.      Plaintiff the United States of America is the real party in interest with respect to the *qui tam* claims asserted herein pursuant to 31 U.S.C. § 3730(b).

### The Relators

12.      Relator Brian Butler lives and works in Palm Beach County, Florida.  He holds a license to sell health insurance plans in the State of Florida, and he is the former Executive Director for one of the Defendants in this case, Well-Life Group, LLC ("Well-Life Agency").  As further set forth below, the Well-Life Agency is an insurance agency that specializes in selling plans offered by MA Organizations to Medicare beneficiaries in South Florida.  Relator Butler worked

as the Executive Director of the Well-Life Agency from approximately December 2013 through his resignation in April of 2019.  As the Executive Director, Relator Butler was in charge of recruiting, training and supervising agents to work for the Well-Life Agency in selling Medicare Advantage plans.  Relator Butler reported directly to Defendant Shikara and dealt with him on a daily basis.

13.     Relator Mark Philipp lives and works in St. Lucie County, Florida.  He holds a license to sell health insurance plans in the State of Florida, and he formerly sold Medicare Advantage plans on behalf of the Well-Life Agency.  Relator Philipp holds a B.A. degree from Western New England University.  He also holds a J.D. degree from John Marshall Law School, although he does not practice law and did not serve in any legal counsel capacity during any of the events related to the allegations in this Complaint.  Relator Philipp worked as an independent sales agent on behalf of the Well-Life Agency from approximately May 2013 until April 2019.  During a brief period of time, from approximately December 2013 to February 2014, he also worked as the Compliance Director of the Well-Life Agency, which entailed reviewing contracts between MA Organizations and the Well-Life Agency.  In or around February 2014, Shikara informed Relator Philipp that he was no longer needed in the compliance capacity, but Philipp continued as an independent sales agent until April 2019.  As an independent sales agent, Relator Philipp's duties involved selling Medicare Advantage plans to Medicare beneficiaries on behalf of the Well-Life Agency.  During this time, Relator Philipp interacted with Defendant Shikara on a weekly basis.

**Defendant Mazin Shikara**

14.     Mazin Shikara is a primary care physician who lives and works in Palm Beach County, Florida.  Shikara owns and controls a large primary care practice, Defendant Medical

Consultants of Florida, LLC, doing business as MedFlorida Medical Centers.  This practice has ten (10) offices throughout South Florida and specializes in serving as primary care physician for Medicare beneficiaries with Medicare Advantage plans.

15.     Defendant Shikara also owns and controls the Defendant Well-Life Agency, which is an insurance agency that specializes in selling Medicare Advantage Plans in South Florida.

16.     Defendant Shikara also owns and operates a Management Services Organization, Defendant Medical Consultants Management, LLC.  Shikara's MSO enters into contracts with other primary care physicians in South Florida to provide administrative services, including inter-facing with MA Organizations.  There are approximately twenty (20) physicians within Shikara's MSO umbrella.

17.     As set forth below, Defendant Shikara operates his medical practice, his MSO, and his insurance agency together as part of a web of companies with one, common purpose: to drive Medicare Advantage patients to his medical practice, to be insured by those MA Organizations that pay him the most remuneration, whether through provider reimbursements, insurance commissions, marketing money, or other kickbacks.  To implement this scheme, Shikara negotiates with MA Organizations while wearing simultaneous hats of medical provider, MSO, and insurance agent. He negotiates the highest possible reimbursement rates, insurance commissions, and other benefits for himself.  He then steers his large patient base back and forth between MA Organizations, based on which MA Organization agrees to pay him the most at any given time.

18.     Shikara has enormous control over his patient base and the Medicare Advantage plans they select.  He and his large staff regularly make insurance recommendations to patients, who believe they are receiving neutral advice delivered by medical providers who are acting in their best interests.   Yet in reality, Shikara is simply a salesman, hocking the plans from MA

Organizations that pay him the most at any given time.

**Defendant Medical Consultants of Florida, LLC**

19.      Medical Consultants of Florida, LLC (hereafter "Medical Consultants") is a Florida limited liability company based in Palm Beach County, Florida.  Defendant Shikara owns and controls Medical Consultants and now markets the practice under the name "MedFlorida Medical Centers."  According to records maintained by the Florida Secretary of State, the managing member of this medical practice is the Shikara Family Partnership.  Medical Consultants has ten (10) locations:

Port St. Lucie West Location
672 SW Prima Vista Blvd Suite #101
Port St. Lucie West, Florida 34983

Jupiter Location
3889 Military Trail Suite #101
Jupiter, Florida 33458

Palm Beach Gardens Location
9089 N. Military Trail Suite #37
Palm Beach Gardens, Florida 33410

Wellington Location
1395 State Rd 7. Suite 420
Wellington, Florida 33414

Port St. Lucie East Location
9109 S US-1 Hwy Suite #101
Port St. Lucie, Florida 34952

Aventura Location
21110 Biscayne Boulevard Suite #203
Aventura, Florida 33180

Boynton Beach Location
1485 Gateway Blvd, Ste 102
Boynton Beach, Florida 33426

West Palm Beach Location

944 S. Military Trail Suite-B
West Palm Beach, Florida 33415

Riviera Beach Location
3514 Broadway Avenue, Suite-B
Riviera Beach, Florida 33404

Kissimmee Location
819 N. Central Avenue
Kissimmee, FL 34741

20.     Medical Consultants specializes in serving as primary care physicians to Medicare Advantage patients.  The practice typically enters into contracts with MA Organizations, under which the MA Organization agrees to pay a capitated rate to Medical Consultants to treat a given patient over a given period of time.  These arrangements are intended to incentivize primary care physicians to keep patients healthy.  If a patient remains healthy, the patient will require fewer medical services, and the physician will make more money.  These arrangements incentivize Shikara in a very different way.  As set forth below, he views each Medicare beneficiary as a source of monthly revenue to be maximized in every way possible.

**Defendant Well-Life Group, LLC**

21.     Well-Life Group, LLC (the "Well-Life Agency") is a Florida limited liability company based in Palm Beach County, Florida.  The company now does business as "Preferred Medicare Advisors."   According to records maintained by the Florida Secretary of State, the managing member of the Well-Life Agency is Julissa Shikara, the wife of Defendant Shikara.  In reality, Julissa Shikara has almost nothing to do with this business, and Shikara controls it on a day-to-day basis.  Indeed, Relator Butler, who worked as the Executive Director of the Well-Life Agency has never seen Julissa Shikara perform any work for the company, nor has he ever spoken to her about a business issue.  Instead, Butler took all day-to-day orders from Defendant Shikara or

11

from Shikara's brother-in-law Raul Puente, who was, on paper, the Executive Director of Shikara's MSO.  In reality, Puente served as Shikara's right-hand man, performing work functions for all three businesses – the medical practice, the MSO, and the Well-Life Agency.

22.     The Well-Life Agency specializes in selling Medicare Advantage plans to Medicare beneficiaries in South Florida.  The Agency has contracts to sell Medicare Advantage plans with numerous companies, including all of the Defendant MA Organizations.  Well-Life Agency has an office at 3889 Military Trail, #103, Jupiter, Florida, which is the same physical location as Shikara's MSO and one of his medical practice offices.

23.     Shikara opened the Well-Life Agency in December 2008 (less than two years after he opened Medical Consultants), and he planned, from the very beginning, to use it as a means to control patients and capture added profit by way of insurance commissions.  At the outset, Shikara placed the insurance agency under the name of his sister, Mayada Shikara.  Later, he switched the agency to the name of his wife, Julissa Shikara.

24.     Shikara knew of the conflicts of interest inherent in having a medical provider also serve as an insurance agent.  Indeed, as early as 2013, the former Executive Director of the Well-Life Agency acknowledged this conflict of interest in an email to Relator Butler and multiple other insurance agents.  Specifically, on October 12, 2013, Nate DelToro, the Executive Director at the time wrote as follows:

> there is a special relation between Well-Life group and [Medical Consultants] but we must keep it separate due to conflict of interest. CMS could hurt Well-Life or [Medical Consultants] if they see any activity that they could consider unacceptable.

25.     Yet any purported "separation" between the medical practice and the insurance agency was a fiction.  In reality, Shikara himself controlled virtually every aspect of Well-Life

Agency, from large matters to small, including the following:

- Shikara met with MA Organizations to negotiate contracts on behalf of the Well-Life Agency.

- Shikara supervised employees of the Well-Life Agency. Indeed, the Executive Director of the Well-Life Agency reported to Shikara.

- Shikara signed Well-Life Agency checks on behalf of the company.

- Shikara owned the Well-Life Agency internet domain name.

- In May 2014, Shikara approved the logo for the Well-Life Agency.

- In February 2019, Shikara approved a new website for the Well-Life Agency.

26.     In short, Shikara controlled all aspects of the Well-Life Agency, and he used it to manipulate and steer his Medicare Advantage patients to MA Organizations of his choosing in exchange for a wide variety of kickbacks from those MA Organizations. Moreover, Shikara implemented a *quid pro quo* kickback arrangement with independent insurance agents designed to induce them to refer Medicare beneficiaries to his medical practice. All of this was illegal and has caused millions of dollars in false claims.

**Defendant Medical Consultants Management, LLC**

27.     Defendant Medical Consultants Management, LLC is a Florida limited liability company based in Jupiter, Florida. This defendant (hereafter the "MSO" or "Shikara's MSO") is a Management Services Organization owned and controlled by Shikara. The Shikara MSO enters into contracts with other primary care physicians in South Florida to provide administrative services, including interfacing with MA Organizations. As set forth below, Shikara uses the MSO to manipulate and steer patients, not only from his own medical practice, but also from dozens of other medical practices with whom the MSO enters into contracts.

28.     Shikara employs his brother-in-law, Raul Puente, to work as the Executive Director of the MSO.  On paper, Puente only works for the MSO, but in reality, he performs work for all of Shikara's various businesses, and he plays a key role in steering and switching patients from one MA Organization to another.

29.     Defendants Medical Consultants of Florida, LLC, Well-Life Group, LLC, and Medical Consultants Management, LLC are all entities under the control of Defendant Mazin Shikara and will be referred to herein, collectively, as the "Shikara-controlled Defendants" or "Shikara's entities."

**Defendant Humana Medical Plan, Inc.**

30.     Humana Medical Plan, Inc., ("Humana") is a Delaware for-profit corporation. Humana is an insurance company and MA Organization that contracts with the Center for Medicare and Medicaid Services ("CMS") in order to offer Medicare Advantage plans to Medicare beneficiaries.  As set forth below, Humana was well aware of the multiple hats worn by Shikara, and Humana knowingly paid kickbacks to Shikara to induce him to steer patients to Humana.

**Defendants Coventry Health Plan of Florida, Inc. & Aetna Health, Inc.**

31.     Coventry Health Plan of Florida, Inc. ("Coventry") is a Florida for-profit corporation.  Coventry is an insurance company and MA Organization that contracts with CMS to offer Medicare Advantage Plans to Medicare beneficiaries.  As set forth below, Coventry was well aware of the multiple hats worn by Shikara, and Coventry knowingly paid kickbacks to Shikara to induce him to steer patients to Coventry.

32.     Coventry is a wholly owned subsidiary of Aetna Health, Inc. ("Aetna"), which is a Delaware corporation.  Coventry markets itself as "an Aetna company."  Moreover, as further set forth below, Aetna paid commissions to the Well-Life Agency in exchange for Shikara steering

patients to Coventry.

### Defendant UnitedHealthcare of Florida, Inc.

33.     UnitedHealthcare of Florida, Inc. ("United") is a Florida for-profit corporation. United is an insurance company and MA Organization that contracts with CMS to offer Medicare Advantage Plans to Medicare beneficiaries under the name Preferred Care Partners ("PCP").  As set forth below, United/PCP was well aware of the multiple hats worn by Shikara, and United/PCP knowingly paid kickbacks to Shikara to induce him to steer patients to United/PCP.

### Defendant MMM of Florida, Inc.

34.     MMM of Florida, Inc. ("MMM") is a Florida for-profit corporation.  MMM is an insurance company and MA Organization that contracts with CMS to offer Medicare Advantage Plans to Medicare beneficiaries in Florida.  As set forth below, MMM was well aware of the multiple hats worn by Shikara, and MMM knowingly paid kickbacks to Shikara to induce him to steer patients to MMM.

### Defendant Freedom Health, Inc.

35.     Freedom Health, Inc. ("Freedom") is a Florida for-profit corporation.  Freedom is an insurance company and MA Organization that contracts with CMS to offer Medicare Advantage Plans in Florida.  As set forth below, Freedom was well aware of the multiple hats worn by Shikara, and Freedom knowingly paid kickbacks to Shikara to induce him to steer patients to Freedom.

### THE FALSE CLAIMS ACT

36.     The FCA was enacted during the Civil War, and later amended to enhance the ability of the Government to recover losses sustained as a result of fraud against it.  Congress intended that the amendments would create incentives for individual citizens with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

37.     The FCA creates liability for "any person who," among other things:

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

"conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  31 U.S.C. § 3729(a)(1)(C).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

38.     The FCA provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  For violations occurring between September 28, 1999 and November 1, 2015, the civil penalty amounts range from a minimum of $5,500 to a maximum of $11,000. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999).  For violations occurring on or after November 2, 2015, the civil penalty amounts can reach a maximum of $23,331.

39.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).   The FCA does not require proof that a defendant specifically intended to commit fraud.  *Id*.  Unless otherwise indicated, whenever the words "know," "learn," "discover" or similar words indicating knowledge are used in this Complaint, they mean "knowingly" as defined in the FCA.

40.     The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2).

41.     The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

42.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The FCA requires that the Complaint be filed under seal (without service on the defendant during that time) to allow the

government time to conduct its own investigation and to determine whether to join the suit.  The person bringing the action is known under the FCA as the "relator."

43.     The allegations set forth herein were not publicly disclosed prior to the Court's order unsealing the Complaint.  In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of this Complaint, Relators are each "original sources" as that term is used in the FCA.

44.     To Relators' knowledge, there are no prior pending complaints against Defendants alleging similar facts related to Defendants' fraudulent schemes.

45.     Prior to the filing of this Complaint, Relators made substantive disclosures to the Government of facts and evidence underlying the allegations in this Complaint.

