**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 20-80483-CV-MIDDLEBROOKS

UNITED STATES *Ex. Rel.*, BRIAN
BUTLER, AND MARK PHILIPP

      Plaintiffs and Relators,

v.

MAZIN SHIKARA, *et. al.*,

      Defendants.

_____/

## ORDER ON MOTIONS TO DISMISS

When you develop a sore throat, you make an appointment and go to the doctor. Often, this person is your primary care physician, with whom you have a recurring relationship. While at your doctor's office, she might give you a strep test and send it off to the lab. When it comes back positive, she will likely write you a prescription for antibiotics. Afterward, you will leave and go pick up the pills at the pharmacy. A few days pass, and hopefully you begin to feel better. If all goes as it should, you might not think about your doctor again until the next time you feel ill.

But when you walk out of the office, the doctor does not just say goodbye and call it a day. Because her own services, as well as the strep test and antibiotic prescription, are more expensive than what you paid out of pocket, she submits claims for reimbursement to insurance companies. Notably, if you are a patient that uses Medicare, which is government-provided health insurance for anyone aged sixty-five or older, she must comply with elaborate and detailed regulations to receive that reimbursement.

In simplest terms, complex Medicare regulations prevent doctors from supplying, and then billing the Government, for tainted healthcare. The word "tainted" is, of course, broad, and there

are many ways that a doctor can usurp the Medicare regulations. But one specific way that your doctor can provide legally tainted healthcare is if she paid someone, or provided anything of value to someone, for that individual to refer you to her practice. This is the prohibition against kickbacks.

Although perhaps not intuitive, banning kickbacks makes sense: it promotes doctors making medical decisions based on a patient's best interests as opposed to the doctor's best financial interests. Take this example: Doctor X, a physician who specializes in providing services to individuals aged sixty-five and older, wishes to have more patients and make more money. So, she goes to a local retirement community. She tells the manager that if he only provides Doctor X's name and phone number to any of the elderly residents when they fall down, then Doctor X will tell all of her patients that joining the manager's particular retirement community will help prevent dementia by facilitating later-in-life social connections. The manager agrees because it helps the two parties: both Doctor X and the manager will grow their business.

Such a quid pro quo relationship is, of course, a violation of the Medicare regulations. Although it might help Doctor X's business to receive all of these patients, she might not be the physician best suited for each of the patient's individual healthcare needs. And the patients might not realize that fact if the only doctor's name they are hearing is Doctor X's. If any of those patients do, in fact, go to Doctor X after they fall, and Doctor X treats their injuries, then Doctor X's services will be legally tainted. And if Doctor X then submits a claim to Medicare for reimbursement of her services, she will commit fraud.

With this in mind, it is important to recognize that the complexities of the Medicare regulations make the healthcare industry ripe for fraud. Often, in real life, fraudulent schemes are not nearly as simple as what I have just described. And, in contrast, sometimes even elaborate

schemes do not technically run afoul of the regulations. In wading through the muddy waters of Medicare, the analysis always boils down to whether the parties intentionally circumvented the legal requirements, and whether the actions of the parties directly contravene the regulations.

For instance, this case contains allegations of a doctor entering into many quid quo pro relationships for his own monetary gain, like what we saw with Doctor X. The alleged scheme? The doctor refers those patients of his that qualify for Medicare but are looking for insurance coverage to private insurance companies that are authorized by the Government to provide Medicare benefits. In return, those private companies reimburse the doctor at higher rates for all of his services. To facilitate this scheme, the doctor and the companies rely on individual insurance agents. The insurance agents enroll the doctor's clients with the private insurance companies, and those companies pay a commission for every patient that the agent enrolls. The agents then refer clients of theirs looking for a primary care physician to the doctor for treatment. In all, the doctor ends up with more patients, and the insurance companies end up with more beneficiaries.

But in contrast to Doctor X, our doctor is not himself submitting a claim to Medicare after treating all of his newly referred patients. Instead, the doctor is submitting claims to those private companies, who are reimbursing the doctor through a fixed amount of federal funds that they often received way before the insurance agents enrolled the doctor's patients with their insurance company.

At bottom, the question is whether such allegations demonstrate a scheme sufficiently analogous to that of Doctor X and the retirement home manager—in other words, do we have an intentional violation of the Medicare regulations?

## I.      PROCEDURAL BACKGROUND

THIS CAUSE is a qui tam action alleging Medicare fraud against ten different Defendants. Relators Brian Butler and Mark Philipp originally filed this action under seal in 2020 in the name of the United States. The Defendants in this matter are Doctor Mazin Shikara and his three companies: Medical Consultants of Florida, LLC, Well-Life Group, LLC, and Medical Consultants Management, LLC. Additionally, six Medicare Advantage organizations are listed Defendants. They are Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. Three years after the Relators filed their qui tam complaint, the United States elected not to intervene (DE 32), and I unsealed the case.

On January 16, 2024, the Relators filed an Amended Complaint. (DE 117). All Defendants moved to dismiss the Amended Complaint on January 30, 2024. (DE 125; DE 126; DE 128; DE 129; DE 130; DE 131). The Plaintiffs then filed a Response to each Motion to Dismiss on February 20, 2024 (DE 139; DE 140; DE 141; DE 142; DE 143; DE 144), to which the Defendants Replied on March 5, 2024. (DE 150; DE 151; DE 154; DE 155; DE 156; DE 167). Although the United States elected not to intervene in this action, it filed two Statements of Interest regarding the Defendants' Motions to Dismiss the Amended Complaint. (DE 138; DE 173). Within the Notices of Interest, the United States requests that I deny the pending Motions.

For the following reasons, I will deny the Motions to Dismiss and allow this qui tam action to proceed through litigation.

## II.     LEGAL BACKGROUND

Before I recount the underlying allegations, I begin by providing an overview of the relevant statutory framework.

A. **<u>The False Claims Act</u>**

Congress passed the False Claims Act ("FCA") "with the principal goal of stopping the massive frauds perpetrated by large [private] contractors during the Civil War." *Vt. Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 781 (2000) (quotations omitted). In 1986, after several amendments, Congress yet again altered the language of the original FCA to allow private individuals, acting as "relators," to file a suit on behalf of the United States to expose fraudulent conduct perpetrated against the Government. *See U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497–98 (11th Cir. 1991). Now, many reiterations later, the FCA establishes liability for "any person who," among other things:

- "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

- "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

- "conspires to commit a violation of subparagraph (A), (B), (D), (C), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

- "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

For violations of these provisions occurring between September 28, 1999, and November 1, 2015, the person is liable for a civil penalty ranging from a minimum of $5,500.00 to a maximum of $11,000.00. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999). For violations occurring

on or after November 2, 2015, the civil penalty amounts can reach a maximum of $23,331.00. Further, persons who violate the FCA can be liable in "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

A "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to that money or property" if that claim "is presented to an officer, employee, or agent of the United States; or "*is made to a contractor*, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf to advance a Government program or interest," so long as the Government "(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2) (emphasis added).

### B. **Federal Anti-Kickback Statute**

The Anti-Kickback Statute ("AKS") prohibits any person or entity from making or accepting "any remuneration," which includes "any kickback, bribe, or rebate," "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. § 1320a-7b(b). Such prohibitions apply to both sides of the illegal kickback relationship: in other words, both the giver and the recipient of the kickback are liable under the statute.

