**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 20-80483-CV-MIDDLEBROOKS

UNITED STATES OF AMERICA *ex rel*.
BRIAN BUTLER and MARK PHILIPP,

      Plaintiffs/Relators,

V.

MAZIN SHIKARA; MEDICAL
CONSULTANTS OF FLORIDA, LLC;
WELL-LIFE GROUP, LLC; MEDICAL
CONSULTANTS MANAGEMENT, LLC;
HUMANA MEDICAL PLAN, INC.;
COVENTRY HEALTH PLAN OF
FLORIDA, INC.; AETNA HEALTH, INC.;
UNITEDHEALTHCARE OF FLORIDA,
INC.; MMM OF FLORIDA, INC.; AND
FREEDOM HEALTH, INC,

      Defendants.

_____/

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court on four competing Motions for Summary Judgment,

including two filed on May 29, 2025 by Plaintiff-Relators and Defendant Humana Medical Plan,

Inc. ("Humana") (DE 270; DE 275), and two filed on June 5, 2025 by Defendant UnitedHealthcare

of Florida, Inc. ("United") and Defendants Mazin Shikara, Medical Consultants of Florida, LLC,

Well-Life Group, LLC, and Medical Consultants Management (the "Shikara Defendants") (DE

301; DE 303). Pursuant to the Local Rules, all four Motions are accompanied by Statements of

Material Facts ("SOMF") (DE 269; DE 280; DE 302; DE 352). I have also considered the Parties'

briefings, which are complete for each Motion. (DE 319; DE 324; DE 329; DE 331; DE 332; DE

349; DE 353; DE 354; DE 356; DE 363; DE 366). Because the Motions, the SOMFs filed in

support, and their voluminous briefings are related, I consider them together.

## BACKGROUND

This matter arises from a *qui tam* action alleging Medicare fraud against ten Defendants. Relators Brian Butler and Mark Philipp originally filed this action under seal in 2020 in the name of the United States. Defendants are Doctor Mazin Shikara and his three companies: Medical Consultants of Florida, LLC, Well-Life Group, LLC, and Medical Consultants Management, LLC. Additionally, six Medicare Advantage organizations are listed Defendants. They are Humana Medical Plan, Inc.; Coventry Health Plan of Florida, Inc.; Aetna Health, Inc.; UnitedHealthcare of Florida, Inc.; MMM of Florida, Inc.; and Freedom Health, Inc. Three years after the Relators filed their *qui tam* complaint, the United States elected not to intervene (DE 32), and I unsealed the case.

On January 16, 2024, the Relators filed an Amended Complaint. (DE 117). All Defendants moved to dismiss the Amended Complaint on January 30, 2024. (DE 125; DE 126; DE 128; DE 129; DE 130; DE 131). I issued an Order denying Defendants' motions to dismiss, in which I extensively traced the factual allegations underlying this matter. (DE 187). Now, with the benefit of a developed factual record, I briefly recount the key allegations in this matter.

### I.  The Logistics of Medicare Advantage

We begin with the basics. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395gg, establishes Medicare, a four-part program. Parts A and B are "traditional Medicare." *Humana Medical Plan, Inc. v. Western Heritage Ins. Coverage*, 832 F.3d 1229, 1233 (11th Cir. 2016). These provisions establish a "fee-for-service" plan, which "entitl[e] eligible persons to have the Centers for Medicare & Medicaid Services ('CMS') directly pay medical providers for their hospital and outpatient care." *Id.* Part C of the Medicare Program, the subject of this lawsuit, is known as "Medicare Advantage," and it authorizes Medicare beneficiaries to opt out of traditional fee-for-service coverage under Medicare Parts A and B. *See id.* Instead, persons can enroll in privately managed care plans issued by private insurers, which cover both inpatient and outpatient

2

services. *See* 42 U.S.C. §§ 1395w-21, 1395w-28. These private health insurers act as administrators for the United States Government in the provision of Medicare benefits.

CMS pays Medicare Advantage organizations ("MAOs") a monthly amount per beneficiary, called a "capitation fee," for which the MAO provides "at least the same benefits as an enrollee would receive under traditional Medicare." *Id.* at 1235; *see* 42 U.S.C. §§ 1395w-22(a), 1395w-23. This agreed capitation amount is then adjusted in light of enrollees' "risk factors," such as "age, disability status, gender, [and] institutional status." 42 U.S.C.A. § 1395w-23(C)(i). To receive a monthly capitation fee, an MAO must certify that the diagnosis codes and other patient data that it submitted to CMS are true and accurate. If the information is knowingly false, or the knowing result of violations of the Anti-Kickback Statute, then that triggers liability under the False Claims Act. *See UnitedHealthcare Ins. Co. v. Becerra,* 16 F.4th 867, 870 (D.C. Cir. 2021).