45.     This action is filed *in camera* and under seal pursuant to the requirements of the FCA.

**THE FEDERAL ANTI-KICKBACK STATUTE**

46.     The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1972 and has been amended many times since. To protect the integrity of government health care programs, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

47.     The Anti-Kickback Statute prohibits any person or entity from making or accepting "any remuneration" to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute's prohibition applies to both sides of an

impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute

provides, in pertinent part:

> (b) Illegal remunerations
>
> (1) Whoever knowingly and willfully ***solicits or receives*** any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.
>
> (2) Whoever knowingly and willfully ***offers or pays*** any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order, or arrange for or recommend purchasing,   leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b) (emphasis added).

48.     The AKS further defines "remuneration" to include "transfers of items or services

for free or for other than fair market value." *Id.* § 1320a-7a(i)(6).  Underscoring the breadth of the

statutory definition, the HHS OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form whatsoever." *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 66 Fed. Reg. 23731, 23734 (May 5, 2003) (Anti-Kickback Statute addresses the offer or payment of "anything of value").

49.     Compliance with the federal Anti-Kickback Statute is, and has long been, a precondition to participation and to payment as a health care provider under Medicare. Courts, including the Eleventh Circuit, have held that a violation of the AKS makes a subsequent claim for payment to Medicare or Medicaid actionable under the FCA. *See e.g., U.S. ex rel. McNutt v. Haleyville Medical Supplies, Inc.,* 423 F.3d 1256, 1260 (11th Cir. 2005) (holding that a violation of the AKS makes a subsequent claim for payment to Medicare or Medicaid actionable under the FCA); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 312-14 (3d Cir. 2011) (holding that an FCA claim can be stated against an MA Organization alleged to have paid kickbacks to physicians in exchange for referrals).

50.     The Patient Protection and Affordable Care Act of 2010 ("PPACA") amended the AKS to explicitly state and clarify the already well-established rule that a claim submitted to a federal health care program that was procured by kickbacks in violation of the AKS constituted "a false or fraudulent claim" for purposes of the FCA. 42 U.S.C. §1320a-7b (g) ("a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Accordingly, claims for payment for services that result from kickbacks are false or fraudulent under the FCA.

51.     In addition, PPACA clarified that no actual knowledge of the section or specific intent to commit a violation of the section is required. 42 U.S.C. §1320a-7b(h); *see United States*

*v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013) (citing *United States v. Starks*, 157 F.3d 833, 838 (11th Cir.1998)).

52.     The Anti-Kickback Statute contains safe harbors that exempt certain transactions from its prohibitions because such practices are not likely to result in fraud or abuse.  *See* 42 U.S.C. § 1320a-7(b)(3).  Safe harbor protection is only afforded to those arrangements that meet all of the specific conditions set forth in the regulations. Defendants' conduct does not fall within any regulatory safe harbor.

53.     Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by such a safe harbor or exception.  The Government need not prove as part of its affirmative case that a defendant's conduct at issue does not fit within a safe harbor.

54.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

55.     As noted below, pursuant to provider agreements and other forms, providers, MA Organizations, and others who participate in Medicare generally must certify that they have complied with all applicable federal and state rules and regulations, including applicable anti-kickback statutes, and compliance with the Anti-Kickback Statute is a condition of payment by the Medicare and other federal health care programs. 42 U.S.C. §§ 1320a-7(b)(7).

## THE MEDICARE ADVANTAGE PROGRAM

### Medicare Part C

56.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395gg, establishes the Health Insurance for the Aged and Disabled Program, popularly known as Medicare.  The

Medicare Program is composed of four parts, known as Medicare Part A, B, C, and D.  Medicare

Parts A, B and D are not directly at issue in this case.  Part C, also known as "Medicare Advantage,"

authorizes Medicare beneficiaries to opt out of traditional fee-for-service coverage under Medicare

Parts A and B and instead enroll in privately managed care plans (known as "Medicare Advantage

plans") that provide coverage for both inpatient and outpatient services (except hospice).  *See* 42

U.S.C. §§ 1395w–21, 1395w–28.  The Medicare program is administered by CMS.

    57.    Medicare Part C authorizes private insurance companies, known as MA

Organizations or Plan Sponsors, to operate these private health plans and thereby act as

administrators for the United States government in the provision of Medicare benefits.

    58.    Accordingly, Part C allows Medicare beneficiaries to receive all Medicare benefits

through private insurance plans, instead of directly from CMS.  Under Medicare Advantage, the

government pays the MA Organization a monthly "capitation" amount per beneficiary enrolled in

one of the MA Organization's Medicare Advantage plans, which is based on various factors,

including the beneficiary's geographic location and health status / medical conditions.  Thus, every

month, CMS pays the MA Organizations a capitated amount for each beneficiary who is enrolled

in one of its Medicare Advantage plans.  The MA Organization, in turn, uses these funds to provide

Medicare-covered services and benefits to beneficiaries.

    59.    As a condition for receiving payments from CMS, an MA Organization must, via

its top executives or individuals authorized to sign on their behalf, request payment under the

contract on a document that attests to the accuracy, completeness, and truthfulness of relevant data

that CMS requests.  Specifically, the signatory must attest to the fact that each enrollee for whom

the organization is requesting payment is validly enrolled in an MA plan offered by the MA

Organization and that the information relied upon by CMS in determining payment is accurate, complete, and truthful.

### How Medicare Advantage Plans Pay Primary Care Physicians

60.     MA Organizations provide services to plan members through a network of medical providers.  MA Organizations and their plans build their respective networks by recruiting and entering into contracts with physicians and other medical providers to provide services to plan members.  Once a provider enters into a contract with an MA Organization, the provider is "in network."  This means that plan members can utilize the provider for medical services.

61.     MA Organizations reimburse providers in one of two ways.  First, many contracts call for a traditional fee-for-service model.  Under this model, the provider submits a bill to the MA Organization each time it provides a good or service to a plan member.  The MA Organization then pays the provider based upon a schedule of agreed prices.

62.     Next, MA Organizations can pay providers based on "capitated" agreements. Under this model, the MA Organization pays an agreed-upon capitated rate to the provider for all goods and services.  Capitation is a fixed amount of money per patient, per unit of time, paid in advance to the physician for the delivery of health care services.  The actual amount of money paid is determined by the range and type of services that are provided, the number of patients involved, and the period of time during which the services will be provided.  A variation on these contracts incorporate a level of "risk sharing" whereby, in very general terms, a provider shares in the risk (and potentially the reward) that an MA Organization bears with respect to whether it will ultimately cost more or less than the CMS capitated rate to cover the expenses of a given beneficiary's care over the course of the year.

63.     When the primary care provider signs a capitation agreement, a list of specific services that must be provided to patients is included in the contract. The amount of the capitation will be determined in part by the number of services provided and will vary from one MA Organization to another.   Most capitation payment plans for primary care services include the following:

- Preventive, diagnostic, and treatment services;

- Injections, immunizations, and medications administered in the office;

- Outpatient laboratory tests done either in the office or at a designated laboratory;

- Health education and counseling services performed in the office; and

- Routine vision and hearing screening.

64.     Thus, in a typical capitation arrangement, a primary care physician might agree to accept a monthly rate, for example $100, to care for a given plan member.  If the monthly goods and services provided to the patient exceed $100 in value, the primary care physician loses money. If the monthly goods and services provided to the patient fall below $100 in value, the primary care physician makes a profit.  Under some models, the doctor receives no guaranteed capitated rate and instead works on a full risk model.

65.     With increasing frequency, MA Organizations do not enter into direct contracts with primary care physicians, but instead, enter into contracts with Management Service Organizations, so-called "MSOs."  The MSO acts as a third-party agent for groups of smaller primary care physician practices.  Thus, the MA Organization might enter into a risk sharing agreement with an MSO which, in turn, would recruit primary care providers to become part of the arrangement.  Under this scenario, the MSO would enter into a subcontract with each primary care physician. The MSO would then provide administrative services to the primary care physician

and act as a middleman between the MA Organization and the primary care physician, collecting fees in the process.

66.     As set forth below, Defendant Shikara uses the risk sharing model for most of his provider contracts with MA Organizations.  Moreover, he uses his own MSO to enter into contracts with MA Organizations in order to recruit other primary care physician practices to become part of these contracts.

67.     Shikara negotiates aggressively with MA Organizations to achieve the highest possible capitated rates for caring for plan members.  Moreover, given that he simultaneously serves as insurance agent for most of his patients, he also uses the patients themselves as bargaining chips.  Thus, he regularly asks for higher capitated rates in exchange for promises to move large portions of his own patient base to a given MA Organization.  He frequently adds insurance commissions and insurance-related fees to these negotiations, as further set forth below.

**How Medicare Advantage Plans Pay Insurance Agents**

68.     Like other insurance companies, MA Organizations use insurance agents and brokers to sell their plans to the general public.  Generally, there are two types of agents.  "Captive" agents are those who work directly for the MA Organization.  They are paid employees, and they only sell plans offered by the company that employs them.  "Independent" agents, on the other hand, do not work as employees of any specific MA Organization, but instead enter into contracts that allow them to sell multiple plans from various MA Organizations.

69.     There are thousands of independent agents in the United States.  MA Organizations do not typically recruit these independent agents, but instead enter into contracts with larger organizations called General Agents or Field Marketing Organizations (collectively "FMOs").

These FMOs enter into "umbrella" contracts with MA Organization and then recruit independent agents to sell plans under the authority of the FMO contract.

70.     In this case, the Well-Life Agency (operated by Shikara) served as an FMO.  The Well-Life Agency held contracts with numerous MA Organizations, whereby the Well-Life Agency gained authority to sell plans to members of the public.  In turn, the Well-Life Agency recruited numerous independent agents to sell policies for the various MA Organizations under the authority of the Well-Life Agency FMO contract.  When an independent agent sells a given plan, the terms of compensation are set by a contract, usually a contract between the MA Organization and the FMO.  Compensation consists of two parts.

**"Street Level" Agent Commission**

71.     First, the MA Organization pays a commission to the agent who actually sells the Plan.  The amount of this commission is highly regulated by CMS.  *See* 42 C.F.R. § 422.2274(b)(1).  Each year, CMS publishes a schedule of commissions that MA Organizations are allowed to pay.  For example, in Florida in 2019, MA Organizations were allowed to pay an initial sales commission of $482 for the sale of a Medicare Advantage plan to a beneficiary.  The commission itself consists of two parts: initial and renewal.  The agent receives an initial commission the first year he or she sells the plan.  Then the agent receives renewal commissions for subsequent years that the plan remains in place.  When an agent sells a Medicare Advantage plan, he or she thus stands to make money during the first year of the sale and additional years thereafter.

72.     CMS regulates commissions because it does not want insurance agents and brokers to have an improper financial incentive to sell one Medicare Advantage plan over another.  Under the regulation, the agent stands to be paid the same regardless of which plan he or she sells.  This

helps to ensure that Medicare beneficiaries are free from undue sales pressure by agents and brokers with hidden motivations.

**FMO Fees, Administrative Fees or "Overrides"**

73.     Under this regulated structure, Medicare prohibits MA Organizations from paying any additional compensation above and beyond the regulated "street level" commission – with one exception.   Under 42 C.F.R. § 422.2274(b)(1)(iv), the MA Organization can also pay a fee to the FMO "for services other than selling insurance products."  These services might include "training, customer service, or agent recruitment."  *Id.*  Unlike the street-level commission, the FMO fees are not set by CMS.

74.     In the real world, the fees paid to the FMO are referred to as the "override."  Each time a commission is paid to the street-level agent, the MA Organization also pays an override to the FMO (here, Well-Life Agency).

**How Shikara Moves Patients From One Plan to Another**

75.     Shikara uses the FMO fees and insurance overrides described above as simply one more data point in his global negotiations with MA Organization.  He aggressively negotiates for the highest provider reimbursement rates, the highest overrides, and any other remuneration the MA Organization is willing to give him.  In return, he promises to move large portions of his patient base to the MA Organization that pays him the most.  Often, the negotiations vary by geography.  Thus, Shikara may decide to steer patients in St. Lucie County to Plan A, while steering patients in Palm Beach County to Plan B.

76.     When an MA Organization offers Shikara a deal that tops the rest, Shikara mobilizes all of his various businesses and employees in an effort to switch patients from one plan to another.  As detailed below, Shikara often instructs his employed physicians to speak to patients

during their medical visits about switching Medicare Advantage plans; these physicians will often recommend specific plans to patients.

77.     Shikara also instructs medical assistants and other staff to cold-call patients at their home to recommend that patients switch plans.  Medical staff often go so far as to make appointments for Well-Life agents to visit patients at their home in order to complete the paperwork necessary to switch plans.  Other times, Shikara simply gives HIPAA-protected patient lists to Well-Life agents, call centers, or third-party contractors for cold-calling purposes.  Often, he instructs Well-Life agents to report to work at one of his medical offices, so they can solicit patients before or after their medical appointments.  As detailed below, these actions violate clear CMS regulations and rules governing not only the MA Organizations, but also participating providers, in the marketing of Medicare Advantage plans.

78.     Whether at the patient's home or elsewhere, Well-Life agents or their proxies solicited hundreds of patients at Shikara's direction to convince them to switch Medicare Advantage plans.  Once the switches were completed, the agents earned their standardized "street level" commissions set by CMS for each new enrollment.  Shikara, meanwhile, received whatever FMO fees, overrides, increased capitation, marketing money, kickbacks, or other remuneration the MA Organizations had promised him. All the while, the patients had no idea of Shikara's hidden financial motivations and the impact that had on the recommendations from him and the various people and entities under his control. They simply believed their trusted physician and/or agent was making recommendations in their best interests.

## LEGAL RESTRICTIONS ON MARKETING MEDICARE ADVANTAGE PLANS

79.     Shikara's business model and the kickback scheme with the MA Organizations turns the Medicare Advantage program on its head.  As set forth below, the Medicare laws and

regulations are designed to ensure (a) that Medicare beneficiaries are free to select the plans that are best for them; (b) that MA Organizations pay standardized commissions to agents, so that agents do not favor one plan over another; and (c) that medical providers remain neutral and play no role in influencing a beneficiary's insurance decision, one way or the other.