Compliance with the statute "is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1259 (11th Cir. 2005). Accordingly, violations of the AKS subject the violator to exclusion from participation in federal healthcare programs, civil monetary penalties, and imprisonment of up to five years per violation because

such conduct constitutes a false or fraudulent claim for purposes of the FCA. *See* 42 U.S.C. §§ 1320a-7(b)(7), 1320a-71(a)(7).

However, receiving a kickback or bribe in the healthcare context might not intuitively raise a red flag under federal law for many people. It might not seem obvious that promising an insurance agent, as a doctor, that you will refer clients to them if they refer clients to you, could be illegal. This is why the FCA requires proof of scienter: that is, the violations of the AKS and the FCA must be done both knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2). In other words, the person submitting a claim to the Government (or to the entity with which the Government contracts) must have "actual knowledge [that] the information [is false]." 31 U.S.C. § 3729(b)(1). Such knowledge can be found if the person "acts in deliberate ignorance of the truth or falsity of the information, or when the person "acts in reckless disregard of the truth or falsity of the information." *Id*; *see United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1220–25 (11th Cir. 2012).

## C. <u>The Medicare Advantage Program</u>

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395gg, establishes Medicare, a four-part program. Parts A and B are "traditional Medicare." *Humana Medical Plan, Inc. v. Western Heritage Ins. Coverage*, 832 F.3d 1229, 1233 (11th Cir. 2016). These provisions establish a "fee-for-service" plan, which "entitl[e] eligible persons to have the Centers for Medicare & Medicaid Services ('CMS') directly pay medical providers for their hospital and outpatient care." *Id.* Part C of the Medicare Program, the subject of this lawsuit, is known as "Medicare Advantage," and it authorizes Medicare beneficiaries to opt out of traditional fee-for-service coverage under Medicare Parts A and B. *See id.* Instead, persons can enroll in privately managed care plans by private insurers that provide coverage for both inpatient and outpatient services. *See* 42 U.S.C.

§§ 1395w-21, 1395w-28. These private health insurers act as administrators for the United States Government in the provision of Medicare benefits. Part D is not relevant here.

CMS pays a Medicare Advantage organization ("MAO") a monthly amount per beneficiary, called a "capitation fee," and the MAO provides "at least the same benefits as an enrollee would receive under traditional Medicare." *Id.* at 1235; *see* 42 U.S.C. §§ 1395w-22(a), 1395w-23. This agreed capitation amount is then adjusted in light of enrollees' "risk factors" such as "age, disability status, gender, [and] institutional status." 42 U.S.C.A. § 1395w-23(C)(i). To receive such a monthly capitation fee, an MAO must certify that the diagnosis codes and other patient data that it submitted to CMS are true and accurate. If the information is knowingly false, or the knowing result of violations of the AKS, then that triggers liability under the FCA. *See UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 870 (D.C. Cir. 2021).

MAOs also work with, and reimburse, primary physicians. MAOs build their respective networks by recruiting and entering into contracts with physicians. Once the physician has contracted with an MAO, that physician is "in network." Plan members can then go to any "in network" medical provider. To reimburse these physicians and medical providers, MAOs can undertake a traditional fee-for-service model. Under such a model, the provider submits a bill to the MAO every time it provides a good or service, and then the MAO repays the provider based upon a schedule of agreed prices. The other way to reimburse providers is through the "capitated" agreements described above. Under such an agreement, the MAO pays a doctor an agreed-upon rate for all goods and services it provides to a patient. This is a fixed amount; the MAO calculates it per patient, per unit of time, and the fee is paid to the provider in advance. This fee considers the type of services that are provided, the number of patients involved, and the level of risk that each of the patients brings. This "level of risk" considers whether the MAO will ultimately have to bear

a higher or lower cost than the CMS capitated rate to cover the expenses of a given beneficiary's care over the course of a year.

Two other levels of operation are at play. Often, MAOs do not enter into direct contracts with primary care physicians. Rather, they enter into contracts with "Management Service Organizations" ("MSOs"). These MSOs act as third-party agents for groups of smaller primary care physician practices. Essentially, the MSOs take the role of the primary care physician in the contracts with the MAOs, and the MSO then will enter into subcontracts with primary care physicians. MSOs are useful because they provide administrative services for the primary care physicians and act as middlemen on behalf of smaller operations, collecting fees in the process.

Further, MAOs utilize insurance agents just like any other insurance agency. Typically, MAOs will enter into contracts with larger organizations called Field Marketing Organizations ("FMOs"), which then recruit independent insurance agents that sell plans pursuant to whatever contract the agents have with the FMO, and whatever contract the FMO has with the MAO. Because MAOs must supervise their insurance agents to ensure "[a]ppropriate knowledge and understanding of Medicare rules and regulations," 42 U.S.C. § 422.2274(c), MAOs often delegate this responsibility in their contracts with FMOs, requiring the FMO to undertake some level of obligation to supervise their agents and inform them of the AKS and FCA requirements.

CMS regulates the commissions that insurance agents are allowed to obtain from the MAOs and FMOs. *See* 42 C.F.R. § 422.2274(b)(1). For example, in Florida in 2019, CMS allowed MAOs to pay an initial sales commission of $482.00 for the sale of a Medicare Advantage plan to a beneficiary. The agent then receives renewal commissions, called override commissions, for subsequent years that the beneficiary elects to stick with the same Medicare plan. The regulations provide that insurance agents receive the same commission regardless of which plan he or she

sells. Every time an insurance agent receives a commission or an override from an FMO, the fee (called an "overhead") has come from an MAO. *See* Agent Broker Compensations, CMS.gov, https://www.cms.gov/medicare/health-drug-plans/managed-care-marketing/medicare-marketing-guidelines/agent-broker-compensation.

Congress and CMS also strictly regulate the marketing of Medicare Advantage plans to Medicare beneficiaries. *See* 42 C.F.R. § 422.2260 (2019) *et seq*. This includes that providers cannot offer "anything of value" to induce enrollees to select them as a provider, and providers cannot accept "compensation" from MAOs for any "marketing or enrollment activities" on behalf of the MAO. *See* 42 C.F.R. § 422.2268(b)(2); Medicare Communications & Marketing Guidelines § 60.2. MAOs and downstream entities like FMOs also cannot "[c]onduct sales presentations or distribute and accept [Medicare Advantage] plan enrollment forms in provider offices or other areas where health care is delivered to individuals," unless the "activities are conducted in common areas in health care settings." 42 C.F.R. § 422.2268(b)(7). The goal of such regulations is to require providers remain neutral in the selection of Medicare insurance plans. *See* Medicare Communications & Marketing Guidelines § 60.3 ("Plans . . . must advise contracted providers, through their agreements with those providers, of the need to remain *neutral* when assisting beneficiaries with enrollment decisions."). Accordingly, because of this neutrality requirement, if even one purpose of the marketing scheme, or the payment of the commissions described above, is to gain a referral to a particular Medicare Advantage plan, then that commission is illegal, despite what other business purposes such a commission might have. *See United States v. Starks*, 157 F.3d 833, 839 (11th Cir. 1998).