MAOs also work with, and reimburse, primary physicians. MAOs build their respective networks by recruiting and entering into contracts with physicians. Once the physician has contracted with an MAO, that physician is "in network." Plan members can then go to any "in network" medical provider. To reimburse these physicians and medical providers, MAOs can undertake a traditional fee-for-service model. Under such a model, the provider submits a bill to the MAO every time it provides a good or service, and then the MAO repays the provider based upon a schedule of agreed prices. The other way to reimburse providers is through the "capitated" agreements described above. Under such an agreement, the MAO pays a doctor an agreed-upon rate for all goods and services it provides to a patient. This is a fixed amount; the MAO calculates it per patient, per unit of time, and the fee is paid to the provider in advance.

Two other levels of operation are at play. Often, MAOs do not enter into direct contracts with primary care physicians. Rather, they enter into contracts with "Management Service Organizations" ("MSOs"). These MSOs act as third-party agents for groups of smaller primary

care physician practices. Essentially, the MSOs take the role of the primary care physician in the contracts with the MAOs, and the MSO then will enter into subcontracts with primary care physicians. MSOs are useful because they provide administrative services for the primary care physicians and act as middlemen on behalf of smaller operations, collecting fees in the process.

Further, MAOs utilize insurance agents just like any other insurance agency. Typically, MAOs will enter into contracts with larger organizations called Field Marketing Organizations ("FMOs"), which then recruit independent insurance agents that sell plans pursuant to whatever contract the agents have with the FMO. Because MAOs must supervise their insurance agents to ensure "[a]ppropriate knowledge and understanding of Medicare rules and regulations," 42 U.S.C. § 422.2274(c), MAOs often delegate this responsibility in their contracts with FMOs, requiring the FMO to undertake some level of obligation to supervise their agents and inform them of the AKS and FCA requirements. CMS regulates the commissions that insurance agents are allowed to obtain from the MAOs and FMOs. *See* 42 C.F.R. § 422.2274(b)(1).

Congress and CMS also strictly regulate the marketing of Medicare Advantage plans to Medicare beneficiaries. *See* 42 C.F.R. § 422.2260 (2019) *et seq*. This includes that providers cannot offer "anything of value" to induce enrollees to select them as a provider, and providers cannot accept "compensation" from MAOs for any "marketing or enrollment activities" on behalf of the MAO. *See* 42 C.F.R. § 422.2268(b)(2); Medicare Communications & Marketing Guidelines § 60.2. MAOs and downstream entities like FMOs also cannot "[c]onduct sales presentations or distribute and accept [Medicare Advantage] plan enrollment forms in provider offices or other areas where health care is delivered to individuals," unless the "activities are conducted in common areas in health care settings." 42 C.F.R. § 422.2268(b)(7). If even one purpose of the marketing scheme is to gain a referral to a particular Medicare Advantage plan, that commission is illegal. *See United States v. Starks*, 157 F.3d 833, 839 (11th Cir. 1998).

## II.     The Specific Allegations Against Defendants

At the center of Relators' allegations is Defendant Doctor Mazin Shikara ("Shikara"). Shikara owns and operates a large primary care practice called Medical Consultants of Florida, LLC ("MedFlorida"), which has ten offices throughout South Florida. MedFlorida specializes in servicing Medicare patients who use Medicare Advantage plans. (DE 117 ¶ 14). Relators also allege that Shikara owns and operates two other entity Defendants in this matter: Well-Life Agency ("Well-Life"), an FMO that enters into contracts with insurance agents who sell Medical Advantage Plans, and Medical Consultants Management, an MSO that enters into contracts with various primary care providers and offers administrative services for those physicians. (*Id.* ¶ 15). They assert that Shikara runs these entities "together as part of a web of companies with a common purpose: to drive Medicare Advantage patients to [Shikara's] medical practice" and to insure those patients through "those MAOs that pay him the most remuneration whether through provider reimbursements, insurance commissions, marketing money, or other kickbacks." (*Id.* ¶ 17).