80.     In particular, Congress and CMS have imposed a variety of laws and regulations that govern the marketing of Medicare Advantage plans to Medicare beneficiaries.  All participants in the Medicare Advantage program must agree, by way of contract, to abide by these laws and regulations.  Yet, as detailed below, Shikara and the numerous Defendant MA Organizations blatantly ignored the promises they made to CMS, as well as numerous clear laws and regulations, when they implemented a longstanding (and ongoing) kickback scheme focused solely on increasing each other's profits and market share.  In doing so, Shikara and the Defendant MA Organizations have not only violated the AKS, but also submitted or caused the submission of millions of dollars of false claims and undermined the care of thousands of seniors who had placed their trust in Shikara and his network of physicians.

**Defendant MA Organizations Promised to Comply with the AKS and Medicare Rules and Regulations**

81.     All MA Organization must enter into a contract with CMS known as the Master Application.  42 C.F.R. § 422.503.  CMS has enacted regulations that require the Master Application to contain certain key provisions.  Specifically, CMS requires as follows:

> The contract between the MA organization and CMS must contain the following provisions:
>
> …
>
> (h) Requirements of other laws and regulations. *The MA organization agrees to comply with-*

> (1) *Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act); and*
>
> (2) *HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164.*

*See* 42 C.F.R. §§ 422.504(h)(1)-(2)(emphasis added).

82.     On information and belief, all of the Defendant MA Organizations entered into a contract(s) with CMS with these terms and promises to abide by relevant laws, rules, and regulations.

**Medical Consultants and Shikara Promised to Comply with the AKS and Medicare Rules and Regulations**

83.     The same rule applies to primary care providers such as Shikara's Medical Consultants.  When MA Organizations enter into contracts with third parties (such as primary care providers) to supply healthcare services to beneficiaries, those third parties are known as "first tier" or "downstream" entities.   Medicare defines a first-tier entity as "any party that enters into an agreement, acceptable to CMS, with a Medicare Advantage Organization … to provide administrative or healthcare services to a Medicare eligible individual under the Medicare Advantage program."  *See* 42 C.F.R. §§ 422.500 & 423.501.  Medicare defines a downstream entity as "any party that enters into an acceptable written arrangement below the level of the arrangement between the MA Organization and a first-tier entity."  *See* 42 C.F.R. §§ 422.500 and 423.501.

84.     By law, MA Organizations must enter into contracts with primary care providers, so that the primary care providers, like the MA Organizations themselves, agree to abide by relevant Medicare laws and regulations.  Specifically, the law requires:

(i) **MA organization relationship with first tier, downstream, and related entities.**

…

(3) All contracts or written arrangements between MA organizations and first tier, downstream, and related entities *must contain the following:*

…

(iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the MA organization's contractual obligations.

…

(4) If any of the MA organizations' activities or responsibilities under its contract with CMS are delegated to other parties, the following requirements apply to any first tier, downstream and related entity:

…

(v) *All contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions.*

*See* 42 C.F.R. § 422.504 (emphasis added).

85.     On information and belief, Medical Consultants and/or the MSO entered into contracts with all of the Defendant MA Organizations at issue in this case.  In each of these contracts, Medical Consultants and/or the MSO promised to abide by the relevant Medicare laws, regulations, and CMS instructions, as required by the regulations.

### The Well-Life Agency Promised to Comply with the AKS and Medicare Rules and Regulations

86.     The same applies to FMOs and insurance agents.  Federal regulations require MA Organizations to supervise these FMOs and agents who sell their plans to ensure they comply with

the applicable laws and regulations.  Among other obligations, MA Organizations must provide training to ensure that all agency brokers who sell Medicare products are trained and tested annually to ensure "[a]ppropriate knowledge and understanding of Medicare rules and regulations."  *See* 42 C.F.R. § 422.2274(c); *see also* Medicare Communications and Marketing Guidelines, § 110.3 ("Plans/Part D Sponsors must oversee downstream entities to ensure agents/brokers abide by all applicable state and federal laws, regulations, and requirements.").

87.     As a result, MA Organizations regularly enter into contracts with FMOs (like Defendant Well-Life Agency) that require FMOs and their agents to abide by Medicare laws and regulations, though the MA Organizations remain responsible for ensuring that the rules and laws are actually followed.  Defendant Well-Life Agency entered into contracts with all of the Defendant MA Organizations, whereby Well-Life Agency agreed to abide by Medicare's laws and regulations.

**Medicare Advantage Organizations Remain Liable for Violations by Vendors**

88.     Although MA Organizations may delegate certain functions to first-tier or downstream vendors – such as sales to the general public – the MA Organizations themselves maintain ultimate responsibility for fulfilling the terms and conditions of their contracts with CMS and fulfilling the Medicare requirements.  *See* 42 C.F.R. § 422.504(i)(1) ("Notwithstanding any relationship(s) that the MA organization may have with first tier, downstream, and related entities, the MA organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS."); 42 C.F.R. § 423.505(i) (same, relating to Part D Plan Sponsors); Medicare Managed Care Manual, Chapter 21, § 40 ("The sponsor maintains the ultimate responsibility for fulfilling the terms and conditions of its contract with CMS, and for meeting the Medicare program requirements.  Therefore, CMS may hold the

sponsor accountable for the failure of its FDRs [First Tier, Downstream, or Related Entity] to comply with Medicare program requirements.").

89.     As such, CMS can hold the MA Organizations accountable, not only for their own active participation in the kickback scheme and wrongdoing, but also for the failure of any first-tier or downstream vendor, including Shikara and his multiple businesses, to comply with Medicare laws, regulations, or program requirements.  These laws, regulations, and program requirements include the following.

**MA Organization and First Tier or Downstream Entities Cannot Pay or Receive Kickbacks**

90.     First, as detailed above, the Anti-Kickback Statute prohibits anyone from knowingly and willfully soliciting, receiving, offering, or paying remuneration for the purpose of inducing or referring the purchasing, recommending, or ordering of services that are reimbursable, in whole or in part, under Medicare.  *See* 42 U.S.C. § 1320a-7b(b)(1), (2).  And, also as detailed above, a claim submitted to a federal health care program that was procured by kickbacks in violation of the AKS constitutes "a false or fraudulent claim" for purposes of the FCA.

91.     Accordingly, a Medicare Advantage organization that knowingly accepts monthly payments from the government for enrollees who joined their program as a result of a kickback can be held liable under the FCA.  Likewise, a physician or other healthcare professional can be liable under the FCA for soliciting and/or accepting kickbacks in exchange for referrals or recommendations and thus causing false claims to be submitted and/or accepting payments for such enrollees.

92.     In addition, CMS recognizes the inherent danger that kickbacks pose to the Medicare Advantage program and has enacted detailed regulations to ensure that participants in the Medicare Advantage marketplace do not offer or receive kickbacks in connection with

marketing Medicare Advantage Plans. *See* 42 C.F.R. § 422.2268(b)(1)(Plans cannot "provide cash or other monetary rebates as an inducement for enrollment or otherwise"); 42 C.F.R. § 422.2268(b)(2)(Plans cannot "offer gifts to potential enrollees, unless the gifts are of nominal value"); *see also* Medicare Communications & Marketing Guidelines § 60.2. (Providers cannot offer "inducements" to patients to enroll in a particular Plan; Providers cannot offer "anything of value" to induce enrollees to select them as a provider; and providers cannot accept "compensation" from Plans for any "marketing or enrollment activities.").

93.     In short, Congress and CMS intended Medicare beneficiaries to make their insurance and provider decisions in an environment free of hidden kickbacks.  As set forth below, Shikara has based his entire business model on a web of kickbacks between providers, MA Organizations, and insurance agents, and the Defendant MA Organizations have knowingly and willfully engaged in this scheme.

### Participants Cannot Discriminate Based on Health Status

94.     Next, Medicare Advantage participants cannot discriminate, or steer patients based on their health status.  In the Medicare Advantage space, where MA Organizations and primary care providers are paid on a capitated basis, patients who need a greater amount of healthcare services are often deemed expensive, unprofitable and undesirable.   Recognizing that MA Organizations and their Plans and providers might shun such patients, CMS enacted a specific regulation to prevent discrimination based on health status.

> 422.110 Discrimination against beneficiaries prohibited.
>
> (a) General prohibition. Except as provided in paragraph (b) of this section, an MA organization may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to the following:

(1) Medical condition, including mental as well as physical illness.

(2) Claims experience.

(3) Receipt of health care.

(4) Medical history.

(5) Genetic information.

(6) Evidence of insurability, including conditions arising out of acts of domestic violence.

(7) Disability.

42 C.F.R. § 422.110; *see also* Medicare Communications & Marketing Guidelines § 30.1 (Anti-Discrimination).

95.    As set forth below, Shikara regularly violated this material prohibition.  On behalf of his own medical practice as well as the ones he served by way of the Shikara MSO, he regularly culled patient lists to eliminate "expensive" patients or transfer them to less desirable Medicare Advantage Plans.

**Participants Cannot Use Providers to Influence Insurance Decisions**

96.    Next, CMS recognizes the inherent danger posed when medical providers give advice to patients regarding which Medicare Advantage plan to select.  That is to say, patients might naturally assume the provider is giving advice, akin to medical advice, in the patient's best interest, when that might not be the case.  For this reason, CMS has enacted a variety of regulations designed to keep providers neutral and to separate medical advice from insurance marketing and sales.

97.    To begin, MA Organization cannot conduct any marketing activities in the healthcare areas of a provider's office:

> (b)  In marketing, MA Plans cannot do any of the following:
>
> …
>
> (7) Conduct sales presentations or distribute and accept MA plan enrollment forms in provider offices or other areas where health care is delivered to individuals, except in the case where such activities are conducted in common areas in health care settings.

See 42 C.F.R. § 422.2268(b)(7); s*ee also* Medicare Communications & Marketing Guidelines § 60.4 (Plans cannot market in "restricted areas" of a healthcare setting, including "exam rooms, hospital patient rooms, [and] treatment areas where patients interact with provider and his/her clinical team and receive treatment").   This restriction applies not only to MA Organizations, but also to their agents and brokers who sell the Plans.   *See* 42 C.F.R. § 422.2260 (defining "marketing" to include "activities … conducted by the MA organization *or downstream entities*") (emphasis added).

98.    Likewise, Medicare Advantage Organizations cannot use providers to distribute their printed marketing materials, unless the provider also distributes similar printed marketing materials from *other* plans.  *See* 42 C.F.R. § 422.2268(b)(14).  The goal is for providers to remain *neutral* in the selection of plans, as CMS guidance makes crystal clear:

> Plans … must advise contracted providers, through their agreements with those providers, of the need for providers to remain *neutral* when assisting beneficiaries with enrollment decisions.

*See* Medicare Communications & Marketing Guidelines § 60.3 (emphasis added).

99.    Because providers must remain neutral, providers cannot be involved in recommending specific plans.  Likewise, providers cannot do any of the following:

- Accept/collect scope of appointment forms;

- Accept Medicare enrollment applications;

- Make phone calls or direct, urge or attempt to persuade their patients to enroll in a specific plan based on financial or any other interests of the provider;

- Mail marketing materials on behalf of the Plan;

- Offer inducements to persuade their patients to enroll in a particular plan or organization;

- Conduct health screenings as a marketing activity;

- Distribute marketing materials/applications in areas where care is being delivered;

- Offer anything of value to induce enrollees to select them as their provider; or

- Accept compensation from the plan for any marketing or enrollment activities.

*See* Medicare Communications & Marketing Guidelines § 60.2.

100.    Significantly, these guidelines are more than mere suggestions; they have the force of regulations.  *See* 42 C.F.R. § 422.2268(b)(11) (Plans cannot "[e]ngage in any other marketing activity prohibited by CMS in its marketing guidance")

101.    The Defendant MA Organizations' deliberate, referral-based relationships with Shikara – and Shikara's entire business model – make a farce of this regulatory scheme.  As detailed below, Shikara's medical and insurance staff were utilized as referral and recommendation machines, sending patients and new enrollees to the highest bidding Plan, in direct violation of clear CMS regulations and rules, as well as the AKS and the FCA.

### Participants Cannot Engage in Direct Solicitation, Cold-Calling, or Use HIPAA-Protected Materials for Solicitation

102.    Next, CMS has imposed severe restrictions on how MA Organizations and their agents/brokers can solicit Medicare beneficiaries, which Shikara simply ignored.  To begin, MA

Organizations and their agents/brokers (e.g., Well-Life insurance agents) cannot cold-call Medicare beneficiaries:

> (b)  In marketing, MA Plans cannot do any of the following:
>
> …
>
> (13) Solicit door-to-door for Medicare beneficiaries or through other *unsolicited means of direct contact, including calling a beneficiary,* without the beneficiary initiating the contact.

*See* 42 C.F.R. § 422.2268(b)(13) (emphasis added); *see also* Medicare Communications & Marketing Guidelines § 40.2 ("Plans … and their agents/brokers may not make unsolicited telephone calls to prospective enrollees.").

103.    In a related vein, providers, MA Organizations, and their employees cannot use private patient information protected by the Health Insurance Patient Portability and Accountability Act ("HIPAA") for purposes of cold-calling or solicitation.

104.    HIPAA criminalizes such abuse, forbidding a person from knowingly "obtain[ing] individually identifiable health information relating to an individual" maintained by a covered entity (to include physicians and other providers like Shikara and his related Defendants) without authorization.  42 U.S.C. § 1320d-6(a).  It also prohibits knowingly disclos[ing] such information to another person without authorization.  *Id.*

105.    The statute imposes its most severe penalties on violations which, as described here, were committed "with the intent to sell, transfer, or use [the information] for commercial advantage [or] personal gain."  42 U.S.C. § 1320d-6(b)(3).  The statute also imposes civil penalties for improper disclosures of medical information.  *See* 42 U.S.C. §§ 1320d-5(a)(1).

106.     Yet in this case, as detailed below, Shikara's business model relied upon systemic cold-calling and HIPAA violations.  Shikara has set up a free flow of protected health information between his medical practice and his insurance agency.  Medical employees routinely send Excel spreadsheets with HIPAA-protected information to call centers, third party contractors, and Well-Life Agency personnel so that patients can be cold-called and solicited on behalf of the Defendant MA Organizations.  This is not only blatantly illegal, 42 U.S.C. § 1320d-6, but also in direct violation of the express promise made by the MA Organizations (and all first tier, downstream and related entities) to CMS to comply with HIPAA regulations.  *See* 42 C.F.R. § 422.504(h)(2) ("The MA Organization agrees to comply with . . . HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164."); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual obligations to CMS).