MAOs and their insurance agents also cannot "[s]olicit door-to-door for Medicare beneficiaries or through other unsolicited means of direct contact, including calling a beneficiary,

without the beneficiary initiating the contact." 42 C.F.R. § 422.2268(b)(13). Strict penalties can arise when MAOs, FMOs, or insurance agents use personally identified health information protected under the Health Insurance Patient Portal Accountability Act ("HIPAA") to market insurance policies to Medicare beneficiaries. *See* 42 U.S.C. § 1320d-6(a)–(3) (forbidding "obtain[ing] individually identifiable health information relating to an individual" without authorization "with the intent to sell, transfer, or use [the information] for commercial advantage or personal gain"). Thus, using such HIPAA information to solicit patients for particular MAO Medicare plans is a direct violation of the healthcare marketing regulations implemented by CMS.

All contracts between MAOs and CMS, known as "master applications," must contain a provision that the entities are complying with the FCA and HIPAA administrative simplification rules. *See* 42 C.F.R. §§ 422.504(h)(1)–(2). These requirements repeat for contracts between MAOs and other "downstream" entities, like physicians or FMOs. *See* 42 C.F.R. § 422.504. Because the AKS prohibits knowingly and willfully soliciting, receiving, offering, or paying remuneration for the purpose of inducing the purchase or ordering of services that are reimbursable under Medicare, *see* 42 U.S.C. § 1320a-7b(1),(2), an MAO that knowingly accepts monthly payments from CMS for enrollees who joined their program as a result of kickbacks may be held liable under the FCA. The theory here is that the "certification" within each of these master applications is false; the MAOs and/or the providers know that they have not, in fact, complied with all the provisions of the healthcare statutes and regulations. *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 312 (3rd Cir. 2011).

### III.   FACTUAL BACKGROUND

With that legal background in mind, I turn to the facts of this case. Because this cause comes before the Court on several Motions to Dismiss, I accept all facts in the well-pleaded

Amended Complaint as true and construe them in the light most favorable to the Plaintiffs/Relators. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

### A.   __Parties involved__

#### 1.   **Defendants**

At the center of the allegations in the Amended Complaint is Defendant Doctor Mazin Shikara. Doctor Shikara owns and operates a large primary care practice called Medical Consultants of Florida, LLC ("MedFlorida"), which has ten offices throughout South Florida. MedFlorida specializes in servicing Medicare patients who use Medicare Advantage plans. (DE 117 ¶ 14).

Shikara also owns and operates two other entity Defendants in this matter: Well-Life Agency, an FMO that enters contracts with insurance agents who sell Medical Advantage Plans, and Medical Consultants Management, an MSO that enters into contracts with various primary care providers and offers administrative services for those physicians. (*Id.* ¶ 15). Relators allege that Defendant Shikara runs MedFlorida, Well-Life Agency, and Medical Consultants Management "together as part of a web of companies with a common purpose: to drive Medicare Advantage patients to [Shikara's] medical practice" and to insure those patients through "those MAOs that pay him the most remuneration whether through provider reimbursements, insurance commissions, marketing money, or other kickbacks." (*Id.* ¶ 17). Well-Life Agency and Medical Consultants Management both have a listed managing member that is not Defendant Shikara. (*Id.* ¶¶ 19, 21). In reality, however, "Shikara controls [the Defendants] on a day-to-day basis." (*Id.* ¶ 21).

Several MAO corporations within Florida are also in on the scheme, according to the Relators. Defendant Humana Medical Plan, Inc. ("Humana"), is an MAO that contracts with CMS

to provide Medicare to beneficiaries. Coventry Health Plan of Florida, Inc. ("Coventry"), is also an MAO that contracts with CMS to provide Medicare. It is a wholly owned subsidiary of Aetna Health, Inc. ("Aetna"), another Defendant in this matter. Defendant United Healthcare of Florida, Inc. ("United"), MMM of Florida, Inc. ("MMM"), and Freedom Health, Inc. ("Freedom"), are likewise MAOs that contract with CMS to offer Medicare Advantage plans to Medicare beneficiaries in South Florida. All MAOs allegedly paid kickbacks and commissions to Shikara and the Well-Life Agency in exchange for steering Medicare patients to their organizations.

### 2. Relators

Relators Brian Butler and Mark Philipp brought this action on behalf of the United States, the real party in interest. Shikara hired Butler and Philipp in 2013 to work as insurance agents and sell Medicare Advantage plans to the MedFlorida patient base. (DE 117 ¶ 12–13). Shikara promoted Relator Butler in December of 2013 to serve as the Executive Director of Well-Life Agency. (*Id.* ¶ 12). In that role, Relator Butler supervised Well-Life agents, including recruiting and training those agents, and he reported directly to Shikara. (*Id.*). Relator Butler, throughout the course of the Amended Complaint, repeatedly refers to his personal interactions with Shikara and his familiarity with Shikara's management over MedFlorida, Well-Life Agency, and Medical Consultants Management. (*See generally id.*).

Relator Philipp formerly sold Medicare Advantage plans as an independent insurance agent on behalf of Well-Life Agency from May 2013 until April 2019. (*Id.* ¶ 13). From December 2013 until February 2014, Philip served as the Compliance Director of the Well-Life Agency. (*Id.*). In that role, he reviewed contracts between MAOs and the Well-Life Agency, before returning to his role as an independent insurance agent. (*Id.*). Throughout his time working at Well-Life Agency, Relator Philipp interacted with Defendant Shikara on a weekly basis. (*Id.*)

B. **Shikara's Role**

The Relators allege that Shikara "aggressively negotiates for the highest provider reimbursement rates, the highest overrides, and any other remuneration" with each of the Defendant MAOs. (DE 117 ¶ 75). Which particular MAO is best suited for Shikara's financial needs often varies by geography: for example, "Shikara may decide to steer patients in St. Lucie County to Plan A, while steering patients in Palm Beach County to Plan B." (*Id.*). He does so by instructing his employed physicians to discuss with their patients switching their plan, directing medical assistants to cold-call patients and recommend a plan switch, or even having Well-Life agents cold-call patients or "report to work at one of his medical offices, so they can solicit patients before or after their medical appointments." (*Id.* ¶ 77).

C. **Timeline of the Fraudulent Schemes**

In June 2014, a former MAO in Florida named Physicians United Plan ("PUP") liquidated. As a result, all Medicare beneficiaries enrolled in PUP who wanted to continue under a Medicare Advantage plan had to find a different insurance provider. At the time that PUP liquidated, Shikara was in the midst of negotiating new contracts with Humana on behalf of both MedFlorida and Well-Life Agency. As a result of aggressive negotiations with Humana, Shikara began steering his patients that had used PUP for their Medicare Insurance to Humana throughout late 2014 and into 2015 instead. Indeed, in June 2014, Medical Consultants Management, Shikara's MSO, sent a form letter to all existing PUP patients on medical letterhead. The form letter advised patients to contact the Well-Life Agency to obtain new insurance.