Defendants Humana Medical Plan, Inc. ("Humana") and United Healthcare of Florida, Inc. ("United") are two MAOs that, according to Relators, are also in on the scheme. Both contract with CMS to provide Medicare to beneficiaries, and allegedly paid kickbacks and commissions to Shikara and Well-Life in exchange for steering Medicare patients to their organizations. For their part, Relators Brian Butler and Mark Philipp were hired by Shikara in 2013 to work as insurance agents and sell Medicare Advantage plans to the MedFlorida patient base. (*Id.* ¶¶ 12–13). Shikara promoted Relator Butler in December of 2013 to serve as the Executive Director of Well-Life. (*Id.* ¶ 12). In that role, Relator Butler supervised Well-Life agents, including recruiting and training those agents, and he claims he reported directly to Shikara. (*Id.*). From December 2013 until February 2014, Philip served as the Compliance Director of the Well-Life Agency, reviewing contracts between MAOs and Well-Life before returning independent insurance sales. (*Id.* ¶ 13).

The intricacies of the alleged scheme between Shikara, the entities he is claimed to own, and the MAO Defendants are complex, and I will only discuss them in brief. In the main, the Relators allege that Shikara "aggressively negotiates for the highest provider reimbursement rates, the highest overrides, and any other remuneration" with each of the Defendant MAOs. (*Id.* ¶ 75). To those MAOs that Shikara favors, he allegedly "steers" his patients by instructing his physicians to discuss switching plans with their patients, directing medical assistants to cold-call patients and recommend a plan switch, or having Well-Life agents cold-call patients or "solicit patients before or after their medical appointments." (*Id.* ¶ 77).

The Relators' SOMF offers several examples. One involves the former MAO Physicians United Plan ("PUP"), which liquidated on July 1, 2014. (DE 269 ¶ 15). Relators allege that "[t]o retain his PUP patients after the liquidation, Dr. Shikara immediately mobilized his personnel to move them to other MA plans." (*Id.*). Specifically, Relators assert that Shikara used the prospect of referral from former PUP patients to entice Humana into contracting with MedFlorida, having contacted the regional manager on June 9, 2014, and receiving a finalized contract from Humana the very next day. (*Id.* ¶¶ 16–17). Once Humana had established ties to Shikara and his network, Relators allege that Shikara "would work with Well-Life and Humana agents to enroll his patients into Humana's MA plan," purportedly with Humana's knowledge. (*Id.* ¶ 20).

The Relators allege that the Humana enrollment scheme from the PUP fallout consisted of multiple FCA violations. First, each application submitted by the Well-Life Agency to Humana, asking the MAO to enroll the beneficiary in a Medicare Advantage plan, triggered the contractual commission payments from Humana to the Well-Life Agency at the agreed-upon rate. Second, after Humana enrolled the beneficiaries that were referred by Well-Life Agency, Humana knowingly submitted claims to CMS for capitated payments associated with the beneficiary. These were fraudulent because although Humana certified that it and all downstream entities were

compliant with all relevant laws and regulations, the referrals were tainted by kickbacks. Specifically, Humana paid Shikara, MedFlorida, Well-Life Agency, and Medical Consultants Management by way of override commissions and inflated provider rates. The referrals also came as the result of violations of the Medicare marketing regulations, including cold-calling patients through the use of their "HIPPA-protected materials" as well as "utiliz[ing] the role of medical provider to influence, recommend, and solicit sales for Humana." (DE 117 ¶ 35). In other words, Shikara and his three entities were anything but neutral in their recommendations.

The cited PUP fallout is just one example. The Amended Complaint details numerous other alleged schemes involving several Defendants who have now settled, and outlines that the MAO Defendants were fully aware of the machinations behind Shikara's dealings. As Relators put it, "[f]or many years, the worst kept secret in South Florida's Medicare Advantage ('MA') market was that Dr. Mazin Shikara ("Shikara")—through his web of intertwined organizations—was systematically steering the thousands of Medicare Advantage beneficiaries under his control to the MA plan of his choice." (DE 270 at 2). Unsurprisingly, this characterization—and nearly all of the factual averments offered in support of it—remain fiercely contested by the remaining Defendants, who insist that Shikara does not own Well-Life, that any insurance commissions or other renumeration offered were legal, and that the MAO Defendants had no knowledge of any patient steering.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005). "For factual issues to be considered genuine, they must have a real basis in the record." *Id.*

at 1326 (internal citation omitted). "For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.* (internal citation omitted). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