## THE FRAUDULENT SCHEMES

107.     As set forth below, the Defendants have been, and continue to be, engaged in a number of ongoing fraudulent schemes that violate the AKS and the FCA.  The factual allegations and details below proceed in a chronological order, following an initial summary of the kickback schemes.

### Overview

108.     The Defendant MA Organizations offered and paid (and Shikara solicited and received) several types of kickbacks to Shikara and his related entities.  First, the Defendant MA Organizations offered "classic" kickbacks, including MMM's all-expense paid vacation to Puerto Rico for Shikara and approximately twenty (20) other Florida physicians.

109.    In addition, both MMM and Freedom Health provided Shikara with "classic" kickbacks in the form of marketing money, free marketing opportunities, and capital funds in exchange for his patient steering activity.

110.    For example, in a December 2018 text summarizing a meeting with MMM, Shikara openly bragged to Relator Butler that MMM was giving him money to grow his footprint by buying up more practices, writing, "We got a very good commitment for Well-Life Group and our group to spend on marketing."  Notably, Relator Butler had a separate text conversation about the same December 2018 meeting with an MMM representative who described the relationship between MMM and Shikara this way: "All he [Shikara] spoke about was as always we want more doctors contracted.  How much more money we [MMM] can help him with on and on and on."

111.    Then, in early 2019, Shikara began steering St. Lucie County patients to Freedom despite its poor network for physicians.  When Relator Philipp asked why they would be pushing patients to such a poor plan, Puente (Shikara's right-hand-man) explained that Freedom was "helping" Shikara expand his medical practice and that Freedom was "doing more" than any other carrier for Shikara.

112.    Second, each of the Defendant MA Organizations paid kickbacks to Shikara in the form of insurance commissions, known as overrides, to the Well-Life Agency and inflated provider rates.  Because Shikara controls both the medical practice and the insurance agency, Shikara views both the commission for selling the plan ***and*** the capitated rate for treating the patient as data points for assessing which MA Organization is paying him the most and thus, which MA Organization he should favor.  The higher the commission and/or the rate, the more motivated Shikara was to employ the resources of one or both of his businesses to steer beneficiaries to a given MA Organization.

113.    Each Defendant MA Organization knew of Shikara's control of the Well-Life Group agency and thus knew that the insurance overrides went to Shikara.  For example, MA Organization employees and Shikara regularly discussed (via email and in person) insurance agency business, including contracts between the Well-Life Agency and the MA Organizations. Conversely, Relator Butler (an insurance businessmen and a Well-Life Agency employee) was invited to many conversations between MA Organizations and Shikara to discuss the medical practice contract.  In short, each of the Defendant MA Organizations knew that all of Shikara's businesses were one and the same and that he had the ability to send beneficiaries to them.

114.    Once Shikara identifies the MA Organization willing to pay him the most in a given geographic region, he mobilizes all of his various businesses and employees in an effort to switch patients from one plan to another.  Shikara, for example, has repeatedly used medical staff employees to cold-call patients to switch plans, based on his "favorite" plan at the time, including to Humana and Coventry in 2016, to United/PCP in 2017, and to MMM and Freedom in 2018 and 2019.

115.    At Shikara's direction, medical staff often go so far as to make appointments for Well-Life agents to visit patients at their home in order to complete the paperwork necessary to switch Plans.  Shikara has even paid bonuses to medical staff for this cold-calling, as evidenced by a December 7, 2016 email from a medical staff member to Shikara, asking:  "would you be so kind to please give … my bonus $1,000 that you agreed on for me doing the cold calling our patient … converting them from one insurance to the next."

116.    Shikara not only utilizes his medical office administrative staff to direct beneficiaries to switch plans, but he also instructs his employed physicians to recommend specific plans to patients during office visits or other interactions.  In 2018, during the push Shikara was

making for MMM, he even had one of his employed physicians spend time at home cold-calling and soliciting patients to switch to MMM.  Other times, Shikara simply gives HIPAA-protected patient lists to Well-Life agents, call centers, or third-party contractors for cold-calling purposes. Often, he instructs Well-Life agents to report to work at one of his medical offices, so they can solicit patients before or after their medical appointments.

117.    And Shikara even engages in this behavior himself.  For example, Shikara personally hosted a "patient appreciation breakfast" at a local hotel in Palm Beach Gardens.  The flier for the event invited patients to "come say hello to doctors and staff" on September 23, 2019. In reality, however, the breakfast was a sales pitch to switch patients away from their existing MA Organizations to new plans, which (unbeknownst to the patients) had offered to pay Shikara more money.

118.    At the event, Shikara warned his elderly patients not to trust insurance agents and brokers because they "only want commissions."  He then asked the following rhetorical question before making his own insurance recommendations: "Who do you trust to handle your health insurance?  The doctor or the agent?"  Little did the crowd know, of course, that Shikara was both the doctor *and* the agent and that he makes recommendations based on what is best for him, not what is best his patients.

119.    These illegal tactics are very lucrative for Shikara and the Defendant MA Organizations.  Shikara – and his medical and insurance staff – hold considerable sway over the decisions of Medicare beneficiaries when it comes to which plan to enroll in.  And, as detailed below, Shikara is routinely able to deliver the goods (*i.e.*, the beneficiaries) that he promises to MA Organizations in exchange for their paying inflated rates, commissions, and/or other kickbacks.  A chronological accounting of the fraudulent schemes follows below.

**Shikara and His Entities Steered Patients to Humana in Exchange
for Kickbacks from Humana**

120.    In or around June 2014, an MA Organization in Florida named Physicians United Plan or "PUP" became insolvent and was liquidated by state authorities.  As a result, all Medicare beneficiaries who were enrolled in PUP plans had two options: either become traditional Medicare Part B enrollees or find a replacement Medicare Advantage plan.  At the time of the liquidation, Shikara had a great many patients within his medical practice who were PUP enrollees.  He saw the downfall of PUP as a business opportunity to steer those patients to new Medicare Advantage plans and thereby reap additional insurance override commissions in the process.

121.    At the time of the PUP collapse, Shikara was in the midst of negotiating new contracts with Humana, on both the provider side of his business as well as the insurance (Well-Life Agency) side.  In the beginning of 2014, Shikara met with Humana's Delegated Sales Executive, Nick Tatge.  Based on these negotiations, and other interactions that Relator Butler is aware of, Humana knew that Shikara wore multiple hats – primary care provider, MSO and insurance agency.

122.    Indeed, on October 1, 2014, Daphkara Françoise, Humana's Marketing/Medicare Sales Support, sent an email to Relator Butler and Shikara regarding marketing assistance for Shikara's medical practice.  It made no sense for Humana to send an email regarding Shikara's medical practice to Relator Butler, who worked for the Well-Life Agency.  Humana did so for a simple reason: it knew that Shakira's medical practice and his insurance agency were really one and the same.

123.    Throughout late 2014 and into 2015, Shikara worked diligently, using his dual role as provider and insurance agency, to steer his PUP patients to Humana.  Through his MSO, Shikara had access to additional PUP beneficiaries.

124.    In June 2014, for example, Medical Consultants sent a form letter to all existing PUP patients on medical practice letterhead.  The letter informed patients of the PUP demise and openly instructed patients to contact the Well-Life Agency in order to obtain new insurance.  (The letter did not advise patients that Shikara owned the Well-Life Agency, nor did it advise patients that the Well Life Agency would be steering them into new Plans that would benefit Shikara).

125.    Shikara also instructed employees of his medical practice to cold-call PUP patients one-by-one to make appointments for Well-Life agents to visit the patient, either at home or at the medical practice office.  This is evidenced by numerous emails, including an email from Jeanette Hernandez, an employee of Shikara's medical practice (Defendant Medical Consultants), to Shikara himself, dated June 11, 2014:

> Sandy and I are working on the current PUP list ….  We are calling
> all the patients making appointments with agents.

126.    At other times, the practice simply forwarded entire patient lists to Well-Life Agency, so that Well-Life agents could target patients for solicitation, including an email on May 28, 2014 to Relator Butler stating, "I am forwarding the membership list to you so you can identify which members to switch."

127.    Raul Puente, Shikara's brother-in-law and an employee of the Shikara MSO, also kept a running list of patients who needed to be switched and worked closely with Well-Life Agency to steer patients.  He sent numerous emails such as the following to Butler on August 13, 2014:

> Brian please compare the list with yours and tackle all the ones that
> are still pending.

128.    Shikara was also diligent in monitoring the process of switching patients, instructing Butler by email on June 18, 2014 to "please update every day."

129.    Shikara, his various entities, and Humana itself were all extremely successful in steering a great many beneficiaries to Humana, including the following:

| Name | Plan | Date of switch |
|------|------|----------------|
| W.A. | Humana | 7/1/14 |
| J.W. | Humana | 6/26/14 |
| E.G. | Humana | 6/25/14 |
| A.C. | Humana | 7/11/14 |
| J.C. | Humana | 7/11/14 |
| S.D. | Humana | 6/27/14 |
| O.C. | Humana | 6/27/14 |
| J.F. | Humana | 6/26/14 |
| V.D. | Humana | 9/2/14 |

130.    The Relators and/or the Well-Life Agency received commissions ($425.00) and override commissions ($125.00) from Humana for enrolling each of these exemplar beneficiaries in a Humana Medicare plan.[1]    These examples are representative only and taken from contemporaneous commission statements.  On information and belief, Shikara, his various entities, and Humana itself steered many additional beneficiaries to Humana.

131.    Each of these exemplar beneficiaries, and each Medicare Advantage patient enrolled in Humana's Medicare Advantage plan via this scheme, resulted in multiple claims under the False Claims Act.

132.    *First*, for each beneficiary, the Well-Life Agency prepared and submitted an application asking Humana to enroll the beneficiary in the Humana plan.  Each application from the Well-Life Agency triggered a contractual commission payments from Humana to the Well-Life Agency at the agreed rate upon the beneficiary's enrollment.  So each of these applications serves as a claim under the False Claims Act.  *U.S. ex rel. Shutte v. Supervalu, Inc*., 598 U.S. 739,

---

[1]   The commission amounts identified in this Amended Complaint are the initial commission and override commission associated with each plan and beneficiary.  Relators and the Well-Life Agency also received a smaller renewal commissions and override commissions each year a beneficiary re-enrolled in a plan.

745 & n.1 (2023).

133.   *Second*, after enrolling the beneficiary that Shikara and his related entities steered to them, Humana knowingly submitted claims to CMS and the Medicare Advantage program for the capitated payments associated with the beneficiary.

134.   All such claims (both those from the Well-Life Agency to Humana, and those from Humana to CMS) were false or fraudulent because they were tainted by kickbacks. Specifically, Humana knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from Humana) by way of override commissions and/or inflated provider rates. *See* 42 U.S.C. § 1320a-7b(b)(1)-(2).   In return, Shikara and the Shikara-controlled Defendants referred and recommended Medicare beneficiaries to Humana's Medicare Advantage plans.

135.   These claims were also false or fraudulent because Humana and the Shikara-controlled Defendants failed to disclose numerous material violations, including but not limited to:

- Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for Humana in violation of criminal law and material regulations, rules, and contracts governing the Medicare Advantage program. *See* 42 U.S.C. § 1320d-6 (HIPAA/wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain

marketing activities) & (j) (same); 42 C.F.R. § 422.2268(b)(13) (no cold-calling); *see also* Medicare Communications & Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for Humana. *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications and marketing); Medicare Communications & Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to remain *neutral* when assisting beneficiaries with enrollment decisions").

136.    CMS would not have paid for these Humana Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

### Shikara and His Entities Steered Patients to Coventry/Aetna in Exchange for Kickbacks from Coventry/Aetna

137.    Following the collapse of PUP, Shikara also worked to steer many of his PUP patients to Defendant Coventry/Aetna.  In particular, Shikara preferred to steer his MSO patient base to Coventry/Aetna during this timeframe because his MSO had a contract that made it more lucrative for him to do so.  As to the MSO patients, therefore, Shikara preferred Coventry/Aetna over Humana.

138.    Like Humana, Coventry/Aetna was well aware of the multiple hats worn by Shikara, and Coventry/Aetna was eager to persuade Shikara to use all of these hats to steer business to the company.  Indeed, Jeff Carlini, Coventry/Aetna's Director of Medicare Broker Sales for Florida, communicated directly by way of a June 18, 2014 email to Shikara and Relator Butler regarding insurance business, asking for a meeting:

---

**Well-Life Group & Carefree Insurance Meeting (Brian Butler & James Fagan)**
4 messages

**Carlini, Jeffrey** <wjcarlini@aetna.com>                                    Wed, Jun 18, 2014 at 12:53 PM
To: "Fagan, James" <jefagan@carefreeinsurance.net>, "bbutler@wlgfl.com" <bbutler@wlgfl.com>,
"mshikara@mcmhealthcare.com" <mshikara@mcmhealthcare.com>

Re-scheduled for Fri 06/20/2014, 1:00pm, location TBD, to discuss the 'next steps' Well-Life Group, LLC
and Coventry Health Care, Inc.

Lead up to 2015 certification and training.
   PUP opportunity.

---

139.    The term "PUP opportunity" referred to the fact that PUP was in the process of

liquidation, and Coventry/Aetna was anxious to have Shikara steer PUP patients to Coventry.  The

fact that Carlini requested a meeting with Shikara, not his wife, regarding the business of the Well-

Life Agency, shows that Carlini and Coventry/Aetna knew that Shikara, not his wife, was the

person in charge of Well-Life Agency.

140.    When PUP collapsed, Shikara began an aggressive campaign to switch many

patients, but especially MSO patients, to Coventry/Aetna.  On June 10, 2014, Mary Martinez who

worked for the Shikara MSO, wrote an email to all physicians within the MSO, explaining as

follows:

> Over the last few days we've had word that the PUP membership
> will be at risk if we keep in the current plan. [The Shikara MSO] is
> being proactive and we're sending Well-Life Group agents into your
> centers to move the membership to Coventry.