Shikara also instructed his employees to cold-call PUP patients to make appointments with Well-Life agents. All Well-Life agents who successfully switched patients from PUP to Humana received commissions and override commissions (the amount agents receive when the beneficiary

re-enrolls in a plan every year). Humana was aware of Shikara's dual role in this scheme as represented by Daphkara Francoise, Humana's Marketing/Medical Sales Support, emailing Relator Butler, who worked for Well-Life Agency, on October 1, 2014, regarding marketing assistance for Shikara's medical practice.

The Relators allege that the Humana enrollment scheme from the PUP fallout consisted of multiple FCA violations. First, each application submitted by the Well-Life Agency to Humana, asking the MAO to enroll the beneficiary in a Medicare Advantage plan, triggered the contractual commission payments from Humana to the Well-Life Agency at the agreed-upon rate. Second, after Humana enrolled the beneficiaries that were referred by Well-Life Agency, Humana knowingly submitted claims to CMS for capitated payments associated with the beneficiary. These were fraudulent because although Humana certified that it and all downstream entities were compliant with all relevant laws and regulations, the referrals were tainted by kickbacks. Specifically, Humana paid Shikara, MedFlorida, Well-Life Agency, and Medical Consultants Management by way of override commissions and inflated provider rates. The referrals also came as the result of violations of the Medicare marketing regulations, including cold-calling patients through the use of their "HIPPA-protected materials" as well as "utiliz[ing] the role of medical provider to influence, recommend, and solicit sales for Humana." (*Id.* ¶ 35). In other words, Shikara and his three entities were anything but neutral in their recommendations.

This process repeated itself several times throughout the years. In a similar vein, Shikara steered many of his patients to Coventry/Aetna and Preferred Care Partners ("PCP"), a plan owned and marketed by Defendant United. Shikara did this by using his own Well-Life agents and having them travel to the offices of Medical Consultants Management. While there, the agents would

recruit beneficiaries and transfer them to Coventry/Aetna and PCP. In the exact same way that the Humana referrals are alleged to be FCA violations, so too were the Coventry/Aetna referrals.

And as we saw with Humana, these MAOs were aware of the issues this marketing scheme caused under federal law. United's Director of Business Development, Ricardo Diaz, sent an email to Relator Butler regarding MedFlorida and the marketing scheme that United had undertaken with Shikara. Jeff Carlini, Coventry/Aetna's Director of Medicare Broker Sales for Florida, also emailed Relator Butler about the "PUP opportunity." (*Id.* ¶ 38). But even further, Defendant Shikara offered to pay Medical Consultants Management's employees extra bonuses for calling and switching patients from one insurance plan to the new, target plan. (*Id.* ¶ 157). Relator Butler stated that United/PCP even wrote a letter to Well-Life Agency concerning an "investigated complaint," and acknowledged that there was "a potential for a perceived conflict of interest regarding Well-Life Group agency ownership and the provider clinics of [Medical Consultants], and, because of this, a potential for patient steering to the clinics." (*Id.* ¶ 163). Despite this email acknowledging the inherent conflicts of interest, the conduct by United continued.

In 2017, another opportunity presented itself to Shikara.  Molina Medical Group, a primary care entity with offices around the county, operated two clinics in Palm Beach County until August of 2017. During that month, Molina Medical Group notified Relator Butler that Molina Healthcare, the insurance company based in Utah that sells Medicare Advantage plans and runs Molina Medical Group, had decided to close its two Palm Beach County clinics. Because Shikara accepted Molina plans, he had the chance to become the new primary care physician for many Molina patients.

Instead, he began steering Molina patients to both his medical practice and either Humana or United. First, he rented out the Molina offices and converted those spaces into new locations of

his own medical practice. He then contacted and hired many of the doctors and staff who previously worked at the Molina Medical Group clinics. He received the Molina patient list, which contained sensitive personal information protected by HIPAA, and he implemented a plan to have his own employees and Well-Life agents cold call all of the Molina patients. He did this with two goals: convince the Molina beneficiaries to switch to using Shikara as their primary physician and convince the Molina patients to switch to other Medical Advantage plans. This would allow Shikara to obtain both the capitated rate for each beneficiary but also the insurance commissions on each policy. Shikara utilized the Molina employees he had just hired and advised them to cold-call patients "because he knew that the patients would recognize them and, as a result, be more likely to respond favorably." (*Id.* ¶ 180). They were then advised to switch from Molina Healthcare to either Humana or United/PCP. Once the patient agreed to switch, a Well-Life agent would visit the patient and help the patient complete the necessary paperwork.

The misconduct did not stop there. In 2018, Shikara began negotiations with a new MAO called MMM. On December 20, 2018, Shikara met with several corporate representatives of MMM at Shikara's Jupiter MedFlorida office. At this meeting, as told by Shikara to Relator Butler, MMM agreed to pay Well-Life Agency if its agents switched Medicare Advantage beneficiaries from other MAOs to MMM. The MMM officers suggested that they "help [Shikara] grow" by "buy[ing] more doctor offices." (*Id.* ¶ 194). Notably, MMM also offered to pay Well-Life insurance agents $150.00 above the regulated commission rates. (*Id.* ¶ 197). Additionally, MMM invited numerous South Florida physicians on an all-expenses-paid vacation to Puerto Rico. On this trip, MMM provided checks to the doctors that were described as "a bonus in good faith." (*Id.* ¶ 199).

In turn, Shikara and Well-Life Agency underwent the standard practice of cold-calling patients and soliciting them to switch their insurance provider to MMM. In a meeting with Relator Butler, Shikara stated that he was identifying patients enrolled in other MAOs with the lowest risk scores (based on health status, age, etc.) to target the best patients for switching to MMM.

Although Shikara preferred the MMM plan in 2018 and 2019, it was not available for Shikara's patients in St. Lucie County at the time. Accordingly, during that period, Shikara began switching his St. Lucie County patients to another Defendant MAO that offered him substantial, illegal remuneration: Defendant Freedom. On March 20, 2019, Raul Puente, Shikara's brother-in-law who helped him run all three of his businesses, contacted Relator Philipp and informed him that MedFlorida has begun to accept Freedom in St. Lucie County. Puente informed Relator Philipp that Freedom was "doing more" than any other carrier for Shikara. (*Id.* ¶ 216).

On March 20, 2019, Relator Philipp drove to Freedom's Vero Beach office to pick up applications for beneficiaries to switch to Freedom. During this time, all agents, by regulation, were prohibited from conducting any marketing activity. *See* 42 C.F.R. § 422.2268(b)(10). Nevertheless, Shikara helped Freedom conduct a marketing event at a local Golden Corral restaurant to convince Shikara's Medicare beneficiaries to switch their policies to Freedom.

Freedom also paid kickbacks to Shikara by paying marketing expenses used to promote Shikara's medical practice. In particular, Freedom paid for a retired Puerto Rican soap opera star to attend multiple promotional events at Shikara's MedFlorida office in St. Lucie County on March 25, 2019. This event resulted in Well-Life agents preparing many contracts on behalf of new beneficiaries and submitting them to Freedom, who then submitted claims to CMS for the capitated payments associated with each new beneficiary.