When the nonmoving party bears the burden of proof on an issue at trial, the movant may "point[] out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its burden under Rule 56(c), the burden shifts to the nonmoving party to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). "The non-movant's response must be tailored to the method by which the movant carried its initial burden." *Hinson v. United States*, 55 F. Supp. 2d 1376, 1380 (S.D. Ga. 1998), *aff'd,* 180 F.3d 275 (11th Cir. 1999). "If the movant present[s] evidence affirmatively negating a material fact, the non-movant 'must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated.'" *Id.* (citing *Fitzpatrick v. City of Altanta*, 2 F. 3d 1112, 1116 (11th Cir. 1993)). "If the movant demonstrate[s] an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was 'overlooked or ignored' by the movant, or 'come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Id.* (citing *Fitzpatrick*, 2 F. 3d at 1116)). However, "factual disputes that are irrelevant or unnecessary will not be counted" as disputes of material fact and will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

I.        **The False Claims Act**

Congress passed the False Claims Act ("FCA") "with the principal goal of stopping the massive frauds perpetrated by large [private] contractors during the Civil War." *Vt. Agency of Nat. Res. V.* Stevens, 529 U.S. 765, 781 (2000) (quotations omitted). In 1986, after several amendments, Congress yet again amended the language of the original FCA to allow private individuals, acting as "relators," to file a suit on behalf of the United States to expose fraudulent conduct perpetrated against the Government. *U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497–98 (11th Cir. 1991). The FCA now, as amended, establishes liability for "any person who," among other things:

- "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

- "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

- "conspires to commit a violation of subparagraph (A), (B), (D), €, (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

- "knowingly makes, . . . a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

For violations of these provisions occurring between September 28, 1999, and November 1, 2015, the person is liable for a civil penalty ranging from a minimum of $5,500.00 to a maximum of $11,000.00. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, *47103 (1999). For violations occurring on or after November 2, 2015, the civil penalty amounts can reach a maximum of $23,331. Further, persons who violate the FCA can be liable in "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

A "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to that money or property" if that claim "is presented to an officer, employee, or agent of the United States; or "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf to advance a Government program or interest," so long as the Government "(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2).

## II.    Federal Anti-Kickback Statute

The Anti-Kickback Statute ("AKS") prohibits any person from making or accepting "any remuneration," which includes "any kickback, bribe, or rebate," "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. § 1320a-7b(b). Such prohibitions apply to both sides of the illegal kickback relationship: in other words, both the giver and the recipient of the kickback are liable under the statute. Compliance with the statute "is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). Accordingly, violations of the AKS subject the violator to exclusion from participation in federal healthcare programs, civil monetary penalties, and imprisonment of up to five years per violation, constituting a false or fraudulent claim for purposes of the FCA. *See* 42 U.S.C. §§ 1320a-7(b)(7), 1320a-71(a)(7).

Both the FCA and the AKS require proof of scienter: that is, violations must be done both knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2). A person "knowingly" violates the FCA by submitting a claim to the Government with "actual knowledge [that] the information [is false]," by "act[ing] in deliberate ignorance of the truth or falsity of the information, or by "act[ing] in

reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1); *see United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1220–25 (11th Cir. 2012). A person need only to have submitted the claim "with the specific intent to do something the law forbids." *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013). It is not necessary to establish "aware[ness] of the specific law or rule that [the alleged] conduct may be violating." *Id.*

### DISCUSSION

The Parties have filed competing motions as to several requisite elements under the False Claims Act. Defendants further challenge the constitutionality of the *qui tam* provisions of the False Claims Act. For the sake of clarity, I will address each of the Parties' arguments in greater detail below. However, I note at the outset that the Parties spend considerable space and ink lobbing boilerplate contentions of evidentiary insufficiency, contending that Relators (or, conversely, Defendants) have failed to supply enough evidence to support their claims.

I have reviewed the extensive submissions, exhibits, and filings of the Parties, and find these arguments of insufficiency unpersuasive. "Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022) (internal citation omitted). A reviewing court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 656-57, 134 S. Ct. 1861, 1866 (2014). Specifically, "a nonmoving party must present more than '[e]vidence that is merely colorable, or is not significantly probative' or 'a mere scintilla of evidence' to support their claims to survive a motion for summary judgment." *Fernandez v. Seaboard Marine LTD.*, 135 F.4th 939, 947 (11th Cir. 2025) (quoting *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012)). "If the record presents factual issues, the Court must not decide them; it must deny the motion [for summary judgment] and proceed to trial." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999) (citations omitted).