141.    Throughout 2014 and into 2015, Shikara mobilized his various businesses to switch

hundreds of patients from PUP to Coventry/Aetna.   As just a sample, over the course of

approximately three weeks in June and July 2014, Relator Butler documented that over 100 MSO

patients and over 200 Medical Consultants patients were switched from PUP to Coventry/Aetna.

These conversions to Coventry/Aetna accounted for over seventy-five percent of the PUP patients

that Shikara converted to another plan in that time period.

142.   Well-Life agents traveled to MSO medical offices during this time to switch patients.  Also, medical staff and agents used HIPAA-protected materials to cold-call and solicit patients during this time.

143.   Shikara, his entities, and Coventry/Aetna itself were all extremely successful in steering a great many patients to Coventry/Aetna, including the following:

| Name | Plan | Date of switch |
|------|------|----------------|
| G.M. | Coventry | 6/24/14 |
| J.H. | Coventry | 6/17/14 |
| J.B. | Coventry | 6/19/14 |
| R.K.W. | Coventry | 6/25/14 |
| R.W. | Coventry | 6/21/14 |
| C.V. | Coventry | 6/23/14 |
| R.S. | Coventry | 6/16/14 |
| B.T. | Coventry | 6/14/14 |
| P.T. | Coventry | 6/23/14 |
| R.T. | Coventry | 6/16/14 |

144.   The Relators and/or the Well-Life Agency received commissions ($425.00) and override commissions ($45) from Coventry/Aetna for enrolling each of these exemplar beneficiaries in a Coventry/Aetna Medicare plan.  These examples are representative only and taken from contemporaneous commission statements.  On information and belief, Shikara his entities, and entities and Coventry/Aetna transferred many additional patients to Coventry/Aetna.

145.   Coventry/Aetna was well aware of Shikara's ongoing efforts to steer patients. Indeed, employees of Coventry/Aetna kept in contact with Shikara, on both the provider side and the insurance side, to process the new enrollees.

146.   Each of these exemplar beneficiaries, and each Medicare Advantage patient enrolled in Coventry/Aetna's Medicare Advantage plan via this scheme, triggered multiple claims under the False Claims Act.

147.   *First*, for each beneficiary, the Well-Life Agency prepared and submitted an

application asking Coventry/Aetna to enroll the beneficiary in the Coventry/Aetna plan. Each application from the Well-Life Agency triggered a contractual commission payment from Coventry/Aetna to Well-Life at the agreed rate upon the beneficiary's enrollment. So each of these applications serves as a claim under the False Claims Act. *Supervalu*, 598 U.S. at 745 & n.1.

148.    *Second*, after enrolling the beneficiary that Shikara and his related entities steered to them, Coventry/Aetna knowingly submitted claims to CMS and the Medicare Advantage program for the capitated payments associated with the beneficiary.

149.    All such claims (both those from the Well-Life Agency to Coventry/Aetna, and those from Coventry/Aetna to CMS) were false or fraudulent because they were tainted by kickbacks. Specifically, Coventry/Aetna knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from Coventry/Aetna) by way of override commissions and/or inflated provider rates. *See* 42 U.S.C. § 1320a-7b(b)(1)-(2). In return, Shikara and the Shikara-controlled defendants referred and recommended Medicare beneficiaries to Coventry/Aetna's Medicare Advantage plans.

150.    These claims were also false or fraudulent because Coventry/Aetna committed and failed to disclose numerous material violations, including but not limited to:

- Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for Coventry/Aetna in violation of criminal law and material regulations, rules, and contracts governing the Medicare Advantage program. *See* 42 U.S.C. § 1320d-6 (HIPAA / wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier,

downstream, and related entities to comply with the MA Organization's contractual obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain marketing activities) & (j) (same); 42 C.F.R. § 422.2268(b)(13) (no cold-calling); Medicare Communications & Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for Coventry/Aetna. *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications and marketing); Medicare Communications & Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to remain *neutral* when assisting beneficiaries with enrollment decisions").

151.    CMS would not have paid for these Coventry/Aetna Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

**Shikara and His Entities Steered Patients to United/Preferred Care Partners in Exchange for Kickbacks from United/Preferred Care Partners**

152.    In or around mid-2015, Shikara began negotiations with a new MA Organization, Preferred Care Partners or "PCP," a plan owned and marketed by Defendant United.  Shikara once again negotiated on all fronts: provider side, insurance side, and MSO side.  He made no secret to United that he controlled all aspects of the business, having multiple meetings with representatives of United and Optum, a wholly owned subsidiary of United.  Shikara negotiated his provider-side contracts with Ricardo Diaz, United's Director of Business Development, and Joe Valasco, United's Chief Marketing Officer.  He negotiated the insurance-side contract with Arlen Delgado, Optum's Territory Manager.

153.    United/PCP was fully aware of Shikara's multiple hats.  For example, on June 18, 2015, Shikara and Butler held a meeting with Arlen Delgado, Optum's Territory Manager to

discuss the insurance contract for the Well-Life Agency.  The fact that Optum met with Shikara to discuss Well-Life business shows that Optum knew that Shikara, not his wife, controlled the Well-Life Agency.

154.     Likewise, on May 31, 2016, Ricardo Diaz, United's Director of Business Development, sent an email invitation to Relator Butler, titled "meet with Florida Medical Consultants."  In a traditional (legal) business arrangement, there would be no logical reason for a United employee to invite Relator Butler, who worked for the Well-Life Agency, to attend a meeting regarding Shikara's medical practice contract.  Here, however, it made perfect sense to do so because United knew that all of Shikara's businesses were one and the same.

155.     The conversations were fruitful.  By the middle of 2016, United/PCP had convinced Shikara to embark on a campaign to target certain of his patients for a switch to the PCP Medicare Advantage plan.  On June 17, 2016, MSO employee Raul Puente sent an email to Relator Butler and several others, describing the following "project":

> [C]ould you please from our latest Coventry patient roster get us all the summit maximum patients of Palm Beach County only?
>
> Once that is done.… From Brian's list could you also match all the Palm Beach patients with your other list and pull them out?
>
> Same thing from well care if you can get us the patient roster for Palm Beach County only.
>
> *The project is to increase our Preferred Care Partners patients from Coventry and well care.*

(emphasis added).

156.     Shikara then mobilized the employees of his various companies to switch patients to PCP.  As with previous switches, he instructed medical staff employees to cold-call patients to

solicit the new plan and to set up appointments with Well-Life agents.  Shikara made no secret of his intentions to steer patients to the new plan.

157.   He even offered to pay medical practice employees extra bonuses for calling and switching patients from one insurance to the next.  This is evidenced by a December 7, 2016 email from a medical staff employee Maribel Cruz to Shikara, openly asking for the bonus she had been promised for cold-calling Shikara's practice's patients:

> Good afternoon Dr. Shikara,
>  I will be meeting up with Brian on Friday ( December 7, 2016 ).
> Would you be so kind to please give him my bonus $1,000.00. That you agreed on for me doing the cold calling our patient. And helping Mcf ( Boynton and Jupiter office) converting them from one insurance to the next.

Based on emails in his possession, Relator Butler estimates that Maribel Cruz cold-called at least 100 patients in total.

158.   Once medical staff employees cold-called patients, they filled out appointment forms and forwarded them to the Well-Life Agency.  Relator Butler received many emails during this time from medical practice employee Maribel Cruz, forwarding stacks of appointment forms to him.   The attachments to those emails included appointment forms, on medical practice letterhead, completed by medical practice employees, in order to schedule appointments between patients and Well-Life agents.

159.   Shikara, his entities, and United/PCP were all extremely successful in steering a great many patients to United/PCP, including the following:

| Name | Plan | Effective date |
|------|------|----------------|
| D.F. | PCP | 1/1/17 |
| D.W. | PCP | 1/1/17 |
| S.E. | PCP | 1/1/17 |
| H.K. | PCP | 1/1/17 |
| T.K. | PCP | 1/1/17 |
| S.E. | PCP | 1/1/17 |
| S.C. | PCP | 1/1/17 |

160.     The Relators and/or the Well-Life Agency received commissions ($443.00) and override commissions ($100.00) from United/PCP for enrolling each of these exemplar beneficiaries in a United/PCP Medicare plan.  These examples are representative only and taken from contemporaneous commission statements.  On information and belief, Shikara, his entities, and United/PCP steered many additional patients to United/PCP.

161.     United/PCP was well aware of Shikara's ongoing efforts to steer these patients. Indeed, employees of United/PCP kept in contact with Shikara, on both the provider side and the insurance side, to process the new enrollees.  Moreover, in exchange for these new enrollees, United/PCP paid kickbacks to Shikara in the form of override commissions to the Well-Life agency, as documented by commission statements.

162.     In addition, United/PCP offered to pay marketing expenses for Shikara.  In an October 27, 2017 email, a United/PCP representative advised Relator Butler as follows: "Dr. Shikara mentioned some marketing needs … wanted to make sure I got back to you guys to see if I can help."

163.     Moreover, United/PCP acted with direct knowledge of the conflict of interest – and violation of law – inherent in Shikara's multiple business interests and roles.  On March 25, 2019, United/PCP wrote a letter to the Well-Life Agency concerning ownership of the company.  In the letter, United/PCP advised that a "corrective action plan" had been instituted against Well-Life due to:

> an investigated complaint, in which there is a potential for a perceived conflict of interest regarding Well-Life Group agency ownership and the provider clinics of [Medical Consultants] and, because of this, a potential for patient steering to the clinics.

164.    While United/PCP noted one of the problems inherent with the conflict, *i.e.*, the risk that Shikara might use his insurance agency to steer patients to his own medical clinic, United/PCP omitted the other (more obvious and relevant) problem, *i.e.*, the risk that Shikara might use his medical clinic and insurance company to steer patients to United/PCP!

165.    In truth, United/PCP knew of the conflict long before it wrote the 2019 letter to Well-Life.  As set forth earlier, Shikara met personally with representatives of United/PCP on numerous occasions to negotiate provider rates *and* insurance commission overrides.

166.    Moreover, the "corrective action plan" referenced in the 2019 letter was a farce. United/PCP did not terminate its relationship with Well-Life or with Shikara or his related entities. Instead, United/PCP merely instructed Relator Butler, who was the Executive Director of Well-Life at the time, to complete a short sales and compliance course online.  At United/PCP's request, Relator Butler then submitted a supplemental notice (Conflict of Interest Disclosure Form) stating the following:

> Julissa Shikara is the wife of Dr. Mazin Shikara and she is the owner of Well-Life group LLC.  I am currently the executive director of the agency however in the next 7-10 business days am resigning my position.

167.    United/PCP took this light-handed approach for a simple reason: United/PCP benefitted from Shikara's conflict of interest, and United/PCP wanted Shikara to continue to steer patients *to United/PCP*.  In fact, United/PCP is still doing business with Shikara despite having full knowledge of the conflict.

168.    The conduct described in paragraphs 152 – 162, resulted in multiple claims under the False Claims Act, including those for the exemplar beneficiaries identified above.

169.    *First*, for each beneficiary, the Well-Life Agency prepared and submitted an application asking United/PCP to enroll the beneficiary in the United/PCP plan.  Each application

from the Well-Life Agency triggered a contractual commission payment from United/PCP to the Well-Life Agency at the agreed rate upon the beneficiary's enrollment.  So each of these applications serves as a claim under the False Claims Act.  *Supervalu, Inc.*, 598 U.S. at 745 & n.1.

170.    *Second*, after enrolling the beneficiary that Shikara and his related entities steered to them, United/PCP knowingly submitted claims to CMS and the Medicare Advantage program for the capitated payment associated with beneficiary.

171.    All such claims (both those from the Well-Life Agency to United/PCP, and those from United/PCP to CMS) were false or fraudulent because they were tainted by kickbacks. Specifically, United/PCP knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from United/PCP) by way of override commissions, marketing expenses, and/or inflated provider rates.  *See* 42 U.S.C. § 1320a-7b(b)(1)-(2).  In return, Shikara and the Shikara-controlled defendants referred and recommended Medicare beneficiaries to United/PCP's Medicare Advantage plans.

172.    These claims were also false or fraudulent because Defendants failed to disclose numerous material violations, including but not limited to:

- Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for United/PCP in violation of criminal law and material regulations, rules, and contracts governing the Medicare Advantage program.  *See* 42 U.S.C. § 1320d-6 (HIPAA / wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual

obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain marketing activities) & (j) (same); 42 C.F.R. § 422.2268(b)(13) (no cold-calling); Medicare Communications & Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for United/PCP.  *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications and marketing); Medicare Communications & Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to remain *neutral* when assisting beneficiaries with enrollment decisions").

173.    CMS would not have paid for these United/PCP Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

### Shikara and His Entities Steered Patients Away From Molina and to Humana and United/PCP in Exchange for Kickbacks from Those Defendants

174.    Shikara seized yet another opportunity to steer patients in 2017.  This project involved Molina Healthcare, a managed-care insurance company based in Utah.  Molina offers, markets, and sells numerous Medicare Advantage plans and Major Medical Affordable Care Act *i.e,* "Obamacare" Plans.  The Molina family of businesses also includes a separate company called Molina Medical Group, which owns and operates primary care medical clinics throughout the country.  Thus, Medicare beneficiaries could simultaneously have their Medicare Advantage plan through Molina Healthcare and choose Molina Medical Group as their primary care clinic.

175.    Up until 2017, Molina Medical Group operated two clinics in Palm Beach County Florida, one in Riviera Beach and one in West Palm Beach.  In August 2017, Relator Butler received an email from Molina Healthcare advising all brokers in the Palm Beach County area that Molina Healthcare had made the decision to close its two clinics in Palm Beach County.

176.     Relator Butler forwarded this email to Shikara because he knew that Shikara accepted the Molina plans.  As such, the closure of these clinics presented an opportunity for Shikara to become the new primary care physician for many Molina patients.  When Shikara saw the email, however, he had even bigger ideas.  He immediately put into place a plan to capture not only the provider side of this opportunity, but the insurance side as well.  That is to say, he wanted to steer the Molina patients to his medical practice *and* to his insurance agency, so that the patients could switch out of the Molina plans to new plans of his choosing—*i.e.*, to those that provided him with the greatest remuneration via provider rates, insurance commissions, and other kickbacks.