18

On top of all of this, beginning in 2014, Shikara established a quid pro quo relationship with many independent insurance agents. As described in the Amended Complaint, MedFlorida had access to many individual patients who were not yet enrolled in Medicare plans but would become Medicare-eligible. This provided an opportunity for insurance agents to earn a commission by selling Medicare Advantage policies to brand-new Medicare beneficiaries. Independent insurance agents, in contrast, had access to new medical patients for him. These were Medicare Advantage beneficiaries who had not yet chosen a primary care physician. In exchange for sending these independent insurance agents information regarding the soon-to-be-Medicare-eligible patients, Shikara would receive new patients from the insurance agents, who convinced their Medicare beneficiaries to choose Shikara and MedFlorida as their primary provider. The Amended Complaint sights numerous emails from Raul Puente memorializing such a quid pro quo arrangement. (*See id.* ¶¶ 244–249).

### D.  <u>Discrimination based on health status</u>

The Amended Complaint also alleges that on a nearly constant basis, Shikara would eliminate or transfer unprofitable patients to MAOs that paid providers like Shikara on a "fee-for-service" basis as opposed to a capitated basis. For example, in March 2017, Shikara came close to reaching the 1,000-patient threshold with WellCare, another Medicare Advantage plan. Had Shikara reached such a threshold, his overall compensation would drop per the terms of his WellCare contract. Raul Puente, in an email dated March 17, 2017, emailed Relator Butler to start immediately switching patients away from WellCare. (*Id.* ¶ 232). On June 27, 2018, one of Shikara's MSO employees, Monica Romero, emailed an MSO physician with a list of patients that the MSO had identified as the "most expensive" based on "[m]any ER visits and referrals." (*Id.*

¶ 230). Ms. Romero then directed Relator Butler to have them switch their Medicare Advantage plan so that Shikara, MedFlorida, or the MSO would not assume the risk of those patients.

All of Shikara's actions and negotiations with MAOs and insurance agents throughout the years were conducted with one goal: to drive the largest profits possible.

## IV.    DISCUSSION

Each Motion to Dismiss raises grounds for dismissal that largely overlap. Broadly, these arguments are: (1) the Relators fail to plead with the particularity required under Federal Rule of Civil Procedure 9(b) that a claim was submitted to the Government in violation of 31 U.S.C. § 3729 *et seq*; (2) the Relators fail to allege that any violations of the FCA were material to the Government's decision to pay the MAOs for each beneficiary; and (3) that the qui tam provision of the FCA is unconstitutional on its face.

I evaluate a 12(b)(6) motion to dismiss under the standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To satisfy *Twombly-Iqbal* when alleging violations of the FCA, the Relators must meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *See U.S. ex rel. Matheny v. Medco Health Sols., Inc.,* 671 F.3d 1217, 1222 (11th Cir. 2012). Rule 9(b), which applies to claims of fraud, requires a plaintiff to "state with particularity the circumstances constituting fraud." However, Rule 9(b) allows a plaintiff to "allege[] generally" "[m]alice, intent, knowledge, and other conditions of a person's mind." Fed. R. Civ. P. 9(b). Such a standard requires plaintiffs to detail the "who, what, when, where, and how" of the fraud itself. *Mizzaro v. Home Depot, Inc*.,

544 F.3d 1230, 1237 (11th Cir. 2008). Inherently, a plaintiff-relator can never state a claim for relief under a statute that fails to withstand constitutional scrutiny.

**A.  <u>Constitutionality of the Qui Tam provision of the FCA</u>**

One Defendant, United, argues in its Motion to Dismiss that the Amended Complaint fails to state a plausible claim for relief because the Relators' statutory cause of action, the qui tam provision of the FCA, is unconstitutional on its face. The relevant portion of the FCA for United's constitutional challenge is 31 U.S.C. § 3730(b), which allows a "person" to "bring a civil action for a violation of [the FCA] for the person and for the United States Government." The statute continues: "The action shall be brought in the name of the Government." *Id.*

According to United, the qui tam mechanism of the FCA violates Article II of the Constitution and the separation-of-powers principles that the Constitution embodies. (*See generally* DE 131). United argues that because enforcement of the laws is an act executive in nature, by delegating litigation of the FCA to private third parties, Congress authorizes "unappointed individuals to act as Officers of the United States." (*Id.*). This not only violates the Appointments Clause, as relators in FCA cases obviously do not undergo the appointment process, but also violates the Take Care clause, which provides that the President shall "take Care that the Laws be faithfully executed." U.S. Const. art II § 3. United maintains that the Take Care clause gives the president exclusive authority to determine whether to commence civil or criminal litigation on behalf of the Government. (*See* DE 131) (citing *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"))). And because the FCA allows private individuals to initiate a lawsuit on behalf of the Government, it runs afoul of Article II. United also emphasizes that such

constitutional concerns are at its peak in a case like this one where the United States has elected *not* to intervene. Ultimately, this case represents a situation where the president is not exercising "sufficient control" over the litigation on behalf of the Government. *See Morrison v Olson*, 487 U.S. 65, 696 (1988).

Before I engage in the constitutional analysis, I note that even in its own brief, United concedes that no court has held the qui tam provision of the FCA unconstitutional. (*See id.* at 21 n.4). Instead, United invokes the beckoning of Supreme Court Justices Thomas, Kavanaugh, and Barrett in *United States ex. Rel. Polansky v. Exec. Health Res. Inc.*, 599 U.S. 419, 449 (2023), for its argument. *See id.* (Thomas, J., dissenting) ("There are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation."); *see id.* at 442 (Kavanaugh, J., and Barrett, J., concurring) ("I agree with Justice Thomas that '[t]here are substantial arguments that the qui tam device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation."). All three Justices have expressed an interest in evaluating FCA qui tam actions in light of an Article II challenge. However, notably, no Justice has stated his or her opinion or how they would rule in light of the facts of a given case.

Surprisingly, the Eleventh Circuit has yet to squarely consider the issue of an Article II challenge to 31 U.S. C. § 3730(b). However, decades—nay, centuries—of litigation through the use of the qui tam device under the FCA undercuts United's argument. Every circuit court that has considered the issue outside of the Eleventh Circuit has considered the provision constitutional. *See e.g., United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel.*

*Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993))). District courts in the Eleventh Circuit have reached similar conclusions regarding the matter. *See e.g.*, *United States ex rel. Wallace v. Exactech, Inc.,* 703 F. Supp. 3d 1356, 1363 (N.D. Ala. 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1279 (M.D. Fla. 2014). And although the Supreme Court has not considered whether the qui tam provision violates Article II specifically, it has upheld the portion of the statute delegating litigation to third parties in the name of the United States in the face of an Article III challenge. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 778 (2000) (holding there is "no room for doubt that a *qui tam* relator under the FCA has Article III standing"). Justice Thomas himself did not cite a single court where the majority held the FCA qui tam provision unconstitutional, and, in fact, he cited Supreme Court cases revealing the long historical practice of qui tam lawsuits. *See e.g., Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 801 (2000) (noting that the First Congress passed a handful of qui tam lawsuits).