All Parties in this matter have presented substantial evidence across hundreds of exhibits in support of their competing accounts of contested facts, including, *inter alia*, thousands of pages of depositions, dozens of sworn declarations, several expert reports, internal emails from Well-Life, and extensive communications between Defendants on the scope and nature of the MAOs' business dealings with Well-Life and the Shikara Defendants. (Exhs. DE 269; DE 280; DE 294; DE 302; DE 304; DE 330; DE 352). The central factual disputes include, among others: whether Shikara in fact owns Well-Life as its de facto manager, and if so, whether the MAO Defendants were aware of the same; whether Shikara "steered" patients within his network to preferred MAO Defendants using Well-Life's agents and his in-network physicians; and, whether the MAO Defendants offered Shikara unlawful renumeration in exchange for his steering operations, such as override commissions paid to Shikara through Well-Life, or preferable rates for provider services. To be clear: on the extensive evidentiary showings of the Parties, I find these questions cannot be resolved on summary judgment. Each is a material fact on which there is a genuine dispute. This case must proceed to trial on the ultimate question of whether liability exists. However, there are certain, narrow issues that are amenable to disposition by way of summary judgment, which will clarify the issues to be brought before an appropriate trier of fact. Therefore, I address some of the Parties' substantive arguments below.

## I.    Requisite Showing Under the False Claims Act

To state a claim under the FCA, a plaintiff must establish that an alleged violator (1) presented claims for payment to the United States or to a contractor spending federal funds ("Presentment"); (2) that those claims were false or fraudulent ("Falsity"); and (3) that Defendants knew the claims were false or fraudulent ("Scienter"). 31 U.S.C. § 3729(b)(4); *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). Where, as here, a plaintiff's theory of falsity turns on breaches of applicable statutes and regulations, the plaintiff

must also establish that said breaches were material to the Government's decision to pay the false claims ("Materiality"). *Universal Health Svcs. v. United States*, 579 U.S. 176, 192 (2016).

### A. Presentment

Only Relators move for summary judgment on the question of presentment, and neither of Defendants' briefs in opposition address the matter. (DE 270 at 5); (*see generally* DE 319; DE 329). This is hardly surprising; the Parties extensively briefed the question of presentment upon Defendants' motions to dismiss. There, Defendants contended that none of the MAOs submitted "claims" to CMS itself. (DE 187 at 26) (citing *United States ex. rel. 84 Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023)). I rejected this argument, and held that "an FMO's prepared beneficiary application to an MAO, which triggers a contractual commission payment pursuant to federal funds the MAO receives from CMS, constitutes a 'claim' for payment under the FCA," and that Relators "need not provide exact billing information in order to plausibly establish that a claim was submitted under the FCA." (*Id.* at 32, 34).

Now, Relators observe that "the undisputed facts establish (1) that Well-Life presented claims (enrollment forms) to Humana enrolling Shikara Defendant patients and (2) that Humana presented claims for payment to the United States for Shikara Defendant patients enrolled by Well-Life." (DE 270 at 5 (quoting DE 269 ¶¶ 130-31)). Neither the Shikara Defendants nor Humana controvert this characterization. (*See generally* DE 319; DE 329). Accordingly, I find there is no triable issue of fact as to whether the Shikara Defendants or Humana[1] presented a "claim" under the FCA. Summary judgment on this narrow question is granted to Relators.

### B. Falsity

The most extensive dispute between the Parties, by far, relates to the question of falsity. Relators have several distinct theories purporting to establish liability for legal falsity: that the

---

[1] Relators' Motion for Partial Summary Judgment is not brought against Defendant United.

MAO Defendants violated the AKS by offering unlawful renumeration in exchange for Shikara "steering" his patients to them, that Defendants falsely certified their compliance with the AKS in submitting their claims for payment, and that Defendants falsely certified compliance with HIPPA and Medicare marketing regulations. Relators move for summary judgment against Humana and the Shikara Defendants on each of these grounds, contending that they establish the element of falsity. All Defendants, conversely, move for summary judgment against each theory.