177.     As his first step, Shikara contacted Molina Medical Group and attempted to take over the leases of their physical office space in Riviera Beach and West Palm Beach.  Shikara planned to convert those offices into new locations of his own medical practice, which he eventually succeeded in doing.

178.     He then contacted and hired many of the doctors and staff who had previously worked at the local Molina Medical Group clinics.  Shikara even managed to obtain the actual patient list of the Molina Medical Group.  Relator Butler is unsure how Shikara obtained this list, which contained sensitive personal information protected by HIPAA.

179.     Once Shikara had the Molina patient list, he implemented a plan to cold-call all of the patients with two goals: (1) to convince the beneficiaries to switch their primary care provider to Shikara's practice and (2) to switch their insurance to other Medicare Advantage plans.  In this way, Shikara would capture not only the capitated rate for each beneficiary, but also the insurance commissions on each new policy.  On November 6, 2017, Shikara, in a series of three emails, sent the complete Molina patient list containing sensitive HIPAA-protected patient information to Relator Butler.

180.    Next, Shikara utilized the employees he had recently hired from the Molina Medical Group to cold-call all Medicare Advantage and Affordable Care Act patients on the list.  He used these employees because he knew that the patients would recognize them and, as a result, be more likely to respond favorably.  Shikara instructed cold-callers to call each patient and advise them that the Molina Medical Group clinic had closed, but that Shikara's clinic would be reopening in its place with many of the same doctors and staff.  The cold-callers were further instructed to advise the patients to switch their insurance from the Molina Healthcare Plan to either Humana or United/PCP (the two MA Organizations favored by Shikara at the time).

181.    Once a patient agreed to switch plans, the cold-caller would schedule an appointment for one of the Well-Life agents to visit the person at their home or next medical visit to complete the paperwork necessary to switch plans.  The entire cold-calling project lasted approximately three weeks.

182.    The plan worked enormously well, and Shikara was able to transfer many of the Molina patients away from Molina Healthcare to new Plans of his own choosing.  Representative samples of switched patients include the following:

| Name | Plan | Date of switch |
|------|------|----------------|
| F.C. | PCP | Sept. 2017 |
| M.B. | PCP | Sept. 2017 |
| W.B. | PCP | Sept. 2017 |
| F.W. | Humana | Sept. 2017 |
| N.A. | Humana | Sept. 2017 |
| G.E. | Humana | Sept. 2017 |
| V.H. | Humana | Sept. 2017 |
| D.H. | Humana | Sept. 2017 |
| N. L-M | PCP | Sept. 2017 |
| K.L. | Humana | Sept. 2017 |

183.    The Relators and/or the Well-Life Agency received commissions ($443.00) and override commissions from Humana ($125) and United/PCP ($100) for enrolling each of these

exemplar beneficiaries in their Medicare plans.  These examples are representative only and taken from contemporaneous commission statements.  On information and belief, Shikara transferred many additional patients away from Molina to Humana or United/PCP.

184.    Humana and United/PCP were well aware of Shikara's ongoing efforts to steer these patients.  Indeed, employees of Humana and United/PCP kept in contact with Shikara, on both the provider side and the insurance side, to process the new enrollees.  Moreover, in exchange for these new enrollees, Humana and United/PCP paid kickbacks to Shikara in the form of override commissions to the Well-Life agency, as documented by commission statements.

185.    Thereafter, Humana and United/PCP knowingly submitted claims to CMS and the Medicare Advantage program for these and many other beneficiaries steered to Humana and United/PCP by Shikara and his related entities.

186.    All such claims were false or fraudulent because they were tainted by kickbacks. Specifically, Humana and United/PCP knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from Humana and United/PCP) by way of override commissions, marketing funds, and/or inflated provider rates.  *See* 42 U.S.C. § 1320a-7b(b)(1)-(2).   In return, Shikara and the Shikara-controlled defendants referred and recommended Medicare beneficiaries to Humana and United/PCP's Medicare Advantage plans.

187.    These claims were also false or fraudulent because Defendants failed to disclose numerous material violations, including but not limited to:

•      Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for Humana and United/PCP in violation of criminal law and material regulations, rules, and contracts governing the Medicare

Advantage program.  *See* 42 U.S.C. § 1320d-6 (HIPAA / wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain marketing activities) & (j) (same) 42 C.F.R. § 422.2268(b)(13)  (no  cold-calling);  Medicare  Communications  &  Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for Humana and United/PCP.  *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications  and  marketing);  Medicare  Communications  &  Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to remain neutral when assisting beneficiaries with enrollment decisions").

188.    CMS would not have paid for these Humana and United/PCP Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

**Shikara and His Entities Steered Patients to MMM
in Exchange for Kickbacks from MMM**

189.    In 2018, Shikara began negotiations with a new MA Organization, MMM, which was anxious to expand in South Florida.  On December 20, 2018, Shikara met with several representatives of MMM, including Rosy Cozad, MMM's President and CEO, as well as Elina Garcia, MMM's Broker Sales Manager, and Frank Izquierdo, MMM's Corporate Vice President

of Contracting & Network Development.  The meeting took place at Shikara's Jupiter medical office (Medical Consultants).

190.    Based on this meeting, MMM had a clear understanding that Shikara controlled all aspects of the medical practice (Defendant Medical Consultants), the MSO (Defendant Medical Consultants Management) and the insurance agency (Defendant Well-Life).  This was evidenced by an email invitation, sent by MMM to Relator Butler and Shikara on December 19, 2018.

191.    The above email, sent directly to Shikara made reference to all three of his companies.  "MCM" referred to Medical Consultants Management, Shikara's MSO.  "Well Life Group" referred to his insurance agency.  "MCF" referred to Medical Consultants of Florida, his medical practice.  As such, MMM was fully aware that Shikara wore all three hats.

192.    The December 20, 2018 meeting was eventful in several respects.  Shikara asked Relator Butler to leave the meeting so he could speak privately with MMM, which was unusual. This offended Relator Butler, prompting him to text MMM employee Elina Garcia, later in the day to "clear the air."  Garcia texted Butler that, while he was out of the meeting, Shikara had asked MMM for money:

> Do not worry.  All he [Shikara] spoke about was as always we want more doctors contracted.
>
> *How much more money we [MMM] can help him with on and on and on*

(Emphasis added).  The reference to "more doctors contracted" referred to the fact that MMM had an inadequate number of specialists in its physician network.

193.    Later in the same day, December 20, 2019, Relator Butler texted Shikara himself about the meeting, expressing frustration over being asked to leave.  In responding to this text,

Shikara confirmed that, not only had he asked MMM for money, but that MMM had agreed to pay it:

> Good afternoon Brian my brother …  you're upset I agree that the way I asked you to give me a few minutes with Rosa … and Frank might not be appropriate and I apologize for that but you know you are highly value …
>
> *We got a very good commitment for Well-Life Group and our group to spend on marketing and to motivate certain people in our group* and the meeting was very successful other than this hiccup between us which should be water under the bridge.

(Emphasis added).

194.   In later conversations with Shikara and Puente, Butler learned more about the various types of kickbacks that MMM had offered Shikara in exchange for his agreement to transfer his patients away from their current Medicare Advantage plans to MMM.  First, MMM offered to pay kickbacks in the form of commission overrides to the Well-Life Agency.  Second, MMM offered to pay marketing money to Shikara in order to help him grow his practices.  Although Shikara never told Butler the exact amount of money, he and Puente repeatedly told Butler that MMM was giving money to Shikara to "help him grow" and "buy more doctor offices."

195.   Also, MMM offered additional (and illegal) insurance commissions to be paid to street-level agents on top of the regulated, fair market value commissions established by CMS.  As stated earlier, CMS regulates the commissions that MA Organizations can pay to street-level agents.  Despite these regulations, MMM promised to offer street-level agents an additional $150 per application, above and beyond the regulated CMS commission.  MMM asked Well-Life to submit invoices to MMM for "marketing" or other similar expenses in order to hide these illegal commissions.

196.     MMM and Shikara implemented this scheme, offering this illegal commission to independent agents, many of whom took advantage of it.  This is evidenced by a text exchange between one of the independent agents, Diana Auman, and Relator Butler.  Motivated by the illegal commissions, Diana Auman worked hard to switch many patients from their existing Medicare Advantage plans over to MMM in exchange for the promise of the additional $150 per application.

197.     On April 9, 2019, Diana Auman texted Relator Butler, who at the time was still the Executive Director of Well-Life, and asked the following question:

> also forgot to ask you, when does the March and April effectives get paid? (the $150 per)

198.     Shikara's brother-in-law, Raul Puente, also openly acknowledged the illegal commission in a text to an agent, trying to persuade her to sell polices for Well-Life Agency and MMM.  In the text, dated January 28, 2019, he asked the agent to contact Well-Life Agency regarding the "benefits of joining us under Well-Life Group with a special agreement with MMM."  The "special agreement" referred to the illegal, extra commissions.

199.     MMM also offered other kickbacks to Shikara and other providers in the form of trips, vacations, and cash.  Specifically, in or around July 2019, MMM invited numerous South Florida physicians including the Shikara MSO physicians on an all-expense paid vacation to Puerto Rico.  Shikara's brother-in-law Raul Puente attended, along with approximately 20 other physicians, staying in an exclusive oceanfront hotel.  On information and belief, during the trip MMM delivered checks to several of the physicians; the checks were described as "a bonus in good faith."

200.     This array of kickbacks motivated Shikara to mobilize his businesses in an all-out effort to switch patients in Palm Beach, Broward and Dade Counties to MMM.  These efforts followed the well-worn path.  Shikara's medical practice employees cold-called patients and

solicited them to switch plans and meet with Well-Life agents to do so.  The Shikara medical practice openly shared HIPAA-protected materials with Well-Life Agency, so that Well-Life could solicit patients.

201.    For example, on multiple occasions, including January 23, 2019 and January 29, 2019, Sol Moreno, a medical practice employee, emailed Relator Butler Excel spreadsheet lists of patients, so Butler could target those lists for switches.

202.    In coordination with MMM, Shikara also targeted patients to switch based on Medicare Risk Adjustment scores.  In a meeting on January 23, 2019 with Relator Butler, Shikara, and two MMM representatives (Frank Umana, MMM Broker Manager, and Candy Sicle, MMM VP of Marketing), Shikara stated that he was sorting patients currently enrolled in other MA Organizations by (risk) score and cost in order to identify which patients to target for a switch to MMM.

203.    In addition, Shikara utilized one of his employed physicians, who was on sick leave, to cold-call and solicit patients to switch to MMM.  In or around March 2019, Dr. Brigitte Hampton, an employed physician who took an extended sick leave from practice, agreed to use this time to cold-call patients to encourage them to switch to MMM.  Dr. Hampton called numerous patients, convincing them to switch to MMM.

204.    Shikara, his various entities, and MMM itself were all extremely successful in steering a great many patients to MMM, including the following:

| Name | Plan | Date of switch |
|------|------|----------------|
| H.N. | MMM | February 2019 |
| A.S. | MMM | February 2019 |
| W.A. | MMM | February 2019 |
| G.M. | MMM | February 2019 |
| J.P. | MMM | February 2019 |
| C.B. | MMM | February 2019 |
| A.C. | MMM | February 2019 |

| J.C. | MMM | February 2019 |

205.    The Relators and/or the Well-Life Agency received commissions ($482.00) and override commissions ($200.00) from MMM for enrolling each of these exemplar beneficiaries in a MMM Medicare plan.  These examples are representative only and taken from contemporaneous commission statements.  On information and belief, Shikara, his various entities, and MMM itself steered many additional patients to MMM.

206.    MMM was well aware of Shikara's ongoing efforts to steer patients.  Indeed, employees of MMM kept in contact with Shikara, on both the provider side and the insurance side, to process the new enrollees.  Moreover, MMM paid an array of kickbacks to Shikara as an inducement to persuade Shikara to switch these and many other patients.

207.    Each of these exemplar beneficiaries, and each Medicare Advantage patient enrolled in MMM's Medicare Advantage plan via this scheme, resulted in multiple claims under the False Claims Act.

208.    First, for each beneficiary, the Well-Life Agency prepared and submitted an application asking MMM to enroll the beneficiary in the MMM plan.  Each application from the Well-Life Agency triggered contractual commission payments from MMM to the Well-Life Agency at the agreed upon rate upon the beneficiary's enrollment.  So each of these applications serves as a claim under the False Claims Act.

209.    Second, after enrolling the beneficiary that Shikara and his related entities steered to them, MMM knowingly submitted claims to CMS and the Medicare Advantage program for the capitated payments associated with the beneficiary.

210.    All such claims (both those from the Well-Life Agency to MMM and those from MMM to CMS) were false or fraudulent because they were tainted by kickbacks.  Specifically,

MMM knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from MMM) by way of expensive trips, marketing or other funds, override commissions, and/or inflated provider rates. *See* 42 U.S.C. § 1320a-7b(b)(1)-(2). In return, Shikara and the Shikara-controlled defendants referred and recommended Medicare beneficiaries to MMM's Medicare Advantage plans.

211. These claims were also false or fraudulent because Defendants failed to disclose numerous material violations, including but not limited to:

- Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for MMM in violation of criminal law and material regulations, rules, and contracts governing the Medicare Advantage program. *See* 42 U.S.C. § 1320d-6 (HIPAA / wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain marketing activities) & (j) (same); 42 C.F.R. § 422.2268(b)(13) (no cold-calling); Medicare Communications & Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for MMM. *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications and marketing); Medicare Communications & Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to

remain *neutral* when assisting beneficiaries with enrollment decisions").

212.    CMS would not have paid for these MMM Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

213.    These kickback-induced switches benefited Shikara and MMM, but they often had real-life negative consequences for the beneficiaries.  For example, as part of Shikara's push for MMM in 2019, a Medicare Advantage beneficiary (J.C. in the chart above) was switched from a Humana plan to MMM.

214.    J.C. has severe eye problems that require specialized injections on a monthly basis. Only after the switch was made did J.C. discover that his eye doctor was not in MMM's network and that the closest doctor able to perform the injections was sixty (60) miles away.  As a result, J.C. missed two months of injections until Relator Butler intervened and switched him back to his previous plan.