When considering this history of the FCA, and the abundance of other courts that have balked at United's argument, I find that the qui tam provision of the FCA does not run afoul of Article II. In reaching such a conclusion, I am mindful to not restate the exact historical analysis that the Supreme Court has undergone when evaluating the roots of qui tam actions, although it is certainly persuasive in my determination that the provision is constitutional. For if the First Congress found the mechanism constitutionally appropriate, it would be difficult to justify reaching the opposite conclusion from the very Framers themselves. *See Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (Legislation "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, is contemporaneous and weighty evidence of its true meaning."); *see also Riley*, 252 F.3d at 752 ("Indeed, the Founding

Fathers and the First Congress enacted a number of statutes authorizing qui tam actions . . . . [T]he Supreme Court in *Stevens* gave due credence to the important historical role that qui tam lawsuits have played on both sides of the Atlantic as a means to root out corruption against national governments.").

I also note that the facts of this case, along with the majority of FCA qui tam actions, comply with the plain language of sections 2 and 3 of Article II of the Constitution. The Appointments clause of Article II provides that the President

> shall nominate, and, by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II § 2).  The concept of an "office" of the United States "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868). Here, the Relators, private individuals who worked as insurance agents on behalf of a private organization, have none of the defining qualities of an officer of the United States that must be appointed with the advice and consent of president. Nor do they contain any qualities that define an inferior officer: they are not in an employment-like relationship with the United States, and they have no permanent or continuing duties, either inside this litigation or outside of it. *See Auffmordt v. Hedden,* 137 U.S. 310, 327 (1890) (holding that a "merchant appraiser" was not an inferior officer because he had "no general functions, nor any employment which ha[d] any duration as to time, or which extend[ed] over any case further than as he [was] selected to act in that particular case"). Accordingly, the Constitution has no say in how or why their selection comes about.

Section 3 of Article II of the Constitution states that:

> He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; . . . . he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

This provision requires that "the Executive Branch [maintain] sufficient control over [independent parties] to ensure that the President is able to perform his constitutionally assigned duties." *Morrison*, 487 U.S. at 696 (applying the Take Care analysis in the context of the appointment of independent counsel in the Special Division). Here, the Relators, civil litigants, certainly do not hold unchecked power over prosecuting the alleged violations of the FCA: the United States exercises significant control over all aspects of this lawsuit, from commencement to disposition. For one, all relators must file an FCA claim under seal and serve it on the United States. *See* 31 U.S.C. §§ 3730(b)(2); (c)(2)(a). Additionally, the Government can still elect to pursue a remedy through any administrative proceeding; it need not rely on litigating its own injury. *See* 31 U.S.C. § 3730(c)(5). Additionally, the United States always has the opportunity to later intervene in the action, *even if it chooses not to intervene initially*, and it can always seek dismissal of the claims. *See Polansky*, 599 U.S. at 434. A court must grant such motions to dismiss "in all but the most exceptional cases." *Id.* The United States also has the authority to settle the case, *see* 31 U.S. § 3730(c)(2)(B), and it can veto any voluntary dismissal/settlement by the relators, *see id.* § 3730(b)(1). Even in this case, I ordered that the relators serve all pleadings on the United States Government (DE 32), which has actively opposed dismissal of any of the claims. In sum, "nothing about the statute's objective suggests that the Government should have to take a back-seat to its co-party relator." *Polansky*, 599 U.S. at 435.

For all these reasons, I decline to find that the structure of the qui tam provision usurps the boundaries of any section of Article II of the Constitution. Indeed, the FCA guarantees that the

United States maintains significant control over this public-interest litigation, even despite the fact that it has elected not to intervene in this action. Thus, I will proceed to address whether the Relators have plausibly established a claim that survive a motion to dismiss.

**B.   Standard for Establishing a Plausible "Claim" Under the FCA**

All of the Defendants argue that the Relators have failed to plausibly allege under Federal Rule of Civil Procedure 9(b) that any of the Defendant MAOs actually submitted a false "claim" to CMS itself. *See United States ex. rel. 84 Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023) ("[A]n essential element that must be alleged in a False Claims Act complaint is the actual presentment or payment of a false claim."). This, they argue, is fatal, and must result in the Court dismissing the Relators' Amended Complaint. Of course, the United States, in its Statement of Interest, and the Relators in Response to all of the Motions to Dismiss, disagree. They argue that the Amended Complaint is pleaded with sufficient particularity as to each Defendant and withstands scrutiny. For the following reasons, I agree with the Relators and the United States.

**1.   Legal Overview**

Plausible allegations that a defendant presented a false claim to the Government is the "*sine qua non*" of an FCA violation. *Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006). Liability under the FCA does not attach "merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citation omitted); *see* 31 U.S.C. § 3729(a)(1) (FCA subjects a person to liability who presents a false claim "to . . . the United States Government."). Such a requirement is in reality a guarantee that the United States itself has standing for the claim,

or that the public fisc has experienced "actionable damage." *Clauson*, 290 F.3d at 1311 (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999)).

Accordingly, "Rule 9(b)'s directive . . . does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted." *Id.* Rather, under Rule 9(b), the Eleventh Circuit requires an "indicia of reliability" that a plaintiff has plausibly demonstrated the three elements of an FCA violation actually occurred: (1) a false claims was, in fact, submitted to the Government; (2) the defendants knowingly submitted the false claim; and (3) the false statements materially affected the Government's decision to reimburse the claim. *See* 31 U.S.C. § 3729(b)(4). This burden of reliability is not light.

### a. Submission of a False Claim

A court evaluates whether a relator has reliably alleged presentment of a false claim on a "case-by-case basis." *Atkins*, 470 F.3d at 1358. For example, a relator can adequately plead that a defendant submitted a false claim to the Government by including exact billing information in the complaint. *See Clausen*, 290 F.3d. at 1312. This can include identifying "amounts of charges," "actual dates," "policies about billing," or even "second-hand information about billing practices." *Id.* Or a relator can plead his "direct, first-hand knowledge of the defendants' submission of false claims gained through [his] employment with the defendants." *U.S. ex rel. Mastej v. Health Mgmt. Associates, Inc.*, 591 Fed. Appx. 693, 704 (11th Cir. 2014) (citing *U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) ("holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ *who conversations about the defendant's billing practices with the defendant's office manager* formed the basis for the relator's belief that claims were actually submitted to the government")). Although

the Eleventh Circuit has held that the inquiry regarding whether a relator has reliably alleged a false submission is a "nuanced" analysis, at a minimum, "[i]t is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge." *Mastej*, 591 Fed. Appx. at 704–05 (internal citations omitted).

### b.  Scienter

Even if a defendant violates the FCA, the person or entity cannot be held liable unless they committed that violation with the requisite scienter. That means the violation must have been committed "knowingly," which the statute defines as either "actual knowledge," "deliberate indifference," or "reckless disregard." 31 U.S.C. § 3729(b). Although this does not require a "specific intent to defraud," the relator must demonstrate that the defendants did not commit an "innocent mistake or simple negligence." *Urquilla-Diaz v. Kaplan Univ.,* 780 F.3d 1039, 1058 (11th Cir. 2015) (citation omitted).

Although proof of scienter is necessary for ultimate liability, Federal Rule of Civil Procedure 9(b) allows a plaintiff to allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally." Thus, at this stage, the Relators merely need to allege that the Defendants failed "to make such inquiry as would be reasonable and prudent" to ensure compliance with the AKS and FCA. *Urquilla-Diaz*, 780 F.3d at 1058.