### i. *Statutory Violations of the Anti-Kickback Statute*

To incur liability under the AKS, a defendant's conduct must: (1) knowingly and willfully ("scienter"); (2) pay[] something of value, directly or indirectly ("renumeration"); (3) to induce the referral of individuals to the defendant for the furnishing of services ("causation"); (4) paid for by a federal health care program ("federal funds"). *See Vernon*, 723 F.3d at 1252. The Parties dispute all but the final element on primarily evidentiary grounds, and so for the reasons above, I will deny summary judgment as to those elements. In so doing, I note that a collective contention raised by Defendants on the element of renumeration merits further discussion, as they argue any payments made to Well-Life were legal under circuit precedent.

The AKS prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration" with the intent to "induce" a referral for services paid for by the federal government. 42 U.S.C. § 1320a-7b(b)(2). However, all Parties agree that CMS regulations allow for compensation in the form of commissions, overrides, and provider payments. 42 C.F.R. § 422.2274(d)–(e); *see id.* § 422.520(b)(2). The Eleventh Circuit has explained that "renumeration" must be assessed in the context of the proffered thing of value: "In a business transaction . . . , the value of a benefit can only be quantified by reference to its fair market value." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019); *see also* 42 U.S.C. § 1320a-7a(i)(6) (defining "renumeration" to include "transfers of items or services for free or for other than fair market value"). Consequently,

"[m]erely paying people for doing [a legitimate job]—even if the rates vary—does not violate the law." *Vargas v. Lincare, Inc*., 134 F.4th 1150, 1161 (11th Cir. 2025).

Placing these principles in focus, Defendants maintain that, to the extent they offered insurance commissions to Well-Life or its agents for marketing the MAOs' MA plans, such payments were legal under applicable regulations, as the quantity paid fell within the "fair market value" for those services. Relators respond by conceding that insurance commissions and overrides are, indeed, ordinarily permitted, and that the amounts at issue here were within appropriate limits. (DE 332 at 2). Instead, however, they argue that because Shikara *owns* Well-Life, and steered his patients to MAOs in exchange for otherwise-lawful commissions, these payments funneled to Shikara through Well-Life constitute unlawful renumeration. They conclude that as "it is illegal for an MAO to pay Dr. Shikara for beneficiary enrollments in a MA plan under the AKS, the fair market value of any payments to Dr. Shikara, either directly or indirectly through Well-Life, for enrollment activities is exactly *zero dollars and 00/100*." (*Id.* at 2-3 (emphasis in original)); *see also* 42 C.F.R. § 422.2266(d)(1) (clarifying applicable restrictions on provider activity).

These contentions present a mixed question of law and fact. That is, the Parties offer competing legal interpretations of the Eleventh Circuit's standard for "renumeration," predicated on competing factual assertions as to Shikara's relationship with Well-Life, as well as the purpose and intent behind the MAOs' commissions. Though I do not resolve the factual questions here, I reaffirm that *if* Shikara is found to have owned Well-Life, commissions paid to Well-Life in order to induce referral activity would be unlawful under the AKS. (DE 187 at 36-37 ("As a matter of common sense, these MAOs cannot backdoor those same patients to their plans by paying Shikara's own insurance agency, knowing full well that he operated it, to avoid liability under the FCA.")). That payments allegedly passed through an insurance agency to Shikara does not somehow transmogrify them into lawful payments under the AKS, which forbids paying

something of value "directly or *indirectly*" to providers for referral activity. 42 U.S.C. § 1320a-7b(b)(2)(A)–(B). As a matter of law, such payments would constitute "renumeration."

The recent Eleventh Circuit case of *Vargas v. Lincare, Inc.*, cited by Defendants, does not counsel otherwise. There, the Eleventh Circuit held that the payment of setup fees to independent contractors did not constitute renumeration under the AKS, even though the contractors allegedly worked with sleep clinicians in prescribing medical devices. 134 F.4th at 1161. In so holding, the court emphasized that "the relators fail[ed] to tie the . . . payments to any actual referrals," and "identify no patient referred by a CFT, no instance in which a CFT influenced a prescribing decision, and no facts showing that CFTs played any role in the referral process." *Id.* Here, Relators allege—and supply sufficient evidence showing—precisely what the Eleventh Circuit found was missing in *Vargas*: patient referrals spurred by otherwise-lawful business activities. As such, I decline to adopt Defendants' reading of the "fair market value" of insurance commissions, as it would, in effect, exempt any renumeration offered to a physician provider, so long as such kickbacks were first filtered through an insurance agency held in the physician's name. Such a reading would frustrate the well-established aims and plain language of the AKS.