### Shikara and His Entities Steered Patients to Freedom in Exchange for Kickbacks from Freedom.

215.    Although Shikara favored the MMM plan in 2018 and 2019, MMM is not available in St. Lucie County, where one of Shikara's medical practice offices is located.  For that reason, in 2019 Shikara began to steer his St. Lucie County patients to another plan that offered him substantial and illegal remuneration: Defendant Freedom.

216.    On March 20, 2019, Raul Puente contacted Relator Philipp to tell him that the Shikara medical practice (Defendant Medical Consultants) had begun to accept Freedom.  This surprised Philipp because Freedom was known to have a very poor network and was difficult to sell for that reason.  Puente explained that Freedom was "helping" Shikara expand his medical practice and that Freedom was "doing more" than any other carrier for Shikara.  Philipp took this to mean that Freedom was paying kickbacks to Shikara in some form or fashion.

217.     Puente instructed Philipp to begin doing everything possible to start moving Port St. Lucie patients from their existing Medicare Advantage plans over to Freedom.  On or about March 20, 2019, Relator Phillip drove to the Vero Beach office of Freedom and picked up approximately 150 Freedom applications, to be used to switch patients.

218.     While he was at the Vero office, an employee of Freedom told Philipp that a number of Freedom captive agents (i.e., those that work directly and only for Freedom itself) had arranged to attend a promotional event at a local Golden Corral restaurant, specifically to convince Shikara's Medicare beneficiaries in order to switch their policies.  This news was significant to Philipp because March 20, 2019 was during the Medicare Advantage open enrollment period.

219.     During this time frame, by CMS regulations, no MA Organization, insurance agent, or anyone else is allowed to conduct marketing activity.  *See* 42 C.F.R. § 422.2268(b)(10).   Nevertheless, Shikara helped Freedom conducted a marketing event in a Golden Corral in order to switch his patients to Freedom.

220.     Relator Philipp then telephoned Elisea Sanchez, who worked in the Port St. Lucie office of Shikara's medical practice.  Philipp asked what steps they were taking to transfer patients to Freedom.  Sanchez explained that medical staff were in the process of making phone calls to patients in order to set up appointments with captive Freedom agents.  Thus, Freedom was using Shikara's staff to do something they could not do themselves: cold-call patients using HIPAA-protected material.

221.     Freedom also provided kickbacks to Shikara by paying marketing expenses used to promote the Shikara's medical practice.  In particular, Freedom paid for a famous, retired Puerto Rican soap opera star named Charytín Goyco to promote Shikara's medical practices.  Shikara's brother-in-law Raul Puente told Relator Philipp that Freedom paid for the soap opera star.   The

soap opera star attended multiple promotional events at Shikara's Medical Consultants St. Lucie County office on or about March 25, 2019. The purpose of this and other similar events was to draw elderly Hispanic Medicare beneficiaries to the event in order to enroll them in Freedom Plans with Shikara as the primary care physician.

222.    As a result of these and other kickbacks, Shikara and Freedom steered many patients to Freedom.  Because both Relators resigned from Well-Life Group during this campaign, Relators do not have specific representative examples of patients who switched Plans.   On information and belief, Relators allege that Shikara steered many unsuspecting patients to Freedom.

223.    Freedom was well aware of Shikara's ongoing efforts to steer patients.  Indeed, employees of Freedom kept in contact with Shikara, on both the provider side and the insurance side, to process the new enrollees.  Moreover, Freedom paid a variety of kickbacks to Shikara as an inducement to persuade Shikara to switch these and many other patients.

224.    This scheme resulted in multiple false claims under the False Claims Act.

225.    *First*, for each beneficiary, the Well-Life Agency prepared and submitted an application asking Freedom to enroll the beneficiary in the Freedom plan.  Each application from the Well-Life Agency triggered a contractual commission payment from Freedom to the Well-Life Agency at the agreed rate upon the beneficiary's enrollment ($482.00 commission, $250.00 override commission).  So each of these applications serves as a claim under the False Claims Act. *Supervalu, Inc*., 598 U.S. at 745 & n.1.

226.    Second, after enrolling the beneficiary that Shikara and his related entities steered to them, Freedom knowingly submitted claims to CMS and the Medicare Advantage program for the capitated payments associated with the beneficiary.

227.    All such claims (both those from the Well-Life Agency to Freedom and those from Freedom to CMS) were false or fraudulent because they were tainted by kickbacks.  Specifically, Freedom knowingly and willfully offered and paid kickbacks to Shikara and the Shikara-controlled defendants (and Shikara and the Shikara-controlled defendants knowingly and willingly solicited and/or received kickbacks from Freedom) by way of marketing and other funds to fuel growth, override commissions, and/or inflated provider rates.  *See* 42 U.S.C. § 1320a-7b(b)(1)-(2).  In return, Shikara and the Shikara-controlled defendants referred and recommended Medicare beneficiaries to Freedom's Medicare Advantage plans.

228.    These claims were also false or fraudulent because Defendants failed to disclose numerous material violations, including but not limited to:

- Shikara directed people to cold-call beneficiaries, using HIPAA-protected materials, in order to solicit sales for Freedom in violation of criminal law and material regulations, rules, and contracts governing the Medicare Advantage program.  *See* 42 U.S.C. § 1320d-6 (HIPAA/wrongful disclosure of individually identifiable health information); 42 C.F.R. § 422.504(h)(1)-(2) (requiring all MA Organizations to comply with HIPAA); 42 C.F.R. § 422.504 (requiring all first tier, downstream, and related entities to comply with the MA Organization's contractual obligations to CMS); *see also* 42 U.S.C. § 1395w-21(h)(4) (prohibition of certain marketing activities) & (j) (same) 42 C.F.R. § 422.2268(b)(13) (no cold-calling); Medicare Communications & Marketing Guidelines § 40.2 (no cold-calling).

- Shikara, Medical Consultants, and the MSO impermissibly utilized the role of medical provider to influence, recommend, and solicit sales for Freedom.  *See* 42 C.F.R. § 422.2268(b) (Standards for MA Organization communications and

marketing); Medicare Communications & Marketing Guidelines §§ 60.2-60.3 (list of prohibited activities for providers and admonition of "the need for providers to remain *neutral* when assisting beneficiaries with enrollment decisions").

229.   CMS would not have paid for these Freedom Medicare Advantage enrollees had it known of the multiple violations of material laws, regulations, and contract terms.

## Defendants Discriminated Based on Health Status.

230.   On a nearly constant basis, Shikara also manipulated his patient base to eliminate unprofitable patients or transfer unprofitable patients to other MA Organizations.  For example, on June 27, 2018, one of Shikara's MSO employees, Monica Romero, e-mailed an MSO physician, Dr. Michael Blum, with a list of patients, explaining "these are your most expensive. Many ER visits and referrals."

231.   Monica Romero then directed Relator Butler to contact these "expensive" patients directly in order to change them to a PPO plan that paid providers like Shikara on a fee-for-service basis and thus did not entail any risk for Shikara, Medical Consultants, or the MSO.

232.   As another example, in March 2017, Shikara came close to reaching a 1,000-patient threshold with WellCare, an event that would have caused his overall compensation to drop under the terms of his WellCare contract.  Shikara's brother-in-law responded by ordering Butler to immediately start switching patients out of WellCare.  Puente explained as follows in a March 17, 2017 email:

> [W]e are very close to reach the threshold of 1000 members.  Brian you have to move as many duals as possible out of this plan ASAP.

It made no difference, of course, whether it was in the best interests of these patients to switch plans – they needed to switch so Shikara would not lose money.

233.   All of this activity was illegal.  MA Organizations, participating medical providers, and their agents/brokers cannot discriminate or steer patients based upon their health status or the financial interests of the physician.  *See, e.g.*, 42 C.F.R. § 422.110; *see also* Medicare Communications & Marketing Guidelines § 30.1 (Anti-Discrimination) and § 60.3 (providers must remain neutral in patient enrollment decisions).

234.   This is especially true when the insurance agent is also the medical provider.  In such situations, the patient may believe the doctor is making recommendation in their best interest when in reality, the doctor is acting in his or her own self-interest.

**Defendants Used HIPAA-Protected Materials to Steer & Cold-Call Patients.**

235.   As explained earlier, MA Organizations and their agents cannot use HIPAA-protected materials for solicitation purposes, nor can they cold-call patients to solicit insurance sales.  In this case, Shikara built his entire business model on these two practices.  Under normal circumstances, it would be inconceivable for a medical physician to simply hand over an Excel spreadsheet of his or her patients' HIPAA-protected information to an insurance agent who wanted to sell insurance to those patients.  But this was exactly the standard practice with Shikara.

236.   Because Shikara owned both the provider clinics and the insurance agency, Shikara set up a free flow of information between the two companies, which worked in tandem in the business of selling and switching insurance policies.  Oftentimes, Shikara instructed his medical staff to perform the cold-calling functions themselves.

237.   This Complaint has already described numerous cold-calling and HIPAA violations.  Others include the following:

- On June 4, 2014, medical practice Mary Martinez emailed Relator Butler an Excel spreadsheet of HIPAA-protected information, writing, "here you go!"

- On June 11, 2014, MSO employee Raul Puente emailed Relator Butler an Excel spreadsheet of HIPAA-protected information, writing "manage it well buddy."

- On June 16, 2014, MSO employee Raul Puente emailed Relator Butler an Excel spreadsheet of HIPAA-protected information regarding PUP patients.

- On July 7, 2014, Shikara himself emailed Relator Butler an Excel spreadsheet of HIPAA-protected information regarding PUP patients.

- On June 22, 2017, MSO employee Romero emailed Relator Butler an Excel spreadsheet of HIPAA-protected information.

- On January 23, 2019, medical practice employee Sol Moreno emailed Relator Butler an Excel spreadsheet of HIPAA-protected information regarding the plan to switch patients to MMM.

238.   Relators can provide hundreds of examples of individual Medicare Advantage Patients who were cold-called based upon illegally obtained HIPAA-protected information. Representative samples of switched patients include the following:

| Name | Plan | Date of switch |
|------|------|----------------|
| F.C. | PCP | Sept. 2017 |
| M.B. | PCP | Sept. 2017 |
| W.B. | PCP | Sept. 2017 |
| W.B. | Humana | Sept. 2017 |
| N.A. | Humana | Sept. 2017 |
| G.E. | Humana | Sept. 2017 |
| V.H. | Humana | Sept. 2017 |
| D.H. | Humana | Sept. 2017 |
| N. L-M | PCP | Sept. 2017 |
| K.L. | Humana | Sept. 2017 |

239.   These examples are representative only.  On information and belief, Shikara and his entities transferred many additional patients by cold-calling and using HIPAA-protected materials.  CMS would not have paid for the above Medicare Advantage enrollees had it known

of these multiple violations of material laws, regulations and contract terms.

### **Shikara Paid Kickbacks for Referrals of Patients From Agents.**

240.    Finally, Shikara used his dual position as both medical provider and insurance agency to offer kickback deals to independent agents throughout South Florida.  As described earlier, the Well-Life Agency operated as an FMO or General Agent, which in turn entered into contracts with independent agents to sell Medicare Advantage plans under the authority of Well-Life's various FMO or General Agent contracts.  However, the Well-Life Agency was never a traditional insurance agency.  Its goal was not merely to sell Medicare Advantage plans, but also to steer those patients to Shikara's provider clinics.

241.    As a means to steer more patients to his clinics, Shikara offered kickbacks to independent agents.  The kickback involved a *quid pro quo* of swapping new insurance sales for new medical patient enrollments.  The kickback worked as follows.  The Shikara medical practice had access to a great many individual patients who were not yet on Medicare.  For example, a 64-year-old patient might have traditional commercial insurance, but then become eligible for Medicare.  When the 64-year-old patient becomes eligible for Medicare, this presents an opportunity for an insurance agent to earn a commission by selling a Medicare Advantage policy to this brand-new Medicare beneficiary.  This type of "insurance lead" is a valuable commodity to independent insurance agents.

242.    The insurance agents, on the other hand, have access to something valuable to Shikara, namely, new medical patients.  That is to say, independent insurance agents, in the course of their business, come across many Medicare Advantage beneficiaries who have not chosen Shikara as their primary care physician.  Independent agents thus find themselves in a position to

deliver something of value to Shikara, if they can convince a Medicare beneficiary to switch their primary care provider to the Shikara medical practice.

243.    Recognizing the opportunity for a *quid pro quo* arrangement, from approximately 2014 forward, Shikara had an ongoing offer to independent agents in the South Florida area: if you give me new medical patients, I will give you insurance leads.  This was a blatant, illegal kickback offer.

244.    Relators have emails and texts that confirm and prove the existence of this kickback scheme.  For example, on April 10, 2018, Raul Puente sent an email to an independent agent Kimaura Massey-Mitchell, who was participating in a Well-Life Agency marketing activity designed to recruit new insurance leads.  Puente told her the following:

> I need you to please give us a report of how many patients [have] been written from our lists and events and who was the broker, *since I will be asking to all … agents to give us back same amount of leads given [if] they want to continue participating with us.*

(Emphasis added).

245.    In other words, independent brokers like Massey-Mitchell could not accept insurance leads unless they gave back to Shikara the same number of new patient "leads."

246.    The agent asked for clarification of the obligation to "give back" these leads:

> regarding agents giving back the same amount of leads that are given … agents can pay back with enrollments regardless of which practice/Dr., correct?  Or are we talking about paybacks for [Shikara] enrollments?

The agent was attempting clarify whether she could satisfy the *quid pro quo* by signing up beneficiaries who selected a doctor *other than Shikara*.

247.    Raul Puente quickly shot this notion down:

> Kim, I am talking [Shikara] only (any of our practices).

In other words, Shikara would not pay a kickback in exchange for a referral to *somebody else's* medical practice; the new patient had to become a patient of Shikara's practices.

248.     Later in the year, Shikara himself referenced the kickback in an email to several of his employees including Relator Butler, concerning an independent agent named Tanya Parker. Shikara was anxious to get more referrals from this agent and instructed his staff as follows:

> we need to give Tanya a referral to start gaining her business

249.     Shikara's outreach specialist kept a detailed ledger of insurance agents and tracked the number of new patients they referred to his medical practice.