### c.  Materiality

Finally, allegations in a complaint must plausibly demonstrate that any "misrepresentation about compliance with a statutory, regulatory, or contractual requirement" was "material to the Government's payment decision." *Universal Health Services, Inc. v. United States ex. rel. Escobar,* 579 U.S. 176, 181 (2016). The FCA defines "material" as having a "natural tendency to

28

influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Pleading a violation of an expressed precondition to receiving government funds is "relevant, but not automatically dispositive" of the materiality inquiry when determining if an FCA complaint should survive a motion to dismiss. *Escobar*, 579 U.S. at 194. The Eleventh Circuit has instead defined the inquiry as "holistic," and has highlighted some relevant factors to the inquiry: "(1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior." *United States ex rel. v. Mortgage Inv'rs Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021). Of course, at a motion to dismiss stage, a relator need only raise a "reasonable inference that the Government would deny payment if it knew about Defendants' alleged violations*." United States ex rel Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019).

### 2. Application

Although a close call, in this instance, I find that the Amended Complaint withstands Rule 9(b) and 12(b)(6) scrutiny.

### a. Submission of a False Claim

The case is difficult because, although lengthy, the Amended Complaint is replete with repetitive allegations, and the Defendants argue that such repetitive allegations fail to contain the "indicia of reliability" establishing the submission of a false claim to the Government. At most, according to the Defendants, the allegations demonstrate that insurance agents prepared applications on behalf of Medicare Advantage beneficiaries, which triggered contractual commissions from private MAOs. Such commissions do not damage the public fisc, and,

moreover, are permitted by regulation. Accordingly, the Relators have not alleged the submission of a bona fide "claim."

In support of their conclusion, the Defendants cite the structure of Medicare Part C. As discussed above, under Medicare Part C, CMS pays the MAO a fixed fee per enrollee, which is a "pre-negotiated lump sum for one year (known as the 'capitated payment') for each enrollee that the MAO agrees to cover." *Tenet Healthsystem GB, Inc. v. Care Improvement Plus S. Cent. Ins. Co.*, 875 F.3d 584, 586 (11th Cir. 2017). CMS determines this capitated amount, according to Defendants, "well before annual plan enrollment opens" by bids that the MAOs submit. (*See* DE 167 at 6). Because CMS's payment to an MAO is not affected by the Medicare Advantage plan's actual costs, any payment by an MAO to an independent insurance agent as part of a commission rate cannot possibly be the result of false or fraudulent claims. Defendants bolster this argument by citing a Western District of Missouri opinion, which found that because the MAO—and not CMS—pays the commission rates to the independent insurance agents, no "claim" is actually submitted to the Government. *See U.S. ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, No. 18-CV-00860-DGK, 2022 WL 3587358, at *1 (W.D. Mo. Aug. 22, 2022), reconsideration denied, No. 18-CV-00860-DGK, 2023 WL 3807046 (W.D. Mo. June 2, 2023); *Cf. Greenfield v. Medco Health Solutions, Inc.,* 880 F.3d 89, 100 (3d Cir. 2018) ("A kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient.").

In contrast, the United States, in its Statement of Interest, argues that the Defendants have focused on the wrong false "claim" in seeking dismissal of the Amended Complaint. The false "claim," in this instance, is the beneficiary application submitted by insurance agents to Defendant MAOs, who contract with CMS to provide Medicare Advantage plans. These applications trigger

contractual commissions, and the MAOS knowingly pay commissions to insurance agents who have violated Medicare guidelines and the AKS. In support that the insurance agents' prepared beneficiary application can constitute a false "claim," the United States cites to *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 314 (3rd Cir. 2011). In *Wilkins*, the Third Circuit evaluated a qui tam complaint alleging that MAOs violated the FCA by failing to comply with specific marketing regulations and by providing illegal remuneration to physicians for enrolling new beneficiaries with the MAO. *Id.* at 300.

In *Wilkins*, the relators pleaded that one MAO offered $27,000.00 to a medical clinic to switch eligible beneficiaries from one Medicare Advantage plan to its own plan in addition to engaging in numerous marketing violations to enroll new beneficiaries, such as directing insurance agents to solicit patients in the waiting rooms of clinics and doctors' offices and directing the agents to market the Medicare Advantage plan via door-to-door solicitation. *Wilkins*, 659 F.3d at 300.

The court found that such allegations satisfied the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Id.* at 313. The panel focused on the "underlying contracts, statutes, or regulations themselves" and analyzed whether those made "compliance a prerequisite to the government's payment." *Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008). The Third Circuit pointed out that "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare." *See* 42 C.F.R. §§ 42.504(h) ("The MA organization agrees to comply with—(1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the ant-kickback statute."). Because the MAOs "offer[ed] or enter[ed] into payment arrangements [that] violate the AKS, while making claims for

payment to the Government," the relators were allowed to proceed past the motion to dismiss stage of the proceeding. *Wilkins*, 659 F.3d at 314.

I am persuaded by the Third Circuit's reasoning and similarly find that an FMO's prepared beneficiary application to an MAO, which triggers a contractual commission payment pursuant to federal funds the MAO receives from CMS, constitutes a "claim" for payment under the FCA. I am guided in this finding by the plain language of the FCA, which states that a "claim" under the FCA includes "any request or demand . . . for money," regardless if "the United States has title to the moneys," so long as that money "is to be spent or used . . . to advance a Government program or interest, and if the United States Government . . . has provided any portion of the money or property demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).

A beneficiary (or an independent company like Well-Life Agency) submits an enrollment request to the MAO, and the MAO then transmits the information necessary for CMS to add the beneficiary to its records as an enrollee of the insurer's plan. *See* Section 40 of Chapter 2 of CMS' Medicare Managed Care Manual, www.cms.gov/files/document/cy-2024-ma-enrollment-and-disenrollment-guidance. Although CMS might not adjust the capitated rate simultaneously with the addition of a new enrollee, the MAO eventually receives its monthly capitation payments from CMS based on the total number of enrollees in its Medicare Advantage plan. *See Becerra*, 16 F.4th 867, 873 (D.C. Cir. 2021). Intuitively, capitated fees from CMS to MAOs, which are then paid in the form of commissions to either FMOs or independent insurance agents, would qualify as federal funds advancing a Government program.

A determination that the FCA covers "down-the-chain" activities of private parties contracting to execute Medicare programs comports with the Supreme Court's understanding of the intersection between the FCA and other parts of the Medicare Act. *See United States ex rel.*

*Schutte v. SuperValu Inc.,* 598 U.S. 739, 745 n.1 (2023) (holding that the FCA covered the contracts between private Medicare D "plan sponsors" and third parties such as pharmacies and middlemen called pharmacy benefit managers). Despite the money literally exchanging hands between private entities, no Party here disputes that the funds themselves, at least in part, originate from CMS. Further, the funds would not reach the MAO, the FMO, or the insurance agents if the MAO does not certify in its master application that all parties involved complied with federal regulations.