Finally, turning to the fourth element, I note that once again, no party disputes that federal dollars were involved in the payments at issue. As with the element of presentment under the FCA, only Relators expressly move for summary judgment on the fourth element under the AKS, of which, again, Defendants make no mention in opposition. (DE 270 at 11 ("Here, Relators do not anticipate Humana or the Shikara Defendants disputing that any remuneration paid came ultimately from the federal funds paid to Humana to manage the healthcare of each enrollee in a Humana MA plan. Accordingly, the undisputed facts establish this element.")); (*see generally* DE 319; DE 329). I therefore find no triable issue of fact as to whether or not Humana and the Shikara Defendants (the only Defendants within Relators' Motion) used federal dollars for the payment of

the alleged kickbacks, and will grant summary judgment for Plaintiff on that narrow question. As to the remainder of the AKS elements, I deny summary judgment for Relators and Defendants.

### ii. False Certification under the AKS

Briefly, I note that Relators have presented two theories of FCA liability related to the AKS. Their main theory, discussed above, involves a statutory violation of the AKS itself. Their secondary theory, however, turns on the purported failure of Defendants to act in accordance with their certification of compliance with the AKS. (DE 270 at 11 (citing *McNutt*, 423 F.3d at 1259-60). As this theory turns on whether Defendants did, in fact, violate the AKS (and thus, break their certification), I will similarly deny summary judgment, as there remain triable issues of fact as to whether or not a violation of the AKS occurred.

### iii. Statutory Violations of HIPPA and Marketing Regulations

Outside of the AKS, the Parties also move for summary judgment on Relators' distinct theory of legal falsity: that Defendants violated HIPPA and CMS regulations by unlawfully using patient data, and soliciting patients to swap their MA plans. It is well-established that MAOs and those operating on their behalf are bound by marketing regulations, which disallow telemarketing calls to potential enrollees or otherwise unsolicited contact. 42 U.S.C. § 1395w-21(j)(1)(A). Providers must also remain neutral when discussing MA plans with their patients and can only provide the names of the MA plans they accept; answer questions about the merits of a MA plan; and refer the patient to external sources or to marketing materials available in common areas. 42 C.F.R. § 422.2266(c). Relators argue Shikara's alleged steering scheme violated any number of these regulations by instructing his insurance agents and physicians to push certain MA plans on his patients, to the benefit of the MAO Defendants. (DE 270 at 12-13). As these alleged breaches of HIPPA and the CMS marketing regulations purely turn on the factual questions of whether and to what extent Shikara and the other Defendants engaged in such steering, I decline to grant

summary judgment for either Relators or Defendants. This matter, like those discussed above, strikes at the heart of the Parties' dispute, which must be resolved at trial.

### C. Scienter

Both the FCA and the AKS require evidence of a breach being both knowing and willful to establish culpability. 31 U.S.C. § 3729(b); 42 U.S.C. § 1320a-7b(b). However, there is a slight difference in this standard as applied to each statute. False claims under the FCA must be submitted with "actual knowledge [that] the information [is false]," or by one either "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Conversely, the AKS requires showing "only that [the] defendant knew that his conduct was generally unlawful, and not that he specifically knew that his actions violated the statute." *United States v. Man*, 891 F.3d 1253, 1268 (11th Cir. 2018); 42 U.S.C. § 1320a-7b(h). Under either standard, however, I find that both sides have presented genuine disputes as to what Defendants knew about Shikara's alleged activities, rendering summary judgment improper. The question of scienter is reserved for trial.

### D. Materiality

All Parties agree that the question of materiality is raised in this matter, as Relators advance theories of legal, not factual, falsity under the FCA. The FCA defines "material" as having a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court has held that materiality is a holistic inquiry that considers many factors. *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192-93 (2016). While none are dispositive, a court may consider factors such as (1) whether the requirement is an express "condition of payment;" (2) to the extent it had knowledge of the misrepresentations, the effect on the government's behavior; and (3) whether the noncompliance was "minor or insubstantial" or instead went to the very essence of the bargain. *Id.* at 194-95; *U.S.*

*ex rel. Bibby v. Mortgage Investors Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021); *accord United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, 115 F.4th 908 (8th Cir. 2024).