250.     In addition, Shakira gave other forms of kickbacks to agents, including to Marie Seide, in order to induce her to refer patients to his medical practice.  As an example, he donated $1,000 to Marie Seide's foundation, the Marie Louise Cancer Foundation, Inc., in late 2018. Shikara told Relator Butler he made this donation in order to induce Seide to refer more patients to his medical practice.

251.     Medical providers such as Shikara cannot pay kickbacks in order to induce the referral of patients.  This is blatantly illegal.  Nevertheless, Shikara used his dual roles as provider and insurance agency to perpetrate this kickback scheme.  Representative samples of kickback-tainted patients include the following:

| New Patient | Agent | Effective date |
|---|---|---|
| H.M. | Salazar | 10/1/17 |
| O.R. | Salazar | 10/1?17 |
| M.N. | Salazar | 1/1/18 |
| H.M. | Alvarez | 11/1/17 |
| L.O. | Salazar | 10/1/17 |
| R.A. | Salazar | 10/1/17 |
| G.H. | Alvarez | 9/1/17 |
| B.R. | Salazar | 1/1/17 |

252.     CMS would not have paid for the above Medicare Advantage enrollees had it

known of these multiple violations of material laws, regulations and contract terms.

### RELATORS OBJECT TO THE FRAUD

253.    As insurance agents, both Relators developed personal relationships over the years with many of the Medicare beneficiaries to whom they sold Medicare Advantage policies.   At various times working for Shikara, both Relators felt extremely uncomfortable when asked to sell or push insurance policies that were not in the best interests of the patients.   In particular, many policies had poor doctor networks or lacked particular specialists needed by a given patient.

254.    During the campaign to switch patients to MMM, for example, Relator Butler repeatedly complained to Shikara that he did not want to switch patients to MMM because MMM had such a poor network.   Ultimately, Shikara told Relator Butler to do his job and, if he didn't do it, Shikara would simply call in a team of MMM captive agents to make the switches instead.

255.    By late 2018, Shikara had turned up the pressure to switch patients to MMM, and he told Relator Butler to focus *all* of his efforts and switching patients to MMM and not to sell any other policies.   Butler told Shikara he would not and could not do so, because MMM was not the best plan for many of his patients.   Shikara was furious, and their relationship rapidly deteriorated thereafter.   Ultimately, Relator Butler resigned, citing among other things, improper patient steering in his April 12, 2019 resignation letter.

256.    Relator Philipp similarly complained to Shikara in 2019 about the campaign to switch patients to Freedom in St. Lucie County.   Relator Philipp believed that Freedom had an inferior network and was not in the best interest of many of his clients.   Relator Philipp complained to Raul Puente about the immense pressure to sell Freedom.   Puente responded by telling Philipp that Freedom was doing "more than any other carrier" to help Shikara grow his business.   This

issue eventually reached a head, as a result of which Relator Philipp resigned on or about April 8, 2019.

## CONDITIONS PRECEDENT

257.     All conditions precedent have been satisfied.

## COUNT I
### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against Mazin Shikara)*

258.     The Relators reallege the allegations made in Paragraphs 1 through 259.

259.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

260.     Through the acts described above, Defendant Mazin Shikara knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

261.     The Government, unaware of the falsity of the claims made or caused to be made by the Defendant Mazin Shikara, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

262.     By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

263.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT II
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against Mazin Shikara)*

264.     The Relators reallege the allegations made in Paragraphs 1 through 259.

265.     This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. §§ 3729-32, as amended.

266.     Through the acts described above, Defendant Mazin Shikara knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

267.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant Mazin Shikara, has paid and continues to pay claims that would not have been paid had the truth been known.

268.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

269.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT III
### Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against Mazin Shikara)*

270.     The Relators reallege the allegations made in Paragraphs 1 through 259.

271.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

272.     Through the acts described above, Defendant Mazin Shikara conspired with Defendants Medical Consultants of Florida, LLC; Well-Life Group, LLC; Medical Consultants Management, Inc.; Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

273.     The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid claims that would not be paid but for Defendants' illegal conduct.

274.     By reason of Defendants' acts, the United States has been damaged, and continues

to be damaged, in a substantial amount to be determined.

275.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT IV
### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against Medical Consultants of Florida, LLC)*

276.     The Relators reallege the allegations made in Paragraphs 1 through 259.

277.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

278.     Through the acts described above, Medical Consultants of Florida, LLC and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

279.     The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

280.     By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

281.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT V
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against Medical Consultants of Florida, LLC)*

282.     The Relators reallege the allegations made in Paragraphs 1 through 259.

283.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

284.    Through the acts described above, Medical Consultants of Florida, LLC knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

285.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

286.    By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

287.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT VI
## Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against Medical Consultants of Florida, LLC)*

288.    The Relators reallege the allegations made in Paragraphs 1 through 259.

289.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

290.    Through the acts described above, Defendant Medical Consultants of Florida, LLC conspired with Defendants   Mazin Shikara; Well-Life Group, LLC; Medical Consultants Management, Inc.; Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

291.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

292.    By reason of Defendants' acts, the United States has been damaged, and continues

to be damaged, in a substantial amount to be determined

293.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT VII
#### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against Well-Life Group, LLC)*

294.    The Relators reallege the allegations made in Paragraphs 1 through 259.

295.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

296.    Through the acts described above, Well-Life Group, LLC and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

297.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

298.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

299.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT VIII
#### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against Well-Life Group, LLC)*

300.    The Relators reallege the allegations made in Paragraphs 1 through 259.

301.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

302.    Through the acts described above, Well-Life Group, LLC knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

303.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

304.    By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

305.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT IX
### Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against Well-Life Group, LLC)*

306.    The Relators reallege the allegations made in Paragraphs 1 through 259.

307.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

308.    Through the acts described above, Defendant Well-Life Group, LLC conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Medical Consultants Management, Inc.; Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

309.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

310.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

311.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT X
### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against Medical Consultants Management, LLC)*

312.    The Relators reallege the allegations made in Paragraphs 1 through 259.

313.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

314.    Through the acts described above, Medical Consultants Management, LLC and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

315.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

316.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

317.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XI
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against Medical Consultants Management, LLC)*

318.    The Relators reallege the allegations made in Paragraphs 1 through 259.

319.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

320.    Through the acts described above, Medical Consultants Management, LLC

knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

321.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

322.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

323.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**COUNT XII**
**<u>Violation of 31 U.S.C. § 3729(a)(1)(C)</u>**
*(against Medical Consultants Management, LLC)*

324.     The Relators reallege the allegations made in Paragraphs 1 through 259.

325.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

326.     Through the acts described above, Defendant Medical Consultants Management, LLC conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) and 3729(a)(1)(G).

327.     Further to Defendants' conspiracy and fraudulent scheme, despite knowing that tens of millions of dollars in payments from the federal government have been received in violation of the False Claims Act and in violation of the Anti-Kickback Statute's prohibition on receipt of payment for services rendered in connection with an improper financial arrangement, Defendants

have refused and failed to refund these payments and have continued to submit false or fraudulent claims, statements, and records to the United States.

328.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

329.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

330.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**COUNT XIII**
**Violation of 31 U.S.C. § 3729(a)(1)(A)**
*(against Humana Medical Plan, Inc.)*

331.    The Relators reallege the allegations made in Paragraphs 1 through 259.

332.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

333.    Through the acts described above, Humana Medical Plan, Inc. and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

334.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

335.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

336.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XIV
## Violation of 31 U.S.C. § 3729(a)(1)(B)
### *(against Humana Medical Plan, Inc.)*

337.    The Relators reallege the allegations made in Paragraphs 1 through 259.

338.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

339.    Through the acts described above, Humana Medical Plan, Inc. knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

340.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

341.    By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

342.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XV
## Violation of 31 U.S.C. § 3729(a)(1)(C)
### *(against Humana Medical Plan, Inc.)*

343.    The Relators reallege the allegations made in Paragraphs 1 through 259.

344.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

345.    Through the acts described above, Defendant Humana Medical Plan, Inc. conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; and Medical Consultants Management, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

346.    Further to Defendants' conspiracy and fraudulent scheme, despite knowing that tens of millions of dollars in payments from the federal government have been received in violation of the False Claims Act and in violation of the Anti-Kickback Statute's prohibition on receipt of payment for services rendered in connection with an improper financial arrangement, Defendants have refused and failed to refund these payments and have continued to submit false or fraudulent claims, statements, and records to the United States.

347.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

348.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

349.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XVI
### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against Coventry Health Plan of Florida, Inc. and Aetna Health, Inc.)*

350.    The Relators reallege the allegations made in Paragraphs 1 through 259.

351.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

352.    Through the acts described above, Coventry/Aetna and their agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

353.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

354.     By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

355.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XVII
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against Coventry Health Plan of Florida, Inc. and Aetna Health, Inc.)*

356.     The Relators reallege the allegations made in Paragraphs 1 through 259.

357.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

358.     Through the acts described above, Coventry/Aetna knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

359.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

360.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

361.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XVIII
### Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against Coventry Health Plan of Florida, Inc. and Aetna Health, Inc.)*

362.     The Relators reallege the allegations made in Paragraphs 1 through 259.

363.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

364.    Through the acts described above, Defendants Coventry Health Plan of Florida, Inc. and Aetna Health, Inc. conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; and Medical Consultants Management, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

365.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

366.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

367.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT XIX
### Violation of 31 U.S.C. § 3729(a)(1)(A)
*(against UnitedHealthcare of Florida, Inc.)*

368.    The Relators reallege the allegations made in Paragraphs 1 through 259.

369.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

370.    Through the acts described above, UnitedHealthcare of Florida, Inc. and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

371.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

372.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

373.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT XX
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against UnitedHealthcare of Florida, Inc.)*

374.     The Relators reallege the allegations made in Paragraphs 1 through 259.

375.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

376.     Through the acts described above, UnitedHealthcare of Florida, Inc. knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

377.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

378.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

379.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT XXI
### Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against UnitedHealthcare of Florida, Inc.)*

380.     The Relators reallege the allegations made in Paragraphs 1 through 259.

381.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

382.     Through the acts described above, Defendant UnitedHealthcare of Florida, Inc.

conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; and Medical Consultants Management, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

383.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

384.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

385.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**COUNT XXII**
**<u>Violation of 31 U.S.C. § 3729(a)(1)(A)</u>**
*(against MMM of Florida, Inc.)*

386.    The Relators reallege the allegations made in Paragraphs 1 through 259.

387.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

388.    Through the acts described above, MMM of Florida, Inc. and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

389.    The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

390.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

391.    Additionally, the United States is entitled to the maximum penalty for each and

every violation alleged herein.

## COUNT XXIII
### Violation of 31 U.S.C. § 3729(a)(1)(B)
*(against MMM of Florida, Inc.)*

392.     The Relators reallege the allegations made in Paragraphs 1 through 259.

393.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

394.     Through the acts described above, MMM of Florida, Inc. knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

395.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

396.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

397.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XXIV
### Violation of 31 U.S.C. § 3729(a)(1)(C)
*(against MMM of Florida, Inc.)*

398.     The Relators reallege the allegations made in Paragraphs 1 through 259.

399.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

400.     Through the acts described above, Defendant MMM of Florida, Inc. conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; and Medical Consultants Management, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and

3729(a)(1)(B).

401.   The Government, unaware of the Defendants' conspiracy and fraudulent schemes, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

402.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

403.   Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT XXV
### <u>Violation of 31 U.S.C. § 3729(a)(1)(A)</u>
*(against Freedom Health, Inc.)*

404.   The Relators reallege the allegations made in Paragraphs 1 through 259.

405.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

406.   Through the acts described above, Freedom Health, Inc. and its agents and employees knowingly presented and/or caused to be presented to the Government false or fraudulent claims for payment or approval.

407.   The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, has approved, paid, and participated in such false or fraudulent claims (and continued to do so) that would not have been paid had the truth been known.

408.   By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

409.   Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT XXVI
### <u>Violation of 31 U.S.C. § 3729(a)(1)(B)</u>

*(against Freedom Health, Inc.)*

410.    The Relators reallege the allegations made in Paragraphs 1 through 259.

411.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

412.    Through the acts described above, Freedom Health, Inc. knowingly made, used, and/or caused to be used false records and statements material to false or fraudulent claims.

413.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and their agents, principals, employees, and contractors, has paid and continues to pay claims that would not have been paid had the truth been known.

414.    By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

415.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT XXVII
## <u>Violation of 31 U.S.C. § 3729(a)(1)(C)</u>
*(against Freedom Health, Inc.)*

416.    The Relators reallege the allegations made in Paragraphs 1 through 259.

417.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

418.    Through the acts described above, Defendant Freedom Health, Inc. conspired with Defendants Mazin Shikara; Medical Consultants of Florida, LLC; Well-Life Group, LLC; and Medical Consultants Management, Inc. to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

419.    The Government, unaware of the Defendants' conspiracy and fraudulent schemes,

has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

420.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined

421.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## **PRAYERS FOR RELIEF**

WHEREFORE, Relators request:

A.    That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each action in violation of 31 U.S.C. § 3729 *et seq.*;

B.    That in the event the United States intervenes in this action, Relators be awarded 25% of the proceeds of the action or the settlement of any such claim;

C.    That in the event the United States does not intervene in and proceed with this action, Relators be awarded 30% of the proceeds of this action or the settlement of any such claim;

D.    That Relators be awarded all costs, attorneys' fees, and litigation expenses permitted under 31 U.S.C. § 3730(d);

E.    That Defendants are enjoined from violating the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; and

F.    That the United States and Relators receive all relief, both at law and in equity, to which they may reasonably be entitled.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, the Relators hereby demand a trial by jury.

FLORIN | GRAY

*/s/ Scott L. Terry*
**SCOTT L. TERRY, ESQUIRE**
Florida Bar No.: 77105
Primary:      sterry@floringray.com
Secondary:    ddelarosa@floringray.com
**CHRISTOPHER D. GRAY, ESQUIRE**
Florida Bar No.: 902004
Primary:      cgray@floringray.com
16524 Pointe Village Drive, Suite 100
Lutz, Florida 33558
Telephone No.: (727) 254-5255
Facsimile No.: (727) 483-7942

*Counsel for Relators*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16. 2024, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing

to all counsel of record.

*/s/ Scott L. Terry*
**SCOTT L. TERRY, ESQUIRE**