Moreover, the Amended Complaint contains the requisite indicia of reliability that these applications were submitted and the commission payments occurred. True, the Relators do not provide exact billing by the MAOs to Well-Life agents as the result of every new beneficiary application. But in this instance, the Relators have demonstrated sufficient personal knowledge of the false beneficiary applications and the subsequent commissions. For example, the Relators identify 44 specific Medicare beneficiaries that Well-Life agents referred to MAOs and prepared applications on behalf of as the result of Shikara's kickback scheme (DE 117 ¶¶ 129, 143, 159, 182, 204, 238, 251). They also allege the date/month that the MAOs enrolled the beneficiaries into their plan, (*see generally id.*), and the exact amount that the MAOs paid Well-Life agents from federal dollars as commission and/or override payments, (s*ee generally id.*). And these identified commission payments are within the gambit of the Relators' "personal knowledge" because, from approximately December 2013 through April 2019, Relator Butler trained and supervised the Well-Life agents selling Medicare Advantage plans and was aware of the agents' commissions. (DE 117 ¶¶ 130, 144, 160, 183, 205). The Amended Complaint also states that Relator Butler was personally involved in the negotiations between the Defendant MAOs and Dr. Shikara, who controlled Well-Life, MedFlorida, and Medical Consultants Management. (DE 117 ¶¶ 120–123).

To top it off, the Relators have demonstrated that such commissions were plausibly tainted by violations of the AKS and Medicare marketing regulations. For example, the Relators cite that one member of Shikara's medical staff emailed him on December 7, 2016, asking for his bonus of $1,000. (*Id.* ¶ 115). The medical staff member explicitly stated "that [Shikara] agreed on [the bonus] for [the staff member] . . . cold calling [their] patient [and] converting them from one insurance to the next." (*Id.*). Another example cited by the Realtors was a "patient appreciation breakfast" hosted by Shikara, in which he pitched his patients to switch to particular MAOs. (*Id.* ¶ 117). And during the years in which Well-Life agents switched patients to various MAO plans, the Relators identify that Defendants used HIPAA-protected materials to cold-call and solicit patients. (*See id.* ¶¶ 201, 237). Further, Shikara acknowledged to the Relators his own attempts to target and switch patients in light of the "risks" that they presented for certain payments plans and that certain MAOs committed to directly funding his marketing of their insurance plans. (*Id.* ¶¶ 193, 200–203).

These facts demonstrate that the Relators have plausible first-hand knowledge of the commissions paid by MAOs to Well-Life agents in light of beneficiary applications that came about from violations of the governing statutes and regulations. Thus, I find that in this case they need not provide exact billing information in order to plausibly establish that a claim was submitted under the FCA.

### b. *Scienter*

Moreover, the Relators have alleged generally that each Defendant MAO knew about the multiple hats worn by Shikara and knowingly paid kickbacks to him in an effort to steer his patients to their insurance plans. (*See id.* ¶¶ 30, 31, 32, 33, 34, 35).  Although this alone satisfies Rule

9(b)'s scienter standard, the Relators have included specific examples of their generalized allegations.

For instance, the Amended Complaint states that, in 2013, the executive director of Well-Life Agency emailed Relator Butler and multiple other insurance agents acknowledging the potential for abuse that Shikara's setup created:

> There is a special relation between Well-Life group and [Medial Consultants] but we must keep it separate due to conflict of interest. CMS could hurt Well-Life or [Medical Consultants] if they see any activity that they consider unacceptable.

(*Id.* ¶ 24). The Amended Complaint also states that officers for individual MAO Defendants simultaneously reached out to both Shikara and Relator Butler about the opportunity to transfer patients to the MAO. (*Id.* ¶¶ 138, 154, 163, 189, 192, 216, 218). Such allegations plausibly demonstrate that each Defendant knew, or at least were reckless, with regards to the submissions of fraudulent claims.

### c.  Materiality

Finally, the allegations in the Amended Complaint give rise to an inference that CMS would not have paid the Defendant MAOs has CMS been aware of the numerous AKS violations and regulations violations. First, AKS compliance is an explicit prerequisite to the Government's decision to pay MAOs. *See Haleyville*, 423 F.3d at 1259.  And although the Relators fail to point to prior instances of Government enforcement regarding similar violations in their Amended Complaint, I note that circuit courts have not required such allegations to infer materiality at this stage. *See Lemon*, 924 F.3d at 162; *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc*., 892 F.3d 822, 834 (6th Cir. 2018).[1]  Moreover, the Amended Complaint

---

[1] Regardless of the fact that such allegations need not appear within the Amended Complaint to sufficiently allege materiality, the Relators still cite numerous instances in Response to Humana's

recounts almost six years of continuous and widespread violations by all of the Defendants in an attempt to systematically target Medicare patients and maximize business profits. If true, these allegations certainly do not suggest "minor or insubstantial" noncompliance. *Escobar*, 579 U.S. at 194. I

In total, the Amended Complaint includes allegations that satisfy the holistic materiality inquiry that a court must undertake at this stage of the litigation and would warrant the Relators proceeding to summary judgment.

## V.     CONCLUSION

The heart of the allegations in the Relators' Amended Complaint plausibly demonstrate that they were personally aware of FCA violations by the Defendants. *See Matheney*, 671 F.3d at 1224. For years, Well-Life Agency, an insurance company owned and operated by Defendant Shikara, would mobilize its agents at Shikara's request to enroll patients with specific Medicare Advantage plans sold by particular MAOs. The MAO that Well-Life would send patients to? The one that provided the sweetest financial deal for Shikara at the time in any given location.

To be clear, these MAOs are prohibited by law to directly pay Shikara, MedFlorida, and Medical Consultants Management to enroll Shikara's patients in their respective Medicare Advantage plan. As a matter of common sense, these MAOs cannot backdoor those same patients

---

Motion to Dismiss (DE 144) of the Government instituting enforcement actions against those entities that improperly share patient information and violate Medicare marketing regulations. *See* (DE 144 at 18) (citing GAO Report 10-36, *Medicare Advantage CMS Assists Beneficiaries Affected by Inappropriate Markeing but has Limited Data on Scope of Issue* (Dec. 2009) (noting that, in December of 2009, CMS had instituted enforcement actions against "at least 73 organizations that sponsored M[edicare] A[dvantage] plans from January 2006 through February 2009")). Although this citation does not appear within the four corners of the Amended Complaint and I will not consider it my materiality analysis here, it reinforces why at a motion to dismiss I should infer that the numerous violations actually alleged by Defendants could affect CMS's decision to pay the MAO organizations.

to their plans by paying Shikara's own insurance agency, knowing full well that he operated it, to avoid liability under the FCA.

Perhaps at summary judgment, the Relators will be unable to provide sufficient evidence demonstrating that each Defendant MAO knew about the entire scheme. Perhaps the Relators will be unable to demonstrate that any payor had the purpose to induce referrals with these commissions. It might become apparent that the AKS violations were not material to CMS's decisions to pay a capitated rate to the MAOs. But at this stage, the Relators have included sufficient facts demonstrating a plausible FCA violation by each Defendant. And that is all that is needed.

Accordingly, it is **ORDERED AND ADJUDGED** that all Defendants' Motions to Dismiss the Amended qui tam Complaint (DE 125; DE 126; DE 128; DE 129; DE 130; DE 131) are **DENIED**.

**SIGNED** in Chambers, in West Palm Beach, Florida, this 6th day of September, 2024.

Donald M. Middlebrooks
United States District Judge

37