The Parties' cross-motions each move for summary judgment on the question of whether Relators' proffered theories of falsity—violation of the AKS, breach of certification pertaining to the AKS, and breach of certification pertaining to HIPPA and CMS marketing regulations—are material under the FCA. I have previously observed that "AKS compliance is an explicit prerequisite to the Government's decision to pay MAOs." (DE 187 at 35 (citing *McNutt*, 423 F.3d at 1259)). Moreover, the allegations underlying the alleged violations of the AKS, HIPPA, and the CMS regulations involve substantial claims of a pay-for-play referral scheme, suggesting that the breaches identified were anything but "minor or insubstantial." *Escobar*, 579 U.S. at 194.

Nevertheless, I hold that the question of materiality is ultimately one for the jury. *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299-1300 (11th Cir. 2021); *United States ex rel. v. Mortgage Investors Corp.*, 987 F.3d 1340, 1352 (11th Cir. 2021) (finding reversible error where district court resolved the question of materiality by weighing conflicting evidence). That a violation of the AKS is a precondition of funding from CMS is potentially instructive. However, the presence or absence of such designation is ultimately not dispositive in assessing materiality. *Escobar*, 579 U.S. at 194 (describing the designation as "relevant, but not automatically dispositive"); *see also Yates*, 21 F.4th at 1300. It is instead evidence of materiality, along with the other evidence proffered, which must be weighed against, for instance, the Government's inaction. On the facts and evidence supplied, a reasonable jury could conclude that any of the three theories were, or were not, material to the Government's ultimate decision to fund the MAO Defendants. I will therefore deny the Parties' motions as to the question of materiality.

## II.        Constitutionality of the False Claims Act

Finally, Defendants move for summary judgment on the constitutionality of the False Claims Act, and the *qui tam* provisions specifically, under Article II. Namely, Defendants cite the Appointments Clause and the Take Care Clause; as to the former, they contend that Relators are acting as "Officers" of the United States without having been appropriately appointed. (*E.g.*, DE 301 at 25 (citing *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019))). Further, as to the latter, they insist that the FCA violates the Take Care Clause by allowing Congress to circumvent the Executive's check, and have its laws enforced by private citizens instead. (*Id.* (quoting *Montcrief v. Peripheral Vascular Assocs., P.A.*, 134 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring))).

I have previously reviewed and rejected Defendants' challenges on constitutional grounds, and find no cause to unseat my prior holding. (DE 187). Defendants justify their attempt to renew discussion of this matter by citing one opinion from the Middle District of Florida, issued several weeks after my observation that "no court has held the *qui tam* provision of the FCA unconstitutional." (*Id.* at 22). This does not change the fact, however, that "[e]very circuit court that has considered the issue outside of the Eleventh Circuit has considered the provision constitutional." (*Id.* (citing *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993))). And with good reason. "For if the First Congress found the mechanism constitutionally appropriate, it would be difficult to justify reaching the opposite conclusion from the very Framers themselves." (*Id.* at 23 (citing *Marsh v. Chambers*, 463 U.S. 783, 790 (1983))). Finally, I reaffirm my prior reading that "the facts of this case, along with the majority of FCA *qui tam* actions, comply with the plain language of sections

2 and 3 of Article II of the Constitution," and the reasoning involved in so holding. (*Id.* at 24). I thereby decline to reverse my original decision on the question of the FCA's constitutionality, and will deny Defendants' request for summary judgment.

## CONCLUSION

The Parties have supplied sufficient evidence to raise genuine issues of material fact on the core questions of this case. However, on certain uncontested questions and legal theories, I find no triable issue of fact, and will thereby grant Relators' Motion for Partial Summary Judgment in part. Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1) Defendants' Motions for Summary Judgment (DE 275; DE 301; DE 303) are **DENIED**.

(2) Relators' Motion for Partial Summary Judgment (DE 270) is **GRANTED IN PART**.

(3) Summary judgment is **GRANTED** for Relators and against the Shikara Defendants and Defendant Humana as to:

    a. Whether the Shikara Defendants and Defendant Humana presented "claims" under the FCA; and

    b. Whether any kickbacks from Defendant Humana to Shikara involved federal funds under the AKS.

**SIGNED** in Chambers at West Palm Beach, Florida this 8th day of August, 2025.

Donald M. Middlebrooks
United States District Judge

CC: Counsel of